## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

Farrah Gilot,

            Plaintiff,

    v.                         5:26-CV-152
                                    (BKS/MJK)

St. Joseph Hospital,

            Defendant.

_____

Farrah Gilot, Plaintiff, *pro se*

Mitchell J. Katz, United States Magistrate Judge

## REPORT-RECOMMENDATION AND ORDER

## I.   <u>Introduction</u>

Gilot commenced this action on December 15, 2025 by filing a Complaint against Greyhound Lines, Inc. ("Greyhound") in the United States District Court for the Southern District of New York. (Dkt. 1). Gilot also filed an application to proceed *in forma* pauperis. (Dkt. 2) ("*IFP* Application"). On December 19, 2025, Gilot filed an Amended Complaint naming St. Joseph's Hospital as a Defendant and terminating Greyhound as a party. (Dkt. 4).[1] On January 29, 2026,

_____

[1] On January 2, 2026, Gilot and Greyhound, through its attorney, entered a Stipulation of Withdrawal Discontinuance With Prejudice. (Dkt. 5-1).

United States District Judge Pamela K. Chen directed the Clerk of Court to "correct the caption to reflect St. Joseph's Hospital as the current and only defendant in this matter, and transfer this action to the United States District Court for the Northern District of New York." (Dkt. 7, at pgs. 2-3). On January 29, 2026, the Clerk of Court for the United States District for the Southern District of New York transferred this case to the United States District Court for the Northern District of New York. On February 2, 2006, Chief United States District Judge Brendan K. Sannes deemed this action related to 5:25-CV-1801 (Dkt. 10) which Gilot commenced on December 15, 2025 (5:25-CV-1801, Dkt. 1 in). Also on February 2, 2026, Gilot filed a Notice of Voluntary Dismissal as to action 5:25-CV-1801. (5:25-CV-1801, Dkt. 7)  The Clerk of Court for the United States District Court for the Northern District of New York sent the Amended Complaint and *IFP* Application to the Court for review.

## I.   _**IFP** Application_

Gilot declares in her *IFP* application that he is unable to pay the filing fee. (Dkt. 2). After reviewing Gilot's application, this Court finds that she is financially eligible for *IFP* status.

In addition to determining whether a plaintiff meets the financial criteria to proceed *IFP*, the court must also consider the sufficiency of the allegations set forth in the complaint. *See* 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii). Courts shall dismiss a case, at any time, if they determine that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. *Id.*

When determining whether an action is frivolous, a court must consider whether the complaint lacks an arguable basis in law or in fact. *See Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) and 28 U.S.C. § 1915. Dismissal of frivolous actions is appropriate to prevent abuses of court process and discourage the waste of judicial resources. *See Neitzke*, 490 U.S. at 327; *see also Harkins v. Eldredge*, 505 F.2d 802, 804 (8th Cir. 1974). Courts have a duty to show liberality toward *pro se* litigants and must use extreme caution when ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and has had an opportunity to respond. *See Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000). But courts

must still determine that a claim is not frivolous before permitting a plaintiff to proceed. *See id.* (finding that a district court may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

The Court will now consider the sufficiency of Gilot's Amended Complaint, under the above standards.

## II.    <u>Background</u>

Gilot alleges as follows: "Request medical records pertaining mental and cancer information instead got false information on records violation of HIPPA Laws. Want to sue for damages negligence HIPPA violations." (Amended Complaint, Dkt. 4, ¶ 3).

Gilot seeks monetary damages in the amount of $584,000.

## III. Discussion

### A. The Complaint should be dismissed because the District Court lacks subject matter jurisdiction.

#### 1. 28 U.S.C. § 1331

A plaintiff can exercise federal question jurisdiction when their claim arises "under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. A case arises under federal law if the complaint "establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law." *Bay Shore Union Free Sch. Dist. v. Kain*, 485 F.3d 730, 734-35 (2d Cir. 2007) (quoting *Empire Healthchoice Assur., Inc. v. McVeigh*, 547 U.S. 677, 690 (2006)). Invoking federal jurisdiction without pleading any facts demonstrating a federal law claim, does not create federal subject matter jurisdiction. *See Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182, 1188-89 (2d Cir. 1996).

Gilot alleges federal court jurisdiction under the Health Insurance Portability and Accountability Act ("HIPPA") which prohibits the disclosure of medical records without a patient's consent. *See* 42 U.S.C §§ 1320d-1 to 1320d-7. However, the statute does not create a private

cause of action for individuals to enforce this prohibition. *See Meadows v. United Servs.,* 963 F.3d 240, 244 (2d Cir. 2020); *see also McFadden v. Annucci*, No. 9:25-CV-1252 (AJB/ML), 2025 WL 3265447, at *41 (N.D.N.Y. Nov. 24, 2025). Instead, HIPAA provides for penalties to be imposed by the Secretary of the Department of Health and Human Services. *Id.*; *see also* § 1320d-5(a)(1). By delegating enforcement authority to the Secretary of the Department of Health and Human Services, the statute reflects Congress' intent for HIPAA not to create a private remedy. *See* 42 U.S.C. § 1320d-3, § 1320d-5; *see also Alexander v. Sandoval*, 532 U.S. 275, 290, (2001) ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."). Because HIPAA confers no private cause of action, the District Court lacks subject matter jurisdiction over Gilot's HIPPA claims.

Similarly, Gilot's assertion that she has a claim(s) under 18 U.S.C. § 1305 does not confer the District Court with federal question jurisdiction because that section is a criminal statute for which there is no private right of action. *See Tavares v. New York City of Health &*

*Hosps. Corp.*, No. 13-CV-3148, 2015 U.S. Dist.LEXIS 3815, at *25 fn. 9 (S.D.N.Y. Jan. 13, 2015).

Gilot's claims of "negligence, "abuse," and "[i]nitial misleading lies on medical records" as a basis for federal question jurisdiction are without merit. (Dkt. 1, § IIA).

## 2. 28 U.S.C. § 1332

In addition to federal question jurisdiction, federal court jurisdiction can be invoked under 28 U.S.C. § 1332, where a plaintiff alleges that they and the defendant are citizens of different states. *See Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 388 (1998). For diversity purposes, "a corporation is a citizen of both its state of incorporation and its principal place of business." *Powell v. Ocwen Loan Servicing, LLC*, 2024 WL 763406, at *2 (2d Cir. 2024). Further, to establish diversity jurisdiction, a plaintiff must allege to a "reasonable probability" that the claim is more than the sum or value of $75,000.00, the statutory jurisdictional amount. *See* 28 U.S.C. § 1332(a); *see also Colavito v. N.Y. Organ Donor Network, Inc.*, 438 F.3d 214, 221 (2d Cir. 2006) (citation and internal quotation marks omitted).

Because St. Joseph's Hospital, which has its principal place of business in the Northern District of New York (Syracuse, New York), and Gilot, who lives in Brookly, New York, are not citizens of different states, there is no diversity of citizenship. And because there is no diversity of citizenship, the District Court lacks subject matter jurisdiction over Gilot's claims.

Gilot cannot sustain her burden of proving by a preponderance of the evidence that the District Court has subject matter jurisdiction over her claims. *See Pina v. United States*, No. 20-CV-1371, 2021 WL 2019003, at *3 (S.D.N.Y. Apr. 20, 2021) (citations omitted). The Court therefore recommends that the District Court dismiss the Complaint without prejudice.

## IV. **Leave To Amend**

"Generally leave to amend should be freely given, and a *pro se* litigant in particular should be afforded every reasonable opportunity to demonstrate that he has a valid claim." *Matima v. Celli*, 228 F.3d 68, 81 (2d Cir. 2000) (cleaned up). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v.*

*Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). "[L]ack of subject-matter jurisdiction is generally viewed as a substantive defect." *Planck v. Schenectady Cnty.*, No. 1:12-CV-0336 (GTS/DRH), 2012 WL 1977972, at *6 (N.D.N.Y. June 1, 2012).

Mindful of Gilot's *pro se* status, the Court recommends granting Gilot leave to amend. A second amended complaint, which shall supersede and replace the amended complaint in its entirety, must allege claims of misconduct or wrongdoing against the named defendant which Gilot has a legal right to pursue, and over which jurisdiction may properly be exercised. If Gilot files a second amended complaint, she must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.

## V.    <u>Conclusion</u>

**WHEREFORE**, based on the findings above, it is hereby

**ORDERED** that, Gilot's motion to proceed *in forma pauperis* (Dkt. 2) is **GRANTED**, and it is further

**RECOMMENDED**, that Gilot's Amended Complaint be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND**, and it is further

**ORDERED** that the Clerk provide Gilot with a copy of this Report-Recommendation and Order, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*), and it is further

**ORDERED**, that the Clerk mail Gilot an additional copy of the *pro se* handbook.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[2] Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW</u>**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: February 4, 2026.

                                  _____
Hon. Mitchell J. Katz
U.S. Magistrate Judge

---

[2] If you are proceeding *pro se* and are served with this Report-Recommendation and Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Report-Recommendation and Order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

2025 WL 3265447
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert MCFADDEN, Plaintiff,

v.

Anthony J. ANNUCCI, et al., Defendants.

9:25-CV-1252 (AJB/ML)
|
Signed November 24, 2025

**Attorneys and Law Firms**

ROBERT McFADDEN, Plaintiff, pro se, 14-B-3670, Mid-State Correctional Facility, P.O. Box 2500, Marcy, NY 13403.

**DECISION and ORDER**

ANTHONY J. BRINDISI, United States District Judge

**I. INTRODUCTION**

**\*1** The Clerk has sent to the Court for review a complaint submitted by pro se plaintiff Robert McFadden asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983"), together with an application to proceed in forma pauperis ("IFP") and a motion for injunctive relief. Dkt. No. 1, Dkt. No. 1-1, Dkt. No. 1-2, Dkt. No. 1-3, Dkt. No. 1-4, Dkt. No. 1-5, Dkt. No. 1-6, Dkt. No. 1-7, Dkt. No. 1-8 (collectively, "Compl.");[1] Dkt. No. 3 ("IFP Application"); Dkt. No. 2 ("First Motion for Injunctive Relief").[2] Plaintiff, who is incarcerated at Mid-State Correctional Facility, has not paid the filing fee for this action.

[1]   The complaint is 360 handwritten pages. Based on the size of the filing, the complaint is comprised of nine docket entries. Page citations herein refer to the entirety of the pleading, as opposed to the docket number on which the referenced page appears. By way of example, page 38 of the complaint appears at Dkt. No. 1-1 at 1, and is cited herein as page 38.

[2]   On October 1, 2025, the Court received an identical copy of the First Motion for Injunctive Relief, which is separately docketed as a Motion for Preliminary Injunction/Restraining Order. *See* Dkt.

No. 11 ("Second Motion for Injunctive Relief"). For the sake of clarity, the Second Motion for Injunctive Relief is denied as duplicative of the First Motion for Injunctive Relief.

**II. IFP APPLICATION**

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein,* No. 09-CV-1922, 2010 WL 5185047, at \*1 (S.D.N.Y. Oct. 26, 2010).[3] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id.* (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir. 2010)).

[3]   Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

Upon review, the Court finds that plaintiff has submitted a properly completed and signed IFP Application along with an inmate account statement showing his prison balance over the preceding six months, which, together, demonstrate economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization form required in this District. Dkt. No. 4. Accordingly, plaintiff's IFP Application is granted.

**III. SUFFICIENCY OF THE COMPLAINT**

**A. Governing Legal Standard**
**\*2** Section 1915(e) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) ... the court shall dismiss the case at any time if the court determines that – ... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28

U.S.C. § 1915(e)(2)(B). [4] Thus, even if a plaintiff meets the financial criteria to commence an action in forma pauperis, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint that he filed in this District before the court may permit the plaintiff to proceed with this action in forma pauperis. *See id.*

[4]     To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution ... in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id.* (internal quotation marks and alterations omitted).

**B. Summary of the Complaint**

**\*3** The complaint, which is comprised of 360 handwritten pages, asserts allegations of wrongdoing by over 130 defendants arising out of plaintiff's incarceration at Mid-State Correctional Facility between July 2022 and the present, while in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Compl. The following facts are set forth as alleged in the complaint. [5]

[5]     Plaintiff originally submitted 264 pages of exhibits with his complaint. Dkt. Nos. 1-11, 1-12, 5, 5-1, 6, 6-1. Over roughly the next two weeks, the Court received approximately 70 pages of additional exhibits from plaintiff. *See* Dkt. Nos. 7, 8. One week after that, the Court received a second copy of the complaint, along with 870 pages of exhibits from an attorney representing plaintiff in another pending case. *See* Dkt. Nos. 10 thru Dkt. No. 10-36. Some of these exhibits overlap with the exhibits filed with the complaint. After this filing, plaintiff submitted over 250 pages of additional exhibits in support of his complaint and Motion for Injunctive Relief. *See* Dkt. Nos. 12, 13, 14, 15, 16, 17, 18. It is both burdensome and a waste of precious judicial resources to ask a court to sift through hundreds of pages of exhibits filed piecemeal, and with duplicates. Nonetheless, the Court has considered plaintiff's filings in connection with its sufficiency review herein.

**1. Plaintiff's Past Confinement History**

In August 2019, plaintiff was transferred to Mid-State Correctional Facility and placed in the Step-Down Program,

which is "a special housing unit program for excessive disciplinary sanctions ... for problematic prisoners[.]" Compl. at 24. On August 17, 2019, defendant Corrections Officer Annarino conducted an inventory and property review of plaintiff's belongings to identify "in-cell permitted items." *Id.* Defendant Annarino signed the inventory sheet and plaintiff's "non-permitted items were bagged [and] sealed then placed in temporary storage" pursuant to prison rules. *Id.* at 25. Thereafter, defendant Annarino authored a "partially" false misbehavior report against plaintiff, which "set the stage for a chain of [negative] events[.]" *Id.*

At some point thereafter, defendant Deputy Superintendent of Programs Fischer "had plaintiff removed" from Mid-State Correctional Facility based on "unsafe conditions" and threats made against plaintiff. Compl. at 25. In or before 2021, plaintiff wrote to defendant then-acting Director of Special Housing Venettozzi to request that he "not be returned to Mid-State Step Down Program ... due to the 2019 events[.]" *Id.* at 26. Plaintiff also "corresponded with" defendant Deputy Commissioner of Programs McCoy to raise the "same concerns" and "request[ ] a different program[.]" *Id.* at 26-27.

On March 31, 2022, the "HALT Act ... took effect[,]" placing "limits on confinement sanctions[,]" "redefin[ing] 'Segregated Confinement[,]' " and imposing "broad humane measures" on the treatment of certain prisoners. Compl. at 27-28.[6] At the time, plaintiff was incarcerated at Fishkill Correctional Facility "recovering from a serious seizure [and] related injuries to [his] body[,] leg [and] speech." *Id.* at 28. Plaintiff was also "being treated for" (1) food allergies requiring a very strict restricted diet[,]" (2) seizures, (3) a spine condition for which he was prescribed pain medication, a back brace, and physical therapy, (4) certain digestive problems, and (5) Post Traumatic Stress Disorder for which he was prescribed Tegretol. *Id.* at 28-31.

[6]  The Humane Alternatives to Long Term Solitary Confinement Act ("HALT Act") is "a New York State law, which took effect on March 31, 2022, and amends the standards in N.Y. Corr. Law § 137 governing treatment, control, and discipline at correction facilities[.]" *Rivera v. Molina*, No. 23-CV-4128, 2023 WL 4847865, at *4-5 (S.D.N.Y. July 27, 2023); N.Y. Correct. Law § 137(6). Among other things, the law limits segregated confinement [footnote omitted] to fifteen consecutive days and twenty days within any sixty-day period. *See* N.Y.

Correct. Law § 137(6)(i); *New York State Corr. Officers & Police Benevolent Ass'n, Inc. v. Hochul*, 607 F. Supp. 3d 231, 236 (N.D.N.Y. 2022).

**\*4**  In light of the changes to the law and plaintiff's conditions, defendants McCoy, former DOCCS Commissioner Annuci, and new Acting Director of Special Housing Rodriguez were "mandated" to "place [plaintiff] in a special population unit" at a different prison. Compl. at 31-32. Instead, these officials allowed plaintiff to remain in a Residential Rehabilitation Unit at Fishkill Correctional Facility until July 8, 2022. *Id.* at 32.

On or about July 8, 2022, defendant McCoy approved plaintiff's transfer back to Mid-State Correctional Facility, and defendant Venettozzi, who was working at Mid-State Correctional Facility as the First Deputy Superintendent, "disregarded the clear safety concerns" to plaintiff and, along with defendant Mid-State Superintendent Passage, "allowed [him] to be returned to Mid-State" by accepting his transfer to the facility. Compl. at 27, 32, 34. The transfer also occurred based on the failure of defendants Rodriguez, Annucci, and McCoy to adopt and implement alternative housing requirements as set forth in the HALT Act. *Id.* at 32-33. Despite the passage of time since plaintiff was last housed at this facility, "a lot of [the same] staff [members were] still working the Step-Down Program's housing unit," including defendants Fischer, Deputy Superintendent of Security Burns, Annarino, and Corrections Officer Matlock, all of whom were aware of the "constant group attacks [and] harassment" that plaintiff experienced in 2019. *Id.* at 27.

At some point after plaintiff was returned to Mid-State Correctional Facility, defendant Daniel J. Martuscello, III became the Acting DOCCS Commissioner. Compl. at 35. However, this official "did not stop the unlawful [and] illegal practices" related to plaintiff's confinement conditions. *Id.* Instead, plaintiff "remained [and] still remains in the Step-Down Program, with even more additional physical disabilities[.]" *Id.*

At some point in 2023, defendant Passage retired, and defendant Hilton became the Superintendent of Mid-State Correctional Facility. Compl. at 35, 39. However, this official also "did not stop the illegal practices" that deprived plaintiff of "his rights under [the] HALT Act" to be "placed in a special population unit[.]" *Id.* at 35-36.

From 2022 to the present, plaintiff "has amassed several life threatening new diagnos[e]s" and been deprived of treatment

for these conditions. Compl. at 36-37. Plaintiff has filed "uncountable grievances" with defendant Inmate Grievance Program Supervisor Tapia regarding his medical concerns and appealed the denial of those grievances to defendant Passage while he was Superintendent, and thereafter to defendants Hilton and Director of Inmate Grievance Program Rachel Seguin. *Id.* at 37-38. Plaintiff has also verbally complained to defendants Passage and Hilton about the "medical torture [and] abuse" he has experienced when these officials made "weekly rounds" in plaintiff's housing area. *Id.* None of these officials took any action to address plaintiff's worsening condition. *Id.*

### 2. Medical Issues

Upon arriving at Mid-State Correctional Facility on or about July 8, 2022, defendant Primary Care Provider C. Hayes "confiscated ... creams [and] shampoos" prescribed to plaintiff by a Dermatologist to address skin rashes, "without any examination whatsoever." Compl. at 40. Plaintiff had been using these medications since 2017, when he "had a[n] allergy attack [and] was hospitalized overnight[.]" *Id.* Plaintiff "also spoke to defendant Hayes about the symptoms that would soon happen without the creams [and] shampoos[.]" *Id.* at 41. Nonetheless, defendant Hayes "refused to provide the medications[,]" which plaintiff remained without for thirteen days. *Id.* at 40-41. Defendant Hayes informed plaintiff that he needed to be seen by the facility's provider, defendant Nurse Administrator Czerwinski, before he would receive any prescribed medications, without providing a date for plaintiff to be seen. *Id.* at 41-42.

**\*5** Beginning in 2016, plaintiff was also "medically prescribed a Special Diet Order" to address "mandatory diet restrictions[.]" Compl. at 40. Plaintiff "explained" these facts to defendant Hayes and requested that "the Special Diet Order ... be filled [out] by medical staff" and "follow up with food services in order for [him] to receive the correct meals[.]" *Id.* Defendant Hayes "confirmed the allergen order through medical services [and] filled out the mandated paperwork [and] sent food services staff a copy of that medical diet." *Id.* at 40-41. Plaintiff also signed for the medical diet. *Id.* at 41.

Plaintiff's "medical diet order was provided to defendant FSA Deck, who had control over Food Services [and] related matters [and] operations." Compl. at 41.

Following intake, plaintiff wrote to defendant Czerwinski "about all medications being confiscated with no exam or consult." Compl. at 42. Defendant Czerwinski did not respond to plaintiff's letter. *Id.*

Roughly ten to twelve days after plaintiff arrived at Mid-State Correctional Facility, rashes, bumps, skin tearing, and open sores "began to reappear" on his body. Compl. at 5. These symptoms "rapidly got wors[e] each day as the disruption continued with [his] medications." *Id.* Plaintiff "continued to fill out sick calls." *Id.*

On July 20, 2022, plaintiff "was seen" by defendant Primary Care Provider Dr. Mohammed, who visited plaintiff at his cell door with two other corrections officials. Compl. at 42-44. As a result of "the extremely loud housing unit activity," defendant Mohammed spoke "loudly ... about [plaintiff's] seizures [and] the symptoms of [his] groin rash in a[n] agitated manner." *Id.* at 42-43.

Plaintiff "requested to be examined in the medical office[,]" which was in "very close proximity to [his] cell[.]" Compl. at 43. Defendant Mohammed denied plaintiff's request. *Id.* During this exchange, "several other prisoners ... began making lewd, vulgar, [and] insulting remarks" directed at plaintiff's medical conditions. *Id.*

At some point, defendant Mohammed "asked [and] demanded to see [plaintiff's] groin rash only." Compl. at 44. "Plaintiff then exposed himself to [defendant Mohammed and] the security staff ... with her." *Id.* Based on the height difference between plaintiff and defendant Mohammed, "the height of the window [and] stains/scratches on the window, showing her was not even meaningful or possible due to her inability to see the areas [at issue]." *Id.*

After attempting to examine plaintiff, defendant Mohamed stated that his condition was "only dry skin" and left before plaintiff could show her other outbreak areas on his body or "address medications." Compl. at 44. As a result of not having his medications re-ordered, plaintiff continued to experience bleeding rashes and open sores that burned and itched, causing discomfort and difficulty sleeping. *Id.* Plaintiff "continued to file sick calls requesting the dermatology creams [and] shampoos be reissued[,]" and "new eye glasses[,]" and "for food services to be contacted about [not providing him] the medical diet for allergens[,]"

but it still took "over two weeks" to resolve these issues. *Id.* at 45.

On or about August 8, 2022, plaintiff "filed a sick-call form with defendant Hayes requesting to review his medical files, receive medications confiscated upon arrival, [and] new eye glasses." Compl. at 42. Plaintiff provided defendant Hayes with his "broken pair of glasses at that time." *Id.*

On August 11, 2022, plaintiff met with defendant Primary Care Provider Ferguson at his cell "about medications being stopped." Compl. at 45. Defendant Ferguson spoke to plaintiff "loudly[,]" and in the presence of "security officers." *Id.* Defendant Ferguson "denied plaintiff's request for a[n] exam/ meeting in the medical station" and instead "continued to broadcast [plaintiff's] medical matters [and] concerns." *Id.* After some time, defendant Ferguson "looked at the rashes [and] bumps" on plaintiff's body and "reordered the Kenalog (steroid cream) that defendant Mohammed refused [and] discontinued." *Id.* Defendant Ferguson "also placed a request for another Dermatology consult with the specialist outside of the prison." *Id.*

*6 "Despite [plaintiff's] very clear need" for the medications that he had been without for "over 30 days[,]" defendant Ferguson "still reduced the previous order from twice daily to once per day" and "did not reorder the head [and] facial shampoos" previously prescribed. Compl. at 46. Thereafter, plaintiff's symptoms "increased because of the[ ] interferences [and] disruptions [and] denials." *Id.* Plaintiff then "filed another grievance [and] wrote to ... defendant Czerwinski about the problem [and] to request medical files again [and] ... eye glasses." *Id.*

After not receiving a response to his letter, plaintiff "addressed a sick call" to defendant Czerwinski, which he delivered to defendant Hayes, who shared an office with defendant Czerwinski. Compl. at 46-47. By October 2022, plaintiff "had filed an unknown amount of sick-calls [and] grievances on the medical staff[,]" with "no relief ever provided[.]" *Id.* at 47.

On October 24, 2022, plaintiff "was formally approved" for the "Religious Allergen Free Diet." Compl. at 53. However, defendant Mohammed "refused to terminate the medical diet order[,]" which prevented plaintiff from "starting the Religious Allergen Free Diet." *Id.*

"By November 7, 2022, the plaintiff was filing grievances that named defendant[s] Mohammed, ... Czerwinski, ... [and] Passage in each complaint." Compl. at 48. As of this date, plaintiff had filed "sick calls [and] daily complaints for 20 consecutive days" based on "stomach pains [and] the associated symptoms with an abnormal digestive system[.]" *Id.* Defendant Czerwinski "allowed months [and] months to pass without even searching for [plaintiff's] medical file" or "assess[ing]" plaintiff's condition. *Id.* at 49.

Around this same time, defendant Mohammed "stopped [plaintiff's] pain meds, then changed them after a prolonged delay, knowing plaintiff had chronic back [pain,] ... a brace, and a tens unit" and "knowing plaintiff was not being allowed to attend the physical therapy sessions order[ed.]" Compl. at 50-51. Defendant Mohammed also deprived plaintiff of the "medication [and] equipment" he needed for "pain management" and "stopped the plaintiff's seizure medications abruptly" based on bloodwork results, without arranging for prompt review by a specialist. *Id.* at 51. As a result, plaintiff went over a year without seizure medications previously prescribed to him, and throughout this time, defendant Mohammed "did nothing but allow the plaintiff to physically deteriorate[.]" *Id.*

On or around November 8, 2022, plaintiff filed a grievance against defendants Passage, Tapia, Deck, and Mohammed "for collusion to deprive the plaintiff of the Religious Allergen Free Kosher Diet" and causing him to miss "42 Kosher meals." Compl. at 54.

At some point in 2023, defendant Primary Care Provider Dr. Abdelwahab "replac[ed] defendant Mohammed." Compl. at 52. This official also "refused to reorder [plaintiff's] seizure meds, medical boots, [and] knee brace," refused to schedule plaintiff for back and knee scans, and refused to "ensure [plaintiff's] Hematology appointment was scheduled promptly[,] urgently[,] [and] correctly." *Id.* Defendant Abdelwahab also "refused to follow DOCCS Health Service Policy 1.24A" regarding pain management and stopped one pain medication to "prescribe another ... which had been medically proven to cause stomach problems [and] blood clotting" in plaintiff. *Id.* In addition, defendant Abdelwahab "refused to provide anything for the blood problem, pain problems, weight loss, or eye glasses" and, as with defendant Mohammed, "refused to sign the mandatory forms that would allow the plaintiff to terminate the medical diet order [and] restart the Religious Allergen Free Kosher Diet." *Id.* at 53.

**\*7**  From late 2022 through the summer of 2023, defendant Primary Care Provider Paladino "regularly delayed refills for [plaintiff's] pain [and] stomach meds, derm. creams, tens unit battery replacements, tens unit patches [and plaintiff's] access to medical files[.]" Compl. at 59. This official also intentionally failed to file plaintiff's health proxy paperwork, which plaintiff "handed to her" during medical rounds. *Id.* Defendant Czerwinski also failed to file this healthcare proxy, which plaintiff separately provided to her. *Id.*

On May 8, 2023, at approximately 6:15 a.m., defendant Corrections Officer Hoffman notified plaintiff that he was scheduled for a medical trip and asked if plaintiff wished to attend. Compl. at 57. Plaintiff "affirmed he was going" and stated that he "need[ed] breakfast." *Id.* Defendant Hoffman left the area and indicated she would relay his response. *Id.* Roughly thirty minutes later, defendant Corrections Officer LaCoppola arrived at plaintiff's cell with the same inquiry as defendant Hoffman. *Id.* Plaintiff told this official the same things. *Id.*

Roughly fifteen minutes later, defendant Christopher Hayes arrived at plaintiff's cell and indicated that he was informed that plaintiff "was refusing the medical trip." Compl. at 57. Plaintiff responded that he "did not say that[,]" repeated his desire to attend the trip, and requested breakfast. *Id.* Defendant Hayes "replied that [plaintiff] was already late [and] could get a bag lunch[.]" *Id.* Plaintiff advised defendant Hayes that he could not eat the bag lunch meal option because of his allergies, and that his "Special Diet Meal was already downstairs with all the other breakfast meals" as "nobody" had eaten at this point. *Id.* at 57-58. Defendant Hayes stated that he would check on the matter but never returned. *Id.* at 58. Plaintiff later learned that defendant Hayes left the building. *Id.*

Roughly ten minutes later, defendants Corrections Officer Harris and Nurse Jane Doe "came around for meds." Compl. at 58. Plaintiff spoke with these officials about his medical trip, and defendant Harris stated that she would "look in to it." *Id.* Neither official ever returned. *Id.* Plaintiff later spoke with defendants OMH Social Worker Russell and Corrections Sergeant Mayo "about the problem" with defendant Hayes. *Id.*

Later that day, plaintiff filed a grievance, which defendant Tapia denied on the grounds that plaintiff was scheduled for a legal call and medical appointment at overlapping times. Compl. at 59. The Inmate Grievance Review Committee

and defendant Tapia refused to review the recording of plaintiff's interactions with defendant Hayes. *Id.* Defendant Hilton subsequently affirmed the denial of the grievance and also refused to review the aforementioned recording. *Id.*

In or around June 2023, plaintiff "went to the medical unit for a[n] endoscopy/colonoscopy prep ... after x-rays revealed air in [his] stomach" and other complications. Compl. at 59. Plaintiff spoke with defendant Paladino and Offender Rehabilitation Coordinator ("ORC") Brown regarding his healthcare proxy. *Id.* at 59-60. Defendant Paladino ignored plaintiff's request to ensure that the completed form was in his records, and defendant Brown "refused to allow plaintiff to file another ... form" despite confirming that it was not in his files. *Id.* at 60. As a result, plaintiff underwent "a very serious medical procedure" without a healthcare proxy form on file. *Id.*

On or about July 19, 2023, plaintiff met with defendant Abdelwahab at his cell about his grossly swollen" knee and back pain. Compl. at 57. After speaking with plaintiff, defendant Abdelwahab denied his request for an MRI, pain medication, and a knee brace or compression sleeve. *Id.* at 57-58.

**\*8**  On August 7, 2023, defendant Corrections Officer Rosario arrived at plaintiff's cell to transport him for a medical trip. Compl. at 57. Plaintiff "confirmed that he wanted to attend the medical appointment" and "requested to speak [with] a supervisor or medical staff because [his] last medical trip ... was intentionally manipulated" such that upon plaintiff's arrival to the medical facility, he was told that his appointment had been canceled. *Id.* at 57-58. Nobody ever met plaintiff at his cell, and his trip apparently never happened. *Id.*

By August 10, 2023, plaintiff had continuously filed grievances detailing his inadequate medical treatment. Compl. at 57. Defendant Tapia did not process plaintiff's grievances related to his healthcare proxy and other "health problems" until receiving his detailed grievance "on medical torture" on August 10, 2023. *Id.* at 60-61. Plaintiff appealed defendant Tapia's denial of this grievance to defendant Hilton, who "denied the actions plaintiff requested therein." *Id.* at 61-62.

On or around August 28, 2023, defendant Schrader "replac[ed] defendant Abdelwahab as plaintiff's primary care provider." Compl. at 56, 62, 64. As with past changes to

plaintiff's primary care provider, this change "came with instant disruptions to prescriptions, refills, equipment, exams, [and] medical files[.]" *Id.* at 56.

Between the spring and summer of 2023, defendant Nurse Aiken was responsible for collecting plaintiff's sick call slips during medical rounds, "relaying medical matters" raised in those sick calls slips to defendant Schrader, and scheduling defendant Schrader's meetings and exams with inmates. Compl. at 63. On a daily basis, plaintiff showed defendant Aiken "visible swelling" on parts of his body. *Id.* "[A]fter visualizing all the gross swelling to plaintiff's knee, legs, [and] feet" on August 28, 2023, defendant Aiken told plaintiff that he was scheduled to see defendant Schrader in two days. *Id.* at 64. However, on August 30, 2023, defendant Schrader "refused" to visit plaintiff's housing unit "due to the yelling, screaming [and] banging on doors all around plaintiff's cell location." *Id.*

Defendant Aiken then advised plaintiff that he would be seen by defendant Schrader on September 6, 2023. Compl. at 64. However, when that day arrived, defendant Schrader again refused to visit plaintiff's housing area "for the same reasons, according to Aiken." *Id.* "This became a pattern of delays, from this point" to the filing date of the complaint. *Id.*

On September 13, 2023, defendant Schrader visited plaintiff's cell and "loudly" listed his health conditions "for the entire housing gallery ... to hear[.]" Compl. at 62-63. Although plaintiff had swelling throughout his body for over a year, defendant Schrader refused to examine him, and denied his request for medical boots, compression socks, a knee brace, medication for his back, knee, leg, and foot pain, and an MRI. Compl. at 63.

Thereafter, plaintiff submitted a grievance regarding inadequate medical treatment, which resulted in defendant Schrader informing him that "medical records indicated [plaintiff was] refusing medical trips [and] failing to attend." Compl. at 65. Plaintiff informed defendant Schrader that the entries were false, that "nobody showed up for the trip, or with a refusal form to be signed," and that his medical trips were being scheduled on the same dates that he had prescheduled legal calls, meetings, and court dates in order to prevent him from attending these appointments. *Id.* at 65-66.

**\*9** Plaintiff filed grievances against defendants Czerwinski, Aiken, Schrader, Health Services Director Chaudry, Social Worker Kallay, Nurse Dana, and Nurse Surgey related to the

scheduling of his medical trips and legal matters on the same dates and times, including on May 8, May 16, May 19, May 30, June 3, June 6, and June 12, 2023. Compl. at 66, 70. Plaintiff also wrote letters, emails, and made verbal complaint to defendants Assistant Deputy Superintendent of Mental Health Jennifer Christopher, Candy Hayes, Paladino, Dana, Hilton, Fischer, Harris, Storey, Fish, Kallay, Dorchester, Perham, Czerwinski, Schrader, Penree, Chaudry, Clapper, Abdelwahab, Schiavi, Nurse Practitioner Tourtelot, Costello, Yaddow, Ross, Hall, Klien, Mayo, Chandler, Hamilton, Dundden, Johnson, Carpenter, Bishop, and Murphy about this issue. *Id.* at 70-71.

On October 3, 2023, plaintiff attended an initial Hematology appointment more than twelve months after it was first scheduled. Compl. at 72. Corrections Officer Lacoppola "was given plaintiff's medical file, put together by defendants Chaudry, Czerwinski, [and] Schrader ... based on chain of command [and] customs previously explained by defendant[s] Dana, Clapper, Candy Hayes, Banks, [and] Brown[.]" *Id.* Upon arriving at the outside facility and meeting with a specialist, plaintiff was advised that no "labs [or] reports" were included in his medical file, and that bloodwork needed to be taken. *Id.*

On or about October 8, 2023, "seventeen tubes of blood" were "taken from the plaintiff, who was then diagnosed with Leukopenia [and] Thrombocytopenia[.]" Compl. at 72-73. Thereafter, plaintiff's follow-up appointments were repeatedly "botched[,]" resulting in a continued decline in plaintiff's condition. *Id.* at 73. At some point, after additional bloodwork, a specialist diagnosed plaintiff with iron anemia and "recommended iron pills, multi-vitamins" and improved nutrition. *Id.* However, defendant Schrader "refused to follow the recommendations for nutrition" from that point through the filing date of the complaint, resulting in plaintiff's loss of 60 pounds. *Id.*

In January or February 2024, defendants Schrader and Penree examined plaintiff privately, during which time defendant Schrader "stated that she was filling out the mandatory DOCCS Policy Chronic Pain Management forms[,] ... ordered an MRI for [plaintiff's] grossly swollen knee[,]" promised to "adjust [plaintiff's] pain meds to Gabapentin after [his] next Hematology consult[,]" and prescribed plaintiff medical boots and a pill for reducing inflammation. Compl. at 74-75. Defendant Schrader also prescribed plaintiff Tylenol despite knowing about plaintiff's "blood problems" and "refused to change" the prescription after plaintiff "mentioned

the side effects" as the reason why the prescription was "previously stopped." *Id.* at 75. In addition, defendant Schrader "refused to change" plaintiff's pain medication order despite knowing the prescribed medication was causing him stomach pain. *Id.*

As a result of a negative reaction to one or more of the prescribed medications, plaintiff experienced digestive issues and lost "at least 10 pounds in under 30 days[.]" Compl. at 76.

In or around "March/April" of 2024, defendant Schrader "had the plaintiff sent to the Orthopedic, who gave [him] a knee injection of cortozone after x-rays [and] exams" and "requested the MRI" for further evaluation. Compl. at 77. Plaintiff was eventually scheduled for an MRI on June 5, 2024, which revealed various structural deficiencies. *Id.*

On August 28, 2024, plaintiff's scheduled follow-up appointment with the Orthopedic "was intentionally botched" by defendants Chaudry, Czerwinski and Schrader, who "gave the wrong address on the itinerary provided to the CERT escorts[,]" defendants Corrections Sergeant Walker and Corrections Officer Henry. Compl. at 77. Eventually, plaintiff arrived at the Cayuga Medical Center for his appointment, but the "necessary" medical records were omitted from his file by defendants Schrader, Czerwinski, and Chaudry. *Id.* at 77-78. As a result, the specialist "was unable to review [plaintiff's] MRI results to determine the corrective surgery procedure necessary," and instead had to reschedule the appointment. *Id.* at 78.

 **\*10** As of April 2025, plaintiff's Orthopedic appointment had yet to be scheduled despite him sending "numerous emails [and] letters" to defendants Chaudry, Czerwinski, Schrader, Hilton, Fischer, Storey, and Harris. Compl. at 78. Plaintiff also "spoke to [and] filed sick calls [and] grievances with [and] against defendant Penree" regarding this issue. *Id.*

During the same time that plaintiff was seeking treatment for his knee, he was denied "self carry meds," "nutritional supplements" and "proper pain management [treatment and] medications" by defendants Czerwinski, Schrader, Penree, Hilton, Storey, Chaudry, Bishop, and Jennifer Christopher. Compl. at 79. Plaintiff detailed his "chronic pain problems" and other medical conditions in grievances and sick call requests, yet defendant Schrader "never followed the course of care" discussed with plaintiff during his private evaluation with her in January or February 2024. *Id.* 80. Plaintiff also "continued to ask for physical therapy[,]" which was "denied

based on malice" by defendants Christopher Hayes and Candy Hayes. *Id.* at 80-81.

Refills of certain medications prescribed to plaintiff were also "delayed by weeks at a time on a habitual pattern once per month" by defendants Penree and Schrader, in response to plaintiff repeatedly filing grievances and complaints. Compl. at 81-82. On June 3, 2024, defendant Penree personally witnessed plaintiff's adverse skin condition, including irritation and discoloration on his face that "can only best be described as chemical burns[,]" which this official "blamed ... on the commissary soap" without providing any treatment. *Id.* at 83.

On June 4, 2024, corrections officials denied plaintiff's request for medical treatment during an escort back to his cell. Compl. at 83-84. After plaintiff returned to his cell, defendant Area Supervisory Chandler arrived to collect the handcuffs used during the escort. *Id.* at 84. Plaintiff explained to this official that he was in need of medical treatment, showed this official his injuries, and stated that "the cuffs needed to stay" so they could be used to escort him to medical. *Id.* Plaintiff further stated that he was not refusing to return the handcuffs, but that he was "being refused medicine [and] treatment." *Id.* In response, defendant Chandler threatened to assault plaintiff if he did not return the handcuffs then left the area. *Id.*

At approximately 3:30 p.m., defendants Corrections Officers Mazzone, Manson, and Hamilton "gave out the dinner trays [and] refused to take the handcuffs back [from plaintiff] and feed [him.]" Compl. at 84-85. Although plaintiff's skin condition continued to worsen, which he showed defendants Penree, Surgey, and Clapper, these officials refused to provide him with "medical skin cream" or arrange for him to be seen by defendant Schrader for roughly one month. *Id.* at 85.

On June 26, 2024, plaintiff "also had another seizure in the middle of the night" and experienced "extreme nerve [and] muscle pain ... down [his] back [and] legs." Compl. at 86. Defendant Nurse Jane Doe #1 visited plaintiff at his cell and "did nothing." *Id.*

On July 2, 2024, defendants Corrections Officers Smalls and Costello "forced" plaintiff to walk up "no less than 25-30 stairs" for a meeting with defendant Tourtelot despite plaintiff informing these officials of his leg, knee, and foot problems and "stability issues" and the availability of an elevator. Compl. at 86-87. Plaintiff then met with defendant Tourtelot, who "terminated [his] mental health medication," which also

helped prevent seizures. *Id.* at 87. Plaintiff asked defendant Tourtelot why she was terminating the medication, which he had been taking since 2016 with only "minor [and] brief pauses[,]" and she responded, "because I am." *Id.* at 87-88.

**\*11** During this time, defendants Chaudry, Czerwinski, Schrader, Christopher, Storey, Mosher, and Tourtelot were meeting weekly to discuss the medical treatment of prisoners, including plaintiff, and the medications ordered for these individuals. Compl. at 87. Following plaintiff's meeting with defendant Tourtelot, defendants Smalls and Costello returned to escort plaintiff back to his cell. Compl. at 88. As these officials "tr[ied] to guide the plaintiff toward the stairs" with his hands cuffed behind his back, plaintiff told them that he could not walk down stairs without holding a railing. *Id.* After defendants Smalls and Costello "insisted on the stairs[,]" plaintiff asked for a supervisor and was placed "in the area of the elevator." *Id.* at 88-89.

Thereafter, defendants Corrections Officer Ross and Corrections Sergeant Ferrone arrived at the scene with other unknown officials and defendant Costello yelled at plaintiff, called him names and expressed a desire to throw him down the stairs. Compl. at 89. Defendant Ferrone then told defendant Ross to "take over the escort" and "insisted" that plaintiff take the stairs, stating that prisoners were "no longer allowed to ride the elevator[.]" *Id.* Plaintiff said "okay" and "turned to go toward the stairs but was "snatched ... by the bicept [sic]" and "pulled ... forcefully backwards" by defendant Ross, "causing plaintiff to instantly collapse to the ground screaming in pain." *Id.* at 89-90. "Plaintiff was then dragged/carried to a holding cell [and] dropped on the ground" where he was left "for over 1 hour" before defendants Penree and Hamilton arrived. *Id.* at 90.

Defendant Penree told defendant Hamilton to escort plaintiff back to his cell "as plaintiff ... turned on the floor." Compl. at 90. "Plaintiff was then lifted off the floor, still cuffed, [and] forced to walk to the elevator [and] back to his cell by [defendant] Hamilton[.]" *Id.* "[U]nknown officers" executed the transport by "dragging" plaintiff along while he was "doubled over" in pain, "unable to fully stand straight up[.]" *Id.* Defendants Hamilton and Penree walked together behind plaintiff, telling him to "keep going" when he stopped and requested a wheelchair. *Id.*

On August 19, 2024, plaintiff filed a grievance against defendants Chaudry, Czerwinski, Storey, Hilton and Penree

based on "ongoing untreated medical problems[.]" Compl. at 91.

Between July and October 2024, and following the discontinuation of Tegretol by defendant Tourtelot, plaintiff suffered four seizures. Compl. at 96. Plaintiff's sick call requests related to these seizures "were thrown out" by defendants Schrader and Penree. *Id.* at 96-97. After one of these seizures, plaintiff was seen by defendant Penree who did nothing but ask plaintiff what he did to himself. *Id.* at 97. Following another of these seizures, defendant Nurse Jane Doe #2 arrived at plaintiff's cell but "[d]id not take vitals or photos" or undertake "any level of examination" and instead only prescribed Tylenol. *Id.*

On a date prior to October 5, 2024, plaintiff was relocated to a "disability cell with wheelchair accommodations, including shower access." Compl. at 92. Following his relocation to this cell, plaintiff asked defendants Christopher, Hilton, Bishop, Storey, Fischer, Harris, Laliberte, Chaudry, Czerwinski, Schrader, Penree, Ferrone, Prisma, Hark, Johnson, Hamilton, and Russell each to provide him with a shower curtain for privacy and safety. *Id.* at 93.

On October 5, 2024, plaintiff slipped and fell while exiting the shower as a result of water "pooling outside of the shower area due to no plastic shower curtain." Compl. at 93. Plaintiff "hit his head on the metal stools directly outside of the shower entrance[.]" *Id.* at 94. The next day, plaintiff showed defendant Penree his injuries and requested a shower curtain and injury report. *Id.* Defendant Penree touched plaintiff's head, said he would document the injuries, and then denied his request for imaging. *Id.*

**\*12** On October 7, 2024, defendant Penree again refused plaintiff's request for imaging on his brain. Compl. at 95. Defendant "CERT Female" was present for this evaluation. *Id.* Plaintiff told this official that he was in need of help. *Id.* Defendant Hamilton subsequently arrived at the scene to photograph plaintiff's injuries, but defendant Penree directed him to limit photographs to plaintiff's head. *Id.* at 95-96. Plaintiff asked defendant Hamilton for a shower curtain, and this official responded that defendant Christopher "told him not to give them out[.]" *Id.* at 96.

Later that day, plaintiff spoke with defendant Hark at the Sergeant's Gallery, and this official told plaintiff that "he would try" to have photographs taken and an injury report done correctly because "Penree [and] Hamilton were

doing some bullshit." Compl. at 97. However, defendant Corrections Sergeant Edick "refused" to address these matters, so "[n]othing was done[.]" *Id.*

On October 8, 2024, plaintiff delivered defendant Penree another sick call request and asked that all his injuries be documented and photographed. Compl. at 97-98. Defendant Penree refused plaintiff's request. *Id.* at 98. By this date, plaintiff "had filed over 12 consolidated medical grievances" regarding inadequate treatment by defendants Mohammed, Schrader, Czerwinski, Chaudry, Christopher, Hilton, Bishop, Storey, Fischer, Harris, Lileberte, Penree, Ferrone, Hamilton, Prisma, Walker, Johnson, Russell, Reddner, and Hark. *Id.*

Over the next two months, plaintiff continued to file grievances and sick call requests regarding inadequate medical treatment. Compl. at 98-103. At some point apparently in or around December 2024, defendants Penree and Schrader "told the plaintiff they wanted to check for sodium in his urine as a cause for weight loss" and plaintiff gave defendant Penree a urine sample in a cup. *Id.* at 106. About ten days later, plaintiff met with defendants Schrader and Penree and these officials informed plaintiff that he tested positive for amphetamines and as a result, would not be prescribed any medications. *Id.* Plaintiff "became outraged" and asked when they performed a drug test and for chain of custody records. *Id.* Plaintiff never received a misbehavior report for drug use or any answers to his questions. *Id.* at 107. Plaintiff subsequently filed a grievance, but "nothing was done" to address the false charge. *Id.*

On December 8, 2024, defendant Corrections Officer Shue delivered plaintiff a meal tray that contained a banana and was missing yogurt. Compl. at 111. Plaintiff complained to defendant Shue about being provided with a food to which he was allergic – the banana – and being deprived of adequate nutrition. *Id.* After a verbal disagreement, defendant Shue left the area, returned to advise plaintiff that he was not going to be provided with another meal, and then requested that plaintiff remove his hands from the open slot in his cell. *Id.* at 112. Plaintiff then threw an empty cup out of his cell. *Id.* In response, defendant Shue "jumped" and radioed for backup, stating that plaintiff "threw on [him]." *Id.* at 112-113.

Roughly thirty minutes later, plaintiff was removed from his cell by defendants Ferrone, Henry, Walker, Corrections Officer McGraw, and Corrections Lieutenant John Doe, and he was told by Lieutenant John Doe that he was being placed

in an "OBS" cell on suicide watch. Compl. at 113. Plaintiff was not suicidal. *Id.*

Defendants Corrections Sergeant Patek, Henry, Walker, and McGraw escorted plaintiff to the Mental Health Unit. Compl. at 113. On the way into the unit, plaintiff walked past defendant Corrections Officer Gabel, who was holding the door open. *Id.* at 114. Once inside, plaintiff "heard all body cameras being deactivated for audio" and was directed by defendant Corrections Officer John Doe #1 to stand on the scale. *Id.* After plaintiff was weighed, he was escorted to a "strip cage" where his handcuffs were removed. *Id.* Defendant Corrections Officer John Doe #2 directed plaintiff to strip and he was issued a "suicide smock[.]" *Id.*

**\*13** By this time, defendants Walker, Henry, and McGraw "were all out of site," but defendants Patek, Gabel, and Corrections Officers John Doe #1-5 were all nearby. Compl. at 114-115. Eventually, plaintiff was removed from the cell by defendants John Doe #1-5 and relocated to a nearby cell. *Id.* at 115. Once inside, plaintiff "was immediately punched in the head, and thereafter repeatedly punched all over his body while still in handcuffs." *Id.*

Following the assault, defendant Patek directed defendant Gabel to "freeze [plaintiff] out as he left" the area. Compl. at 117. Defendant Gabel then set a box fan inside the open window near plaintiff's cell and "turned it on full blast." *Id.* Defendant Gabel also turned on a box fan located in a different window in the back of the cell. *Id.* Nothing else was in the cell except a metal bed frame that was covered in feces. *Id.*

Plaintiff was not given lunch on this date or medications from defendant Penree, who "came [and] laughed." Compl. at 118. The next morning, plaintiff was denied "a.m. meds [and] breakfast." *Id.* Over the next three days, each of plaintiff's meals were either tampered with or denied altogether. *Id.* Defendants Corrections Officer Hamlin, Corrections Officer Rogers, and Corrections Officers John Doe #1-2 provided plaintiff with meals "sometimes." *Id.* The fans also remained on during most of this three-day period. *Id.* at 119.

On or around December 11, 2024, defendants Penree and Corrections Officers John Doe #1-5 visited plaintiff at his cell, directed him to stand under a light, and then walked off. Compl. at 119. Over the next two days, plaintiff was deprived of medication and a dinner meal by defendant Corrections Officer "John Doe Short Guy[,]" had a water bucket thrown at him by defendants "John Doe Short Guy" and "John Doe Tall

Guy," and had a hose sprayed at him by these same officials. *Id.* at 120.

Defendant Short witnessed plaintiff's confinement conditions between December 8 and December 13, 2024, having walked past the cell "several times" throughout this period. Compl. at 121. Defendant Henry also worked one shift when plaintiff asked for the fans to be turned off and refused the request. *Id.* Plaintiff was deprived of his seizure medication while in OBS by defendants Penree, Brown, and Surgey, and had a seizure on one occasion. *Id.* at 121-122.

On December 13, 2024, defendant Rogers provided plaintiff with blankets and food. Compl. at 121. On or about December 16, 2024, plaintiff was released from OBS. Compl. at 122. At some point thereafter, plaintiff contacted the Office of Special Investigations, and an official from this office ordered that plaintiff receive a medical exam and chest x-ray. *Id.* However, defendant Penree "filed false documents" and defendant Schrader "never did anything" and as a result, "the chest x-ray was never done." *Id.*

On or about December 20, 2024, plaintiff had his second seizure in ten days. Compl. at 108. Plaintiff was escorted to the medical unit where defendants Penree and Ferrone were present. *Id.* Plaintiff told these officials "about having another seizure" and defendant Penree "flashed a light into plaintiff's face while at the same time asking plaintiff about being on drugs." *Id.* Penree did not take any vitals. *Id.*

Defendant Penree then asked plaintiff to provide a urine sample, which plaintiff did "on the spot[.]" Compl. at 109. Days later, defendant Penree stopped by plaintiff's cell during "med rounds" and "waved a paper" while informing plaintiff that he "tested positive again[.]" *Id.*

**\*14** On or around December 26, 2024, a Tier III disciplinary hearing was initiated against plaintiff based on the cup throwing incident that occurred on December 8, 2024. Compl. at 127. Defendant Laliberte was assigned as the hearing officer and allowed plaintiff to make an appearance on the record, after which the hearing was postponed to allow plaintiff time to receive assistance. *Id.*

On December 31, 2024, plaintiff met with defendant ORC Lewis for tier assistance. Compl. at 128. Plaintiff asked defendant Lewis to gather certain evidence for his hearing. *Id.* Later that day, defendant Corrections Sergeant Lamoch interviewed plaintiff regarding an investigation into plaintiff's

claims of wrongdoing by defendants Penree and Schrader. *Id.* Defendant Lamoch noted the "history of problems" between plaintiff and these officials and stated that he would take plaintiff for his chest x-ray. *Id.* at 128-129. However, defendant Lamoch later told plaintiff that the appointment was canceled and rescheduled. *Id.* at 129.

During "mail delivery" on December 31, 2024, plaintiff received defendant Laliberte's Tier III disposition, which "falsely" indicated that plaintiff was "removed from the hearing for bad behavior[.]" Compl. at 129. Defendant Laliberte found plaintiff guilty of the charges in the misbehavior report and sentenced him to 180 of confinement in a special housing unit ("SHU") cell, along with loss of "all other privileges." *Id.*

Later in the day, plaintiff spoke with defendant Corrections Sergeant Fann regarding the disciplinary disposition and this official "agreed it was false." Compl. at 130. Plaintiff appealed the disciplinary determination to defendant Rodriguez. *Id.* At some point, defendant Rodriguez "modified the sanctions [but] still ignored the fact that plaintiff's due process rights were violated by ample evidence [that he] was deprived [the opportunity] to be present [and] participate [in]" the hearing. *Id.* Pursuant to the modification in the sanction, plaintiff "was still regressed to Phase One in [the] Step Down Program" and lost contact visits, packages, and other privileges. *Id.* at 131.

On January 2, 2025, plaintiff was escorted to a holding pen where defendants Shue, Penree, and Schrader were located. Compl. at 123. Plaintiff was seated on a bench, with his hands cuffed behind his back. *Id.* Plaintiff asked defendant Schrader "for an update on all his medical trips [and] sick calls given to Penree" and Schrader "yelled" at plaintiff in response and asked what he wanted. *Id.* After a further negative exchange, plaintiff "cleared his throat [and] suppressed a cough" and defendant Schrader "flinched." *Id.* at 123-124. Defendant Shue then "grabbed" plaintiff "by the arm [and] leg, lifted [him] off the bench [and] threw [him] face first to the ground." *Id.* at 124. Defendant Shue then "drove his knee" into plaintiff and "pinned it down" on plaintiff's legs, causing him "intense nerve pain[.]" *Id.*

At that point, defendant Ross "rushed in the area [and] clamped leg shackles on [plaintiff then] pressed down on them full force, holding the pressure [and] position for over 1 minute[.]" Compl. at 124. Thereafter, defendant Lamoch arrived at the scene and "ordered the plaintiff to

be picked upright, which caused intense pain in [plaintiff's] lower back [and] achiles [sic]." *Id.* Following this incident, defendant Shue "falsely accused" plaintiff of spitting on defendant Schrader, defendants Schrader and Penree each issued plaintiff false misbehavior reports, and defendants Ross and Lamoch filed "false reports" to corroborate the other reports. *Id.* at 125.

**\*15** Thereafter, defendant SORC Ciancio conducted a Tier III disciplinary hearing related to the misbehavior reports authored by defendants Schrader and Penree. Compl. at 130. After an adjournment, defendant ORC Everson and another ORC official met with plaintiff at his cell and defendant Everson advised plaintiff that a different ORC official was assigned as his "Tier Assistant[,]" but they were present to "help[ ]" this person. *Id.* Plaintiff asked defendant Everson for an explanation regarding why his assigned assistant was not present, and why assistance could not wait until this person returned to work. *Id.* at 130-131. In response, defendant Everson "raised her voice" and asked plaintiff whether he wanted assistance, to which plaintiff responded that he did. *Id.* at 131. Plaintiff then requested the information that he sought. *Id.*

Defendant Everson told plaintiff that she was not sure how to obtain the information he sought, asked him to sign an assistance form, and subsequently informed defendant Ciancio that plaintiff had "refused assistance." Compl. at 132. Thereafter, defendant Ciancio resumed the hearing, denied plaintiff's request on the record for Tier Assistance, and ultimately found him guilty of assaulting defendant Schrader. *Id.* at 132-134. Defendant Ciancio imposed a sanction that included 365 days of SHU confinement and loss of good time credits. *Id.* at 134. Defendant Ciancio found plaintiff not guilty of the charges in the misbehavior report authored by defendant Penree. *Id.* Plaintiff appealed the disciplinary determination and "the sanctions were overturned 4 months later[.]" *Id.*

On or around January 8, 2025, plaintiff was sent to an outside facility for an MRI even though he had yet to receive the chest x-ray to identify whether a metal object was "stuck inside" him. Compl. at 135. Defendants Corrections Officer Bower and Corrections Officer Walker were "the CERT escorts" on this trip. *Id.*

On April 23, 2025, plaintiff was seen by defendants Czerwinski and Schrader, who refused to prescribe plaintiff

a brace for his "visibly swollen knee." Compl. at 137. Defendant Slate was also present during the evaluation. *Id.*

On April 24, 2025, plaintiff told defendant Fischer about defendant Schrader "and his medical staff trying to torture the plaintiff to death [by] withholding meds [and] nutrition" and asked about being transferred to another facility. Compl. at 138-139. Defendant Fischer responded that officials were "definitely trying to get rid of [plaintiff]" and walked away without addressing plaintiff's stated concerns. *Id.* at 139. The next day, plaintiff spoke with defendant Christopher and raised the same concerns. *Id.* Defendant Christoper "deflected [and] said, 'will see.' " *Id.*

On or about June 26, 2025, plaintiff was seen by a Neurologist for a follow-up. Compl. at 232. As of this date, plaintiff "still had not been prescribed recommended meds for pain by defendant Schrader," or received a follow-up "MRI review[.]" *Id.* The Neurologist "told the plaintiff he would emphasize the need for pain medications to be prescribed as he recommended ... [and] the treatment plan as he outlined[,]" but defendant Schrader "refused." *Id.* Defendant Storey was present for plaintiff's follow-up and "ignore[d] the plaintiff's questions about endocrinology medication[ ] orders [and] other medical records being withheld[.]" Compl. at 256.

On July 5, 2025, plaintiff spoke with defendant Czerwinski and asked this official when he would receive "medications for his glands [and] pain" and an MRI. Compl. at 233. Defendant Czerwinski "smiled [and] winked" and said she would "tell Schrader again." *Id.* As of July 6, 2025, defendant Schrader had yet to prescribe plaintiff "pain meds [and] meds for thyroidism, adrenal gland deficiency [and] hypopituitarism" or schedule him for an MRI follow-up. *Id.*

### 3. Food Issues

**\*16** Upon arriving at Mid-State Correctional Facility in July 2022, plaintiff "signed for his gluten free medical diet order[.]" Compl. at 139. Nonetheless, plaintiff was delivered meals containing gluten. *Id.*

On July 20, 2022, plaintiff filed a grievance against defendants Deck and Food Services Cook Bartlett based on these officials "sending [him] food allergens" and omitting "protein portions" from his meals every day for almost two weeks. Compl. at 139. Roughly one week earlier, plaintiff wrote to defendant Deck about this matter and this official

confirmed that plaintiff "had not been receiving protein daily as entitled" but never corrected the issue. *Id.* at 139-140. Instead, plaintiff "continued to receive food allergens [and] cross-contaminated meals" on a daily basis. *Id.* at 140.

Throughout this time, defendants Matlock, Corrections Officer Stevens, Corrections Officer Gardner, Ross, Corrections Officer Dehli, Corrections Officer Hark, Corrections Officer Martin, Manson, Corrections Officer Nicholas, Corrections Officer Peters, Corrections Officer Ferris, Corrections Officer Ward, Smalls, Mazzone, Corrections Officer Lewis, Lavinski, and Kowalski were "regular feed-up officer[s]" who served plaintiff foods to which he was allergic and "refuse[d] regularly" to contact food services to provide plaintiff with the correct meal. Compl. at 140-142, 148. In addition, the following officials were aware during this time that plaintiff was not receiving proper meals, yet failed to address the issue: defendants Area Supervisors Hall, Klein, Carpenter, Fuse, Mayo, Bailey, Chandler, Ferrone, Hamilton, and Lamoch, Administrators Laliberte, Conrad, and Storey, Chaplain Max, Superintendent Passage, Social Workers Cole, Russell, and Kallay, Escort Officers Yaddow and Costello, Counselors Perham, J. Christopher, Klossner, Fish, and Schiavi, Grievance Program Supervisor Tapia, and Nurses Banks and Dana. *Id.* at 143-149.

In addition to raising his concerns with the aforementioned officials, plaintiff filed "countless grievances" against defendants Food Services Administrators Deck, Ardo, C. Zangari, D. Zangari, Galusha, Fear, Ortiz, Bartlett, Townsend, and Noble. Compl. at 146-147. Each of his grievances were denied by defendants Tapia, Hilton, Passage, and Seguin. *Id.* at 147.

In October 2022, plaintiff "returned to his special Kosher gluten free diet with Nazarite Jewish accommodations for no eggs, grapes, [and] vinegar" based on the "non-stop violations" of his medical diet order. Compl. at 149. By this time, plaintiff had been served "well over 150 meals with known allergens[.]" *Id.*

Between November 2022 and June 2023, plaintiff "was deprived of his religious meals according to his truly held beliefs" by defendants Noble, Max, Deck, Ardo, Venettozzi, Conrad, Passage, and Hilton. Compl. at 150. Plaintiff filed "countless grievances" and written requests throughout this time based on being denied Kosher meals. *Id.* In March 2023, plaintiff filled out "the Passover Participation Form" and returned it to defendant Max. *Id.* at 153. Nonetheless, in April 2023, plaintiff was "denied his ability to observe Passover" as a result of restrictions imposed on his meals. *Id.* at 152.

**\*17**  On April 9, 2023, plaintiff filed a grievance regarding "continuous denials of Passover participation" and other meal deprivations experienced since October 24, 2022, wherein he named the following officials as having been involved in this wrongdoing: defendants Max, Passage, Conrad, Ardo, Noble, McKoy, Chaudry, Hamilton, Mayo, Klien, Hall, Yaddow, and "all Food Service cooks." Compl. at 152-153.

In September 2023, during Rosh Hashanah and Yom Kippur, plaintiff was provided multiple meals that either contained foods that violated religious dietary law, foods to which he was allergic, or foods that were spoiled. Compl. at 161-162. Plaintiff complained to defendant Max about certain meal issues, but problems continued. *Id.* at 162.

Plaintiff's diet, which was a "combination diet ... developed specifically for [him] ... by defendant Noble ... did not contain 2,800 calories [and] 90 grams of protein per day, which resulted in insufficient nutrition." Compl. at 150-151. In addition, when plaintiff began receiving his Kosher meals, he was "still given allergens[.]" *Id.* at 154. As a result, plaintiff eventually "revert[ed] to his medical diet when it was safe to do so, as he tried to work a solution." *Id.* at 151.

At some point in 2024, plaintiff was "served spoiled food for over 10 days[.]" Compl. at 157. Defendants Smalls, Johnson, Ferrone, Hamilton, Chandler, Mazzone, Hamlin, Shue, Hark, Worden, Ward, and Ross "served these meals" and "failed to ensure corrections." *Id.* During Passover that same year, plaintiff was entirely deprived of adequate nutrition. *Id.* at 163-164.

### 4. Step-Down Program

The Step-Down Program is "operated" by a Program Management Team ("PMT"), which is "comprised of security, counselors, social workers, and members of the Executive Team (Administration and the Superintendent), and these officials "meet at least twice per week to discuss prisoner [and] program plans" and "progress." Compl. at 166. The following officials are members of the PMT: defendants Passage, Hilton, Burns, Venettozzi, Bishop, Storey, Laliberte, Fischer, Harris, Murphy, J. Christopher, Kallay, Perham, Dorchester, Klossner, Schiavi, Ajukik, Brown, Everson, Hosma, Mayo, Chandler, Ferrone, Hamilton, Klien, and

Hall. *Id.* at 167. From the time plaintiff arrived at Mid-State Correctional Facility through 2025, the PMT deprived him of "at least 4 hours of out-of-cell programming every day," in violation of the HALT Act. *Id.* at 167-168. The PMT also deprived plaintiff of other privileges, such as contact visits without restraints and access to packages and certain personal property, in violation of the HALT Act. *Id.* at 168. PMT officials "used negative informational reports" as an "alternative to misbehavior reports[,]" through which sanctions were "relentlessly" imposed against plaintiff without him being afforded a hearing to dispute the alleged wrongdoing. *Id.* at 169.

In or around late September 2022, plaintiff learned that an inmate named "Bradley" with whom he had a negative history had been transferred to Mid-State Correctional Facility. Compl. at 171. Plaintiff informed defendant Perham about the issue and asked to be kept away from this inmate. *Id.* Defendant Perham agreed to raise the issue at the next PMT meeting, and thereafter informed plaintiff that PMT officials would not separate him from another inmate because "the program is designed to keep [prisoners] with [their] enemies [and] teach [them] how to get along." *Id.* Plaintiff expressed his view that he would not be able to get along with this inmate, and defendant Perham responded that the PMT had "made its decision." *Id.*

 **\*18** Thereafter, PMT officials "decided to put Bradley in the same class with the plaintiff [and] set it up for plaintiff [and] Bradley to sit next to each other[.]" Compl. at 172. In an effort to "repell [sic] any attacks possible" plaintiff "put spoiled milk [and] powder[ed] coffee into a toothpaste [tube] for protection[.]" *Id.*

On October 13, 2022, plaintiff entered a classroom and was initially "shackled [and] handcuffed" to a restraint chair, but his handcuffs were removed before Bradley entered. Compl. at 172-173. Once Bradley entered the room and was seated and shackled to his chair, plaintiff "expelled the spoiled milk in Bradley['s] direction[.]" *Id.* at 173. From outside the classroom, defendants Luther, Kallay, and "several officers" watched plaintiff and Bradley argue, with Bradley spitting on plaintiff. *Id.* Defendant Annarino "cheered Bradley on." *Id.* Plaintiff yelled for security to remove him from the room, but nobody intervened. *Id.* Plaintiff then "threw his boot at Bradley [and] was allowed to attack Bradley" while Bradley was restrained. *Id.*

Following the incident, defendant Mayo escorted plaintiff back to his cell and stated that he "hate[s]" Bradley, while praising plaintiff for his role in the altercation. Compl. at 174. Thereafter, plaintiff was issued a Tier III misbehavior report. *Id.* Defendant J. Christopher, who was "in charge of assigning prisoners to their classrooms [and] put Bradley with the plaintiff," designated herself as plaintiff's hearing officer. *Id.*

At the conclusion of the disciplinary hearing, defendant Christopher found plaintiff guilty of all charges and imposed sanctions that included 720 days of SHU confinement, loss of all privileges, and six months loss of good time credits. Compl. at 175. Thereafter, plaintiff filed a state court Article 78 petition. *Id.* at 176. Defendants Passage, Burns, Venettozzi, J. Christopher, Fischer, Conrad, and Rodriguez "all refused to turn over the video footage of the incident[,]" which officials "allowed to play out for no less than 30 minutes without any attempt to enter the classroom." *Id.*

On February 9, 2024, the state court issued a Decision and Order reversing the SHU sanction and remitting the matter for a rehearing consistent with the provisions of the HALT Act. Compl. at 176-177. On March 1, 2024, a rehearing commenced before defendant Hearing Officer Barbosa. *Id.* at 177. At the conclusion of the hearing, defendant Barbosa found plaintiff guilty of all charges and sentenced him to 545 days of SHU confinement, along with 4 months loss of good time credits and loss of privileges for 365 days. *Id.* at 177-178. Defendant Hilton then undertook a discretionary review of the determination at plaintiff's request and reduced the confinement sanction to 365 days. *Id.* at 178.

On May 31, 2024, an attorney filed an administrative appeal on plaintiff's behalf, which was submitted to defendant Rodriguez. Compl. at 178. On June 18, 2024, defendant Rodriguez "reviewed [and] affirmed the hearing disposition. *Id.* Counsel then filed a second Article 78 petition. *Id.* Eventually, defendant DOCCS Commissioner Martuscello "expunged the unlawful SHU sanctions" and the Article 78 petition was dismissed as moot. *Id.*

As a result of plaintiff's role in the incident with Bradley on October 13, 2022, defendant J. Christopher "gave orders to PMT staff" and defendant Kallay specifically "to violate plaintiff's attorney/client ... rights by putting his legal calls on speaker phone for PMT staff to listen in." Compl. at 179. Plaintiff's attorney sent an email to defendant Kallay expressing concerns regarding this practice, which

defendant Kallay forwarded to defendant Christopher. *Id.* Defendant Christopher then "fabricated a de facto policy [and] procedure" to justify this conduct. *Id.*

**\*19**  On November 8, 2022, defendants Perham and Kallay placed plaintiff's legal call with his attorney on speaker phone as "PMT staff stood outside the door listening [and] watching plaintiff[.]" Compl. at 180. Defendants Perham and Kallay advised plaintiff that his call was being handled in this matter based on "the new rule ... from defendant J. Christopher." *Id.* Following this call, plaintiff's attorney again emailed the facility regarding "her concerns." *Id.* Defendant Burns responded to the email "fabricating the de facto policy[.]" *Id.*

Thereafter, plaintiff "had numerous additional legal calls placed on speaker[,]" which were "monitored by PMT staff [and] Kallay." Compl. at 180. Plaintiff verbally notified defendants Passage and Venettozzi about this issue, yet they "did nothing to stop [it.]" *Id.* at 181. Plaintiff also filed grievances against all members of the PMT regarding this matter. *Id.* Eventually, "court intervention" ended the "tactic[.]" *Id.*

From there, PMT officials "moved to another tactic" of "[n]ot allowing plaintiff out for programs [and] filing false refusals, while keeping plaintiff excessively confined 24/7 for many months non-stop." Compl. at 181. Between 2022 and 2024, defendant Hughes, "an office assistant for PMT staff," was responsible for filing the majority of these "false refusals[.]" *Id.* at 182. However, defendant Hughes never interacted with plaintiff or made rounds in his housing area. *Id.* The refusals resulted in "false 'negatives' " that plaintiff was unable to challenge, and for which he received "sanctions" that included a 30-day extension in Phase One of the Step-Down Program, "phone/education tablet restrictions," loss of food commissary privileges, and restrictions on programming. *Id.*

Between "late October/early November 2022 [and] April 17, 2023," and apparently as a result of the aforementioned "false negatives," plaintiff was denied out-of-cell programming and group activities with PMT staff. Compl. at 182. Throughout this time, "[n]o security PMT escorts ever [visited] plaintiff's cell for him to attend" and it was therefore impossible for him to ever refuse attendance. *Id.*

On April 17, 2023, defendant Christopher "finally agreed to let plaintiff out for programs." Compl. at 183. However, defendant Christopher placed plaintiff in the morning class, despite the PMT previously agreeing to allow plaintiff to

participate in "p.m. classes for medical reasons[,]" and inmate Bradley being in this class. *Id.*

After plaintiff "made verbal complaints daily to PMT staff on rounds," he was told that defendant Christopher had placed him on a list to meet with PMT staff on April 21, 2023, to "discuss all issues." Compl. at 183. Sometime on the morning of April 21, 2023, plaintiff "secured protection for defense with a soap in a sock for his own safety, knowing the staff set up assaults." *Id.* At some point thereafter, plaintiff "went to meet with PMT[.]" *Id.*

Plaintiff arrived at a "waiting class" where other prisoners were also waiting to meet individually with PMT staff. Compl. at 183. Plaintiff "was secured in [a] restart chair shackled [but] unhandcuffed[.]" *Id.* "As plaintiff was waiting, Bradley was escorted into class" and "seated in the next chair by the plaintiff," at which time he stated, "my turn." *Id.* "Plaintiff then swung the soap in a sock at Bradley twice [and] security intervened." *Id.* at 183-184. Plaintiff believes that PMT officials "forced Bradley onto [him] for retaliatory motives[.]" *Id.* at 184.

Following this incident, plaintiff was issued a misbehavior report by defendant Mayo. Compl. at 184. Defendant Mayo was the official responsible for escorting inmates to PMT meetings and was aware of plaintiff's prior altercation with Bradley. *Id.* at 184-185.

**\*20**  Defendant Storey was assigned as the hearing officer for plaintiff's disciplinary hearing. Compl. at 185. At the conclusion of the hearing, defendant Storey found plaintiff guilty of all charges and sentenced him to six months of SHU confinement. *Id.* Plaintiff appealed the disciplinary determination to defendant Rodriguez, who "affirmed" the decision. *Id.*

As a result of being denied access to programming and receiving the imposed disciplinary sanctions, plaintiff was "not able to progress" through the Step-Down Program and was instead "restricted to Phase One for nearly 2 years, or more" even though "Phase One is only a 6-week stage/ phase[.]" Compl. at 187-188. Throughout this time, plaintiff did not receive adequate access to "food, clothing, [or] footwear[.]" *Id.* at 188.

On September 29, 2023, defendant Fischer responded in writing to a complaint made by plaintiff asking this official to review video and audio footage from the Step-Down

Program showing that plaintiff was "not being allowed to attend" programming. Compl. at 189-190. Defendant Fischer "refused to review [the] footage" and responded in writing to plaintiff that he was not allowed to attend afternoon programming based on him "giv[ing] the PMT the impression during rounds that [he is] under the influence of an intoxicant in the afternoons[.]" *Id.* at 190.

On October 1, 2023, beginning at around 3:00 a.m., defendant Corrections Officer Stevenson verbally harassed plaintiff during rounds, calling him racial slurs, "loudly" accusing him of "touch[ing] lil kids" so that other prisoners could hear, making sexual gestures at plaintiff, and kicking his cell door. Compl. at 193-194. Plaintiff filed a grievance and "PREA complaint" against defendant Stevenson. *Id.* at 194. Following this incident, other prisoners "began asking the plaintiff about his criminal case[.]" *Id.* Defendant Laliberte "denied the PREA complaint" and defendants Tapia, Hilton, and Seguin denied plaintiff's grievance, all refusing to review video footage of the incident. *Id.*

As a result of defendant Stevenson's actions, other prisoners searched public records and learned from a public court filing that plaintiff "spoke to detectives about a homicide case focused on plaintiff being the shooter[.]" Compl. at 195. Thereafter, plaintiff was "labeled a snitch" throughout the Step-Down Program. *Id.*

On December 26, 2023, "a group of gang members [and] their associates conspired to manipulate staff into moving the plaintiff to ... [a] chaotic [housing area] designated for problematic prisoners" by holding their feed-up hatches open and telling defendants Johnson, Ross, Ferrone, and Dehli that they would not remove their hands until plaintiff is relocated. Compl. at 196-197. After speaking with these inmates, defendant Johnson stopped at plaintiff's cell with defendant Ross to inform him that he was being relocated and advise him to pack his belongings. *Id.* at 197. However, plaintiff "demanded to be left alone" and, after speaking with defendant Ferrone, the move was stopped. *Id.*

On December 28, 2023, plaintiff returned to his cell from an outside trip to find it "in total chaos[,]" having been searched and ransacked by defendants Johnson and Dehli. Compl. at 197-198. Plaintiff's legal materials were "clearly read by staff" and some of those materials were "taken or thrown away, along with personal property[.]" *Id.* at 198. As plaintiff attempted to "regroup mentally[,]" defendants

Johnson and Theo arrived to escort him to a meeting with defendant Chandler. *Id.* at 199.

**\*21** Plaintiff met with defendant Chandler in a hearing room, where he was informed that he would be moved to another gallery based on complaints from other inmates. Compl. at 200. Thereafter, plaintiff was relocated to cell C1-12, which was filthy and reeked of raw sewage. *Id.* at 201. Plaintiff later learned that the sink in the cell was intentionally clogged by defendant Ross. *Id.* at 202. Plaintiff spent that night in a different cell so that the sink could be unclogged. *Id.*

On the morning of December 29, 2023, plaintiff was returned to his new cell, but the sink was still broken, and the "horrible smell" remained even though defendant "Maintenance Man Slim alleged he fixed it all." Compl. at 202.[7] Plaintiff remained housed in this cell without access to water until January 8, 2024, when he was "removed for 3 hours while the sink was worked on." *Id.* The sink "remained broken" for roughly another week. *Id.*

[7]   On October 27, 2025, the Court received a letter from plaintiff identifying this individual as "Mr. Dutcher." Dkt. No. 23.

Over the next fourteen months, plaintiff continued to be deprived of out-of-cell activities. Compl. at 203-205.

On December 31, 2024, defendant Penree threatened plaintiff with future harm and broke plaintiff's feed-up hatch. Compl. at 205. Defendant Dutcher subsequently retrieved the feed-up hatch but ignored plaintiff's request to put it back on. *Id.*

On January 3, 2025, defendants Henry, Ross, Dehli, and Murphy "conspired" to relocate plaintiff to "a filthy, damaged, cold cell" with a broken shower and clogged heat vent, that also did not have a working door hatch. Compl. at 206. Defendants Christopher, Lamoch, Chandler, Fuse, and Fann were all shown the damages within this cell, yet "refused to help." *Id.* at 207. Plaintiff "was left trapped in [this] filthy, cold, broken cell" until April 2025. *Id.*

"The cell manipulation system was used by PMT against the plaintiff by housing him in filthy, disgusting cells without functional plumbing[,]" and surrounded by cellmates with mental health issues, as a method of retaliation. Compl. at 210-211.

#### 5. Law Library and Package Issues

Between July 2022 and 2025, plaintiff was deprived of adequate access to the law library and related privileges and services. Compl. at 212-213. For example, plaintiff was deprived of a law library tablet for at least two years. *Id.* Defendants Passage, Mayo, Klien, Fischer, Hilton, and the other PMT staff members were each involved in these deprivations. *Id.* Plaintiff's ability to litigate civil matters was "severely hindered" as a result of inadequate law library services. *Id.* at 215-217. Plaintiff believes he "lost" two civil cases brought in the New York Court of Claims as a result of "being unable to prepare for trial in 2024[.]" *Id.* at 219.

On July 25, 2023, defendant Package Room Officer Walhby gave defendant Corrections Officer Schultz a package of books purchased for plaintiff by his family. Compl. at 219. Although six books were purchased, plaintiff was only provided with five. *Id.* Thereafter, defendant Walhby "repeatedly reject[ed]" legal books delivered for plaintiff, tampering with plaintiff's mail in response to his grievances and complaints. *Id.* at 220-222.

Between May 31 and July 30, 2024, defendant Hamilton destroyed packages mailed to plaintiff containing toothpaste and soap. Compl. at 223. Plaintiff was also deprived of other packages by other officials. *Id.* at 223-225. Eventually, plaintiff "beg[ged]" defendants Penree, Schrader, Czerwinski, Chaudry, Storey, Hilton, and Christopher to "make medical staff ... provide treatment [and] Dove soap for visible rashes [and] chemical burns" on plaintiff's body. *Id.* at 225. These officials "refused to intervene[.]" *Id.*

#### 6. Mental Health Services

**\*22** Between 2024 and the summer of 2025, defendant Social Worker Cole "refus[ed] to allow plaintiff access to [out-of-cell] therapy sessions" and "facilitated plaintiff's OMH level being changed from a two up to a level four[.]" Compl. at 256-257.

Defendants Christopher, Tourtelot, Cole, Czerwinski, Schrader, Chaudry, and Mosher were members of a Joint Case Management Committee ("JCMC"), which met weekly to discuss mental health services provided to inmates, including plaintiff. Compl. at 257. The JCMC "targeted" plaintiff's "OMH meds[,]" sometimes changing them and other times

stopping them in response to treatment complaints made by plaintiff. *Id.* at 257-258.

Defendant Office of Mental Health Commissioner Sullivan, along with DOCCS Commissioner Martuscello, former DOCCS Commissioner Annucci, and defendants McCoy, Venettozzi, and Rodriguez, allowed plaintiff to be housed in solitary confinement, despite his mental health needs and the requirements of the HALT Act. *Id.* at 258-259. Defendant Sullivan worked with defendants Annucci and Martuscello to narrowly define "serious mental illness" to "a small number of specific diagnoses" to avoid limitations on restrictive confinement imposed by the HALT Act. *Id.* As a result, plaintiff's "mental health disability diagnoses" did not exclude him from restrictive confinement. *Id.*

Defendants Martuscello and Annucci have also "led DOCCS to continue ... use of disciplinary confinement in a manner that HALT 'clearly prohibits.' " Compl. at 271. Defendants Hilton and Passage have also failed to implement "necessary reforms" within Mid-State Correctional Facility to comply with the HALT Act, and "restore basic human rights" to plaintiff and others similarly situated. *Id.* at 272.

#### 7. "Illegal Strike" Issues

Beginning in February 2025, corrections officials employed at various DOCCS facilities, including several of the named defendants, "began an illegal strike," with their "central demands" being "repeal of HALT [and] increased wages." Compl. at 275-277. As a result of the strike, defendant Martuscello unlawfully suspended unidentified aspects of the HALT Act. *Id.* at 276-278.

On February 23, 2025, plaintiff asked National Guard Officer Nader (not a party) to collect food containers in his cell because they were "stacking up" and "drawing [in] rodents [and] insects[.]" Compl. at 278. Hours later, plaintiff "reminded National Guard members of trash pickup[,]" and in response, defendant National Guard Officer John Doe sprayed the inside of plaintiff's cell "with a pressure washer firehose ... for several minutes through the feed-up hatch, destroying plaintiff's legal documents, books, clothes, pictures, [and] property." *Id.* Plaintiff was also sprayed with the water, which "caused him to slip [and] fall [and] injure his knee [and] back." *Id.* at 279.

The destruction of plaintiff's legal materials "has hindered plaintiff['s] civil litigations for other matters[.]" Compl. at 279. As a result of the "illegal strike," plaintiff was also "fed food allergens daily for weeks" and has been forced to remain in segregated confinement "for longer than 17 hours per day." *Id.* at 279-280. Defendant Martuscello's suspension of the HALT Act resulted in plaintiff's loss of daily out-of-cell programming and recreation and "[b]eing denied medications." *Id.* at 280.

**\*23** The following defendants participated in the "illegal strike": Murphy, Storey, Fischer, Harris, J. Christopher, Laliberte, Tapia, Ardo, Seguin, Noble, Chaudry, Max, Czerwinski, Graveline, Barbosa, SORC Stnaley, Kallay, Tourtelot, Cole, Mosher, Springer, Bartlett, Townsend, Schrader, Penree, Ortiz, Fear, Galusha, C. Zangari, D. Zangari, Ciancio, Surgey, Klossner, Fish, Schiavi, Perham, Luther, Dorchester, Everson, Ajukik, Hall, Klien, Carpenter, Fuse, Mayo, Bailey, Ferrone, Hamilton, Chandler, Fann, Lamoch, Orcutt, Annarino, Nicholas, Johnson, Ward, Worden, Dehli, Gardner, Hilton, Martuscello, McCoy, Ross, Reddner, Pope, Martin, Mattlock, Hark, Lavinski, Kowalski, Corrections Officer Lewis, Ferris, Peters, Yaddow, Castello, Banks, Shue, Prisma, Smalls, Fabbio, Jacob, Dowsland, Moss, Schultz, Theo, Patek, Gabel, Hughes, Hamlin, Henry, Walhby, Mazzone, Walker, Stevens, Stephenson, Bower #1, Bower #2, Rogers, Short, Brown, Hosma, Dundden, and ORC Lewis. Compl. at 289-90.

### 8. Other Post-Strike Issues

On May 4, 2025, defendant Corrections Sergeant Moss "refused to correct another allergen meal" delivered to plaintiff after he asked her to call Food Services. Compl. at 236. In response, plaintiff "threw a milk out of his cell in the opposite direction of Moss." *Id.* at 237. Defendant Moss subsequently issued plaintiff a misbehavior report for the incident and a negative informational report. *Id.*

Defendant Ciancio conducted plaintiff's disciplinary hearing on May 21, 2025. Compl. at 237. Plaintiff objected to this official serving in this capacity based on him previously imposing an "unlawful SHU sanction" against plaintiff and denying plaintiff adequate due process when he served as a hearing officer in an earlier disciplinary hearing. *Id.* At the conclusion of the hearing, defendant Ciancio imposed an "excessively harsh sentence" that included loss of package,

phone, tablet, commissary, and property privileges for 120 days and six months loss of good time credits. *Id.* at 238-239.

On June 2, 2025, plaintiff spoke with defendant Christopher during rounds and asked for an update related to his medication and "nutritional needs" and reminded her that it had been "over 12 months" since she told him she was "looking into it[.]" Compl. at 233. Plaintiff then stated that he was "filing a lawsuit." *Id.* Thereafter, defendant Christopher authored "two false reports" charging plaintiff with making threats, a misbehavior report, and a negative informational report, which resulted in PMT staff sanctioning plaintiff with loss of food packages. *Id.* at 234. Defendant SORC Stanley also found plaintiff guilty of the charges in the misbehavior report and sentenced him to 120 days of SHU confinement, 120 days loss of good time credits, and loss of various privileges for 120 days. *Id.*

Defendant Stanley failed to conduct the hearing in a timely manner, denied plaintiff access to an employee assistant and certain video footage, and denied plaintiff the opportunity to question his own witness or be present during that questioning, or call as a witness the officer identified by defendant Christopher as having been present during the events at issue. Compl. at 235. Plaintiff was also not allowed to be present during, and participate in, the hearing. *Id.* at 236. Plaintiff's appeal was pending as of the filing date of this complaint. *Id.*

Liberally construed, the complaint asserts the following claims against the named defendants: (1) First Amendment retaliation claims against defendants Schrader and Penree based on falsely charging him with wrongdoing in response to his engagement in protected activity ("First Retaliation Claim"); (2) First Amendment retaliation claims against defendants Chandler, Mazzone, Manson, Hamilton, Penree, Surgey, Clapper, and Schrader based on depriving plaintiff of treatment needs in response to his engagement in protected activity ("Second Retaliation Claim"); (3) First Amendment retaliation claims against defendants Chaudry, Czerwinski, Schrader, Dana, Clapper, Candy Hayes, Banks, and Brown based on failing to update plaintiff's medical files in response to his engagement in protected activity ("Third Retaliation Claim"); (4) First Amendment retaliation claims against the PMT members based on listening to plaintiff's calls with his attorney in response to his engagement in protected activity ("Fourth Retaliation Claim"); (5) First Amendment retaliation claims against the PMT members based on the imposition of "negative informationals" and "false refusals"

against plaintiff in response to his engagement in protected activity ("Fifth Retaliation Claim"); (6) First Amendment retaliation claims against the PMT members based on the "cell manipulation system" imposed against plaintiff in response to his engagement in protected activity ("Sixth Retaliation Claim"); (7) First Amendment retaliation claims against defendants Walhby and Hamilton based on depriving plaintiff of access to packages in response to his engagement in protected activity ("Seventh Retaliation Claim"); (8) First Amendment retaliation claims against the JCMC members based on depriving plaintiff of access to adequate mental health treatment in response to his engagement in protected activity ("Eighth Retaliation Claim"); (9) a First Amendment retaliation claim against defendant Christopher based on issuing plaintiff "false reports" on June 2, 2025 in response to his engagement in protected activity ("Ninth Retaliation Claim"); (10) First Amendment access-to-courts claims against the PMT members based on plaintiff's lack of access to the law library and legal services; (11) First Amendment mail tampering claims against defendants Walhby and Hamilton based on depriving plaintiff of access to packages; (12) First Amendment free exercise claims against defendants Mohammed, Abdelwahab, Noble, Max, Deck, Ardo, Venettozzi, Conrad, Passage, Hilton, McKoy, Chaudry, Hamilton, Mayo, Klien, Hall, Yaddow, and Tapia based on depriving plaintiff of access to religious meals; (13) a Fourth Amendment unlawful cell search claim against defendants Johnson and Deli based on the events of December 28, 2023; (14) Fourth Amendment privacy claims against the PMT members based on preventing plaintiff from having private communications with his attorney; (15) Eighth Amendment excessive force claims against defendants Ross and Hamilton based on the events of July 2, 2024 ("First Excessive Force Claim"); (16) Eighth Amendment excessive force and failure-to-intervene claims against defendants Patek, Gabel, and Corrections Officers John Doe #1-5 based on the events of December 8, 2024 ("Second Excessive Force Claim"); (17) Eighth Amendment excessive force and failure-to-intervene claims against defendants Shue, Penree, Schrader, Ross, and Lamoch based on the events of January 2, 2025 ("Third Excessive Force Claim"); (18) Eighth Amendment medical indifference claims against defendants Czerwinski, Aiken, Schrader, Chaudry, Kallay, Dana, Surgey, Jennifer Christopher, Candy Hayes, Christopher Hayes, Hoffman, LaCoppola, Nurse Jane Doe, Russell, Paladino, Dana, Hilton, Fischer, Harris, Storey, Fish, Kallay, Dorchester, Perham, Czerwinski, Schrader, Penree, Chaudry, Clapper, Abdelwahab, Schiavi, Tourtelot, Costello, Yaddow, Ross, Hall, Klien, Mayo, Chandler, Hamilton, Dundden, Johnson,

Carpenter, Bishop, Rosario, Murphy, and Tapia based on interference with medical visits ("First Medical Indifference Claim"); (19) Eighth Amendment medical indifference claims against defendants Brown, Paladino, Czerwinski, Tapia, and Hilton based on failing to update plaintiff's medical proxy ("Second Medical Indifference Claim"); (20) Eighth Amendment medical indifference claims against defendants Chaudry, Czerwinski, Schrader, Dana, Clapper, Candy Hayes, Banks, and Brown based on failing to update plaintiff's medical files ("Third Medical Indifference Claim"); (21) Eighth Amendment medical indifference claims against defendants Chaudry, Czerwinski, Schrader, J. Christopher, Storey, Mosher, Mohammed, Abdelwahab, Hilton, Bishop, Fischer, Harris, Lileberte, Penree, Aiken, Ferrone, Hamilton, Prisma, Walker, Johnson, Russell, Reddner, Slate, Hark, Christopher Hayes, Candy Hayes, Chandler, Mazzone, Manson, Surgey, Clapper, and Tourtelot based on failing to adequately address plaintiff's medical needs ("Fourth Medical Indifference Claim"); (22) Eighth Amendment medical indifference claims against defendants Tourtelot, Schrader, Penree, Ferrone, Nurse Jane Doe #1, Nurse Jane Doe #2 based on failing to adequately address plaintiff's seizures ("Fifth Medical Indifference Claim"); (23) Eighth Amendment medical indifference claims against defendants Smalls, Costello, Tourtelot, Ferrone, Ross, Hamilton, and Penree based on the events of July 2, 2024 ("Sixth Medical Indifference Claim"); (24) Eighth Amendment medical indifference claims against defendants Hark, Hamilton, Penree, CERT Female, and Edick based on failing to document plaintiff's injuries from a slip-and-fall incident in October 2024 ("Seventh Medical Indifference Claim"); (25) Eighth Amendment medical indifference claims against defendants Ferrone, Henry, Walker, McGraw, Shue, Patek, Gabel, Corrections Lieutenant John Doe, Penree, Brown, and Surgey based on placing plaintiff in an OBS cell and depriving him of access to adequate care in December 2024 ("Eighth Medical Indifference Claim"); (26) Eighth Amendment medical indifference claims against the JCMC members based on depriving plaintiff of access to adequate mental health treatment ("Ninth Medical Indifference Claim"); (27) Eighth Amendment medical indifference claims against defendants Sullivan, Martuscello, Annucci, McCoy, Venettozzi, and Rodriguez based on placing plaintiff in restrictive confinement despite his mental health needs ("Tenth Medical Indifference Claim"); (28) Eighth Amendment medical indifference claims against defendants Deck, Matlock, Stevens, Gardner, Ross, Dehli, Hark, Martin, Manson, Nicholas, Peters, Ferris, Ward, Smalls, Mazzone, Corrections Officer Lewis, Lavinski, Kowalski,

Area Supervisors Hall, Klein, Carpenter, Fuse, Mayo, Bailey, Chandler, Ferrone, Hamilton, Lamoch, Administrators Laliberte, Conrad, Storey, Chaplain Max, Superintendent Passage, Social Workers Cole, Russell, Kallay, Yaddow, Costello, Perham, J. Christopher, Klossner, Fish, Schiavi, Tapia, Nurses Banks and Dana, Ardo, C. Zangari, D. Zangari, Galusha, Fear, Ortiz, Bartlett, Townsend, Noble, Hilton, Moss, Passage, and Seguin based on depriving plaintiff of his medical diet ("Eleventh Medical Indifference Claim"); (29) Eighth Amendment failure-to-protect claims against defendants Christopher, Hilton, Bishop, Storey, Fischer, Harris, Laliberte, Chaudry, Czerwinski, Schrader, Penree, Ferrone, Prisma, Hark, Johnson, Hamilton, and Russell based on failing to provide plaintiff with a shower curtain ("First Failure-to-Protect Claim"); (30) Eighth Amendment failure-to-protect claims against the PMT members and defendants Luther and Annarino based on failing to separate plaintiff and inmate Bradley ("Second Failure-to-Protect Claim"); (31) Eighth Amendment harassment and failure-to-protect claims against defendants Stevenson, Laliberte, Tapia, Hilton, and Seguin based on the events of October 1, 2023 ("Third Failure-to-Protect Claim"); (32) Eighth Amendment failure-to-protect claims against various defendants for participating in a labor strike ("Fourth Failure-to-Protect Claim"); (33) Eighth Amendment conditions-of-confinement claims against defendants Hilton, Passage, and the PMT members based on maintaining plaintiff in the Step-Down Program for over three years and restricting out-of-cell programming ("First Conditions-of-Confinement Claim"); (34) Eighth Amendment conditions-of-confinement claims against defendants Smalls, Johnson, Ferrone, Hamilton, Chandler, Mazzone, Hamlin, Shue, Hark, Worden, Ward, and Ross based on serving plaintiff spoiled meals ("Second Conditions-of-Confinement Claim"); (35) Eighth Amendment conditions-of-confinement claims against defendants J. Christopher and Fischer based on denying plaintiff access to out-of-cell programming ("Third Conditions-of-Confinement Claim"); (36) Eighth Amendment conditions-of-confinement claims against defendants Patek, Gabel, Penree, Patek, Gabel, Hamlin, Rogers, Short, Henry, Corrections Officers John Doe #1-5, John Doe Short Guy and John Doe Tall Guy based on plaintiff's OBS cell conditions ("Fourth Conditions-of-Confinement Claim"); (37) Eighth Amendment conditions-of-confinement claims against defendants Chandler, Ross, Henry, Dehli, Murphy, Christopher, Lamoch, Fuse, Fann, and Dutcher based on plaintiff's cell conditions between late December 2024 and early January 2025 ("Fifth Conditions-of-Confinement Claim"); (38) an Eighth Amendment

conditions-of-confinement claim against defendant National Guard Officer John Doe based on the events of February 23, 2025 ("Sixth Conditions-of-Confinement Claim"); (39) an Eighth Amendment conditions-of-confinement claim against defendant Martuscello based on his suspension of certain out-of-cell privileges during the labor strike ("Seventh Conditions-of-Confinement Claim"); (40) Fourteenth Amendment disciplinary due process claims against defendants Passage, Burns, Venettozzi, J. Christopher, Fischer, Conrad, Rodriguez, Barbosa, and Hilton arising out of the events of October 13, 2022, and related disciplinary hearing ("First Disciplinary Due Process Claim"); (41) Fourteenth Amendment disciplinary due process claims against defendants Mayo, Storey, and Rodriguez arising out of the April 2023 incident involving defendant Bradley and the related disciplinary hearing ("Second Disciplinary Due Process Claim"); (42) Fourteenth Amendment disciplinary due process claim against defendants Laliberte, Rodriguez, and ORC Lewis arising out of plaintiff's disciplinary hearing in December 2024 ("Third Disciplinary Due Process Claim"); (43) Fourteenth Amendment disciplinary due process claims against defendants Ciancio, Everson, Shue, Schrader, Penree, Ross and Lamoch arising out of the events of January 2, 2025, and the related disciplinary hearing ("Fourth Disciplinary Due Process Claim"); (44) Fourteenth Amendment disciplinary due process claims against defendants Moss and Ciancio arising out of the events of May 4, 2025, and the related disciplinary hearing ("Fifth Disciplinary Due Process Claim"); (45) Fourteenth Amendment disciplinary due process claims against defendants Christopher and Stanley arising out of the events of June 2, 2025, and the related disciplinary hearing ("Sixth Disciplinary Due Process Claim"); (46) Fourteenth Amendment due process claims against defendants Ferrone, Henry, Walker, McGraw, Shue, Patek, Gabel, and Corrections Lieutenant John Doe based on placing plaintiff in an OBS cell in December 2024 without a hearing; (47) Fourteenth Amendment due process claims against the PMT members and defendant Hughes based on the imposition of "negative informationals" and "false refusals" that resulted in the denial of privileges without a hearing; (48) Fourteenth Amendment destruction of property claims against defendants Johnson and Deli based on the events of December 28, 2023; (49) Fourteenth Amendment destruction of property claims against defendants Walhby, Schultz, and Hamilton based on depriving plaintiff of access to packages; (50) Fourteenth Amendment medical privacy claims against defendants Mohammed, Ferguson, and Schrader; (51) Fourteenth Amendment due process claims against defendants Tapia,

Seguin, Passage, and Hilton based on denying plaintiff access to grievance channels; (52) a claim against defendants Mohammed, Ferguson, and Schrader for violation of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), Pub.L. No. 104-191, 110 Stat.1936 (1996); and (53) state law claims against defendants Annucci, Martuscello, McCoy, Rodriguez, Venettozzi, Hilton, Passage, and Sullivan based on violation of the HALT Act.

**\*24** Plaintiff seeks money damages and injunctive relief. Compl. at 357-60. For a more complete statement of plaintiff's claims, reference is made to the complaint.

### C. Analysis

Plaintiff brings this action pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortg. Corp.*, 885 F. Supp. 537, 573 (S.D.N.Y. 1995) (citing *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting 42 U.S.C. § 1983)) (footnote omitted); *see also Myers v. Wollowitz*, No. 6:95-CV-0272 (TJM/RWS), 1995 WL 236245, at \*2 (N.D.N.Y. Apr. 10, 1995) (stating that "§ 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights." (citation omitted)). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

If a defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Instead, "a plaintiff must plead and prove that each

Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676 and holding that "there is no special rule for supervisory liability").

### 1. Retaliation Claims

Courts must approach claims of retaliation " 'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation– can be characterized as a constitutionally proscribed retaliatory act.' " *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

**\*25** "To be an 'adverse action,' retaliatory conduct must be the type that would deter 'a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.' " *Hayes v. Dahlke*, 976 F.3d 259, 274 (2d Cir. 2020) (quoting *Davis*, 320 F.3d at 353).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see e.g. Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that each of plaintiff's retaliation claims survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 2. Access-to-Courts Claims

In *Bounds v. Smith*, the Supreme Court held that access to the courts is a fundamental right that requires prison

authorities to "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. 817, 828 (1977).

The "right of access to the courts" requires States "to give prisoners a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights." Bounds, 430 U.S. at 828, *modified on other grounds, Lewis v. Casey*, 518 U.S. 343, 350 (1996); *see also Bourdon v. Loughren*, 386 F.3d 88, 92 (2d Cir. 2004). "However, this right is not 'an abstract, freestanding right ....' and cannot ground a Section 1983 claim without a showing of 'actual injury.' " *Collins v. Goord*, 438 F. Supp. 2d 399, 415 (S.D.N.Y. 2006) (quoting *Lewis*, 518 U.S. at 351).

To state a claim for denial of access to the courts, a plaintiff must assert non-conclusory allegations demonstrating that (1) the defendant acted deliberately, and (2) the plaintiff suffered an actual injury. *Lewis*, 518 U.S. at 353; *Konigsberg v. Lefevre*, 267 F. Supp. 2d 255, 261 (N.D.N.Y. 2003) ("Prison officials may only be held liable for such injury if they frustrated or impeded a prisoner's efforts to pursue a non-frivolous legal claim.").

"A hypothetical injury is not sufficient to state a claim for violation of the right of access to the courts." *Amaker v. Haponik*, No. 98-CV-2663, 1999 WL 76798, at *3 (S.D.N.Y. Feb. 17, 1999). Instead, a plaintiff must demonstrate "actual injury" by establishing that the denial "hindered his efforts" to pursue a non-frivolous legal claim. *Lewis*, 518 U.S. at 349, 351-53 (noting that "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense").

The Supreme Court has stated that in order to allege a denial of access to the courts claim, "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint ...." *Christopher v. Harbury*, 536 U.S. 403, 415 (2002). The underlying claim "must be described well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id.* at 415-16. "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id.* at 417-18 (footnote omitted).

**\*26** "Finally, ... the injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 354. Rather, the injury must be to an inmate's ability "to attack [his] sentence[ ], directly or collaterally, [or] ... to challenge the conditions of [his] confinement." *Id.* at 355. "Impairment of any other litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id.*

In this case, plaintiff alleges that the PMT members deprived him of access to the law library and legal services, which "severely hindered" his ability to litigate civil matters. *See* Compl. at 212-217. Plaintiff also alleges that he believes he "lost" two civil cases brought in the New York Court of Claims as a result of "being unable to prepare for trial in 2024[.]" *Id.* at 219.

As an initial matter, the complaint does not include any details regarding the nature of plaintiff's existing or intended lawsuits, let alone allegations from which the Court may be able to infer that the "arguable" nature of these actions was "more than hope." *Christopher*, 536 U.S. at 415-16. Moreover, the complaint does not explain in any detail how plaintiff believes that a lack of access to law library services impacted any of his proceedings, i.e., what legal issue or filing necessitated law library services in each proceeding. Thus, the Court has no basis to plausibly infer from the allegations in the complaint and documents attached thereto that plaintiff suffered an "actual injury" in any court proceeding as a result of the lack of access to law library services.

Accordingly, plaintiff's access-to-courts claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### 3. Mail Tampering Claims

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). A prisoner's mail may only be restricted to further " 'one or more of the substantial governmental interests of security, order, and rehabilitation ... [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.' " *Id.* (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail than to non-legal mail[.]" *Davis*, 320 F.3d at 351. "While a prisoner has a right to be present when his legal mail is opened, ... an isolated incident of mail tampering is usually insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see also Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

**\*27**  At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's mail tampering claims survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 4. Free Exercise Claims

The First Amendment to the United States Constitution guarantees the right to free exercise of religion. *See U.S. Const. amend. I*; *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). As is true with regard to the First Amendment generally, the free exercise clause applies to prison inmates, subject to appropriate limiting factors. *See Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (holding that "[p]risoners have long been understood to retain some measure of the constitutional protection afforded by the First Amendment's Free Exercise Clause") (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)).

"[A]n inmate does not need to establish a substantial burden in order to prevail on a free exercise claim under § 1983." *Kravitz v. Purcell*, 87 F.4th 111, 125 (2d Cir. 2023). "In the prison context, however, 'the right to free exercise of religion' is balanced against 'the interests of prison officials charged with complex duties arising from administration of

the penal system.' " *Kravitz*, 87 F.4th at 127-28 (quoting *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990)). Thus, "an infringement of the free exercise of religion [may be] permissible ... if it is 'reasonably related to legitimate penological interests.' " *Id.* (quoting *Benjamin*, 905 F.2d at 574).

"[T]o assess a free exercise claim, a court must determine (1) whether the practice asserted is religious in the person's scheme of beliefs, and whether the belief is sincerely held; (2) whether the challenged practice of the prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers legitimate penological objectives." *Kravitz*, 87 F.4th at 128 (alterations adopted) (quoting *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988)).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's free exercise claims survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 5. Unlawful Cell Search Claim

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. A seizure of property "occurs when there is some meaningful interference with an individual's possessory interest in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). The Supreme Court has held that "the Fourth Amendment has no applicability to a prison cell" or the unlawful destruction of property when adequate post-deprivation remedies exist. *Hudson v. Palmer*, 468 U.S. 517, 528 n.8, 536 (1984); *see also Vogelfang v. Capra*, 889 F. Supp. 2d 489, 509 (S.D.N.Y. 2012) (dismissing Fourth Amendment claim based on unlawful confiscation of property because adequate state post-deprivation remedies were available).

**\*28**  In this case, plaintiff alleges that on December 28, 2023, defendants Johnson and Dehli ransacked his cell during a search while he was away, and confiscated or discarded some

of his legal materials, along with personal property. Compl. at 197-198.

Importantly, plaintiff does not allege that he was unable to litigate any pending or intended claim in a court proceeding as a result of this wrongdoing. Nor does plaintiff allege that adequate post-deprivation remedies were unavailable to him insofar as any item of property was not returned to him. [8] Thus, plaintiff cannot succeed on a Fourth Amendment claim based on the alleged confiscation of property from his cell. *See Hudson*, 468 U.S. at 539 ("Since the exigencies of prison life authorize officials indefinitely to dispossess inmates of their possessions without specific reason, any losses that occur while the property is in official custody are simply not redressable by Fourth Amendment litigation."); *Soldal v. Cook County*, 506 U.S. 56, 65 (1992) ("[A]n inmate, because of his status, enjoy[s] neither a right to privacy in his cell nor protection against unreasonable seizures of his personal effects"); *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996) ("[T]he Court expressly concluded that the confiscation of Koehl's eye-glasses did not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies." (internal citations omitted)); *Humphrey v. Sec'y Pennsylvania Dep't of Corr.*, 712 Fed. App'x 122, 125 (3d Cir. 2017) ("We agree with the District Court that, to the extent Humphrey claimed that the seizure of his legal materials was a violation of the Fourth Amendment, he failed to state a claim for relief because the Fourth Amendment has no applicability to the contents of a prisoner's cell.... In addition, because he has an adequate post-deprivation remedy, both through the prison grievance process and in state tort law, any alleged due process claims with respect to the confiscation of his legal materials also fail." (internal citations omitted)).

[8]    As the Second Circuit has made clear, "New York in fact affords an adequate post-deprivation remedy" for inmates seeking to recover monetarily for lost or destroyed property "in the form of, inter alia, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001); *Davis v. New York*, 311 Fed. App'x 397, 400 (2d Cir. 2009) ("The existence of this adequate post-deprivation state remedy would thus preclude [plaintiff's] due process claim under § 1983 [for lost personal property].").

Accordingly, plaintiff's unlawful cell search claim is dismissed without prejudice pursuant to 28 U.S.C. 1915(e)(2)

(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

## 6. Privacy Claim

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause...." U.S. Const. amend. IV. "The protection afforded by the Fourth Amendment against unreasonable searches and seizures 'governs not only the seizure of tangible items, but extends as well to the recording of oral statements.' " *Lonegan v. Hasty*, 436 F. Supp. 2d 419, 433 (E.D.N.Y. 2006) (quoting *Katz v. United States*, 389 U.S. 347, 353 (1967)). As noted in *Katz*, the applicability of the Fourth Amendment depends on two things: "first, that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' " *Id.* at 361 (Harlan, J., concurring). "If those prerequisites are met, then the court must determine whether the search or seizure at issue was reasonable." *Lonegan*, 436 F. Supp. 2d at 433. "In the context of electronic surveillance, a search and seizure is presumed to be unreasonable unless authorized in advance by a warrant." *Id.* (citing *Katz*, 389 U.S. at 359).

*\*29*  It is well-settled that the attorney-client privilege "is founded upon the necessity, in the interest and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." *Hunt v. Blackburn*, 128 U.S. 464, 470 (1888). "[W]hile a prison is not, for most purposes, a place where a person expects privacy, privileged communications between attorneys and clients, the recording of which is prohibited both by statute and regulation, ... are protected by the Fourth Amendment from government eavesdropping, especially when those communications take place in the area of the prison designated for attorney-client meetings." *Lonegan*, 436 F. Supp. 2d at 435 (E.D.N.Y. 2006) (collecting cases).

In light of the foregoing, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's Fourth Amendment privacy claims survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as

to whether these claims can withstand a properly filed dispositive motion.

### 7. Excessive Force and Failure-to-Intervene Claims

The Eighth Amendment protects prisoners from "cruel and unusual punishment" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 296-97 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This includes punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). The Second Circuit, in addressing the needs protected by the Eighth Amendment, has stated that sentenced prisoners are entitled to "adequate food, clothing, shelter, sanitation, medical care and personal safety." *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979); *Lareau v. Manson*, 651 F.2d 96, 106 (2d Cir. 1981).

The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

"The Eighth Amendment [also] requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Law enforcement officials, including prison officials, can be held liable under Section 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that each of plaintiff's excessive force and failure-to-intervene claims survive sua sponte review and require a response. In so ruling, the Court

expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 8. Eighth Amendment Medical Indifference Claims

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle*, 429 U.S. at 102, 104. The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.*; *see also Whitley v. Albers*, 475 U.S. 312, 319 (1986) (citing, *inter alia, Estelle*). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer*, 511 U.S. at 832 (citing *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)).

**\*30** "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (quoting *Estelle*, 429 U.S. at 104).

"First, the alleged deprivation must be, in objective terms, sufficiently serious." *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). To determine whether inadequate care is "sufficiently serious," a court must "examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). "Where a plaintiff alleges that inadequate care was provided—instead of alleging a failure to provide any treatment—the inquiry focuses on 'the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract.' " *Revels v. Corr. Med. Care, Inc.*, No. 9:17-CV-0088 (MAD/TWD), 2018 WL 1578157, at *4 (N.D.N.Y. Mar. 28, 2018) (quoting *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003)); *see also Ray v. Zamilus*, No. 13-CV-2201, 2017 WL 4329722, *8 (S.D.N.Y. Sept. 27, 2017) (finding that where a "plaintiff

suffered from a delay in treatment, rather than a complete lack of treatment, the objective element must be satisfied by harm that resulted from the delay").

"Second, the defendant must act with a sufficiently culpable state of mind," *Chance*, 143 F.3d at 702 (internal quotation marks and citations omitted); that is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) (With respect to the subjective element, a plaintiff must also demonstrate that defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' ").

Non-medical personnel may be held liable for deliberate indifference to medical needs where a plaintiff demonstrates that the prison personnel intentionally denied or delayed access to medical care or intentionally interfered with medical treatment once it was prescribed. *See Banks v. No. 8932 Corr. Officer*, No. 11-CV-8359, 2013 WL 673883, at *4 (S.D.N.Y. Feb. 25, 2013) ("A prison guard's deliberate indifference to a serious medical need of a prisoner means intentionally denying or delaying access to medical care or intentionally interfering with medical treatment once it was prescribed."); *see also Estelle*, 429 U.S. at 104-05 (1976) (noting that deliberate indifference may be manifested when prison guards intentionally deny or delay access to medical care).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that all but the following medical indifference claims survive sua sponte review and require a response: (1) the First Medical Indifference Claim insofar as it is asserted against defendant Rosario; (2) the Second Medical Indifference Claim; (3) the Fifth Medical Indifference Claim insofar as it is asserted against Nurse Jane Doe #1 and Nurse Jane Doe #2; and (4) the Seventh Medical Indifference Claim. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

**\*31** Insofar as the complaint asserts a medical indifference claim against defendant Rosario based on a single missed medical trip on August 7, 2023, by plaintiff's own allegations, this official arrived at plaintiff's cell to transport him for the trip, and plaintiff "requested to speak with a supervisor" to ensure that his trip would proceed. Compl. at 57-58. While plaintiff also alleges that nobody ever returned to speak with

him, the Court has no basis to plausibly infer that defendant Rosario either (1) was aware of the medical significance of the trip, or (2) interfered with plaintiff's ability to attend the trip. Thus, plaintiff has failed to adequately plead a claim for medical indifference against this official.

Insofar as the complaint asserts a medical indifference claim against defendants Brown, Paladino, Czerwinski, Tapia, and Hilton based on allegations that these officials failed to update plaintiff's medical proxy, plaintiff does not allege that the failure to update his medical proxy resulted in the denial of any medical treatment, or otherwise exposed him to an objectively serious risk of harm. Thus, while this conduct may be evidence of deliberate indifference that is generally relevant to other underlying claims, it does not give rise to an independent Eighth Amendment claim.

Insofar as the complaint asserts a medical indifference claim against defendant Nurse Jane Doe #1 based on allegations that this official failed to treat plaintiff at his cell after he had "another seizure" on June 26, 2024, and against defendant Nurse Jane Doe #2 based on allegations that this official failed to examine plaintiff after a separate seizure around the same time, by plaintiff's own allegations, he frequently suffered from seizures in 2024. Moreover, the complaint does not allege (1) the type of post-seizure treatment plaintiff normally received or expected, (2) how any sort of treatment may have improved plaintiff's condition, (3) when plaintiff received treatment following either of these seizures, (4) the nature of the treatment that he received, (5) how plaintiff's condition worsened, if at all, based on Nurse Jane Doe #1 and Nurse Jane Doe #2 not providing any treatment, or (6) what these officials communicated to plaintiff during their visits with him, if anything. Thus, the Court has no basis to plausibly infer either that (1) plaintiff was suffering from an objectively serious medical condition when either Nurse Jane Doe #1 or Nurse Jane Doe #2 visited him at his cell, or (2) the failure by either of these officials to treat plaintiff to his satisfaction was based on deliberate indifference to his well-being.

Finally, insofar as the complaint asserts a medical indifference claim against defendants Hark, Hamilton, Penree, CERT Female, and Edick based on these officials failing to document plaintiff's injuries from a slip-and-fall incident in October 2024, and arrange for brain imaging, the complaint acknowledges that defendant Hamilton documented plaintiff's head injuries at defendant Penree's direction. *See* Compl. at 95-96. Moreover, the complaint is devoid of allegations which plausibly suggest that the

failure to document plaintiff's injuries to his satisfaction prevented him from obtaining additional necessary medical treatment for those injuries, or that plaintiff's condition worsened in some respect as a result of not having other injuries documented. Furthermore, the law is well-settled that a prisoner is not entitled to the treatment of his choosing, and the failure to document an incident after-the-fact does not, without more, give rise to an Eighth Amendment claim. *See, e.g., Cox v. Lescano*, No. 20-CV-7381, 2022 WL 2048106, at *8 (S.D.N.Y. June 7, 2022) ("Plaintiff alleges Defendant Lescano examined the depigmentation on his scalp but 'intentionally refused to note down that she viewed Cox's scalp with a light and magnified class' and 'did not even make mention of exam performed on October 8, 2018.' ... Plaintiff does not allege how the alleged false record occurred in connection with any deliberate indifference of Lescano to his medical needs."); *Evans v. Murphy*, No. 12-CV-365, 2013 WL 2250709, at *3 (W.D.N.Y. May 22, 2013) (dismissing claim that defendant "failed to document [plaintiff's] injuries to cover-up the incident[,]" noting that "[s]uch a claim does not state a constitutional claim"); *Bloomfield v. Wurzberger*, No. 9:08-CV-0619 (GLS/RFT), 2009 WL 3335892, at *5 (N.D.N.Y. Oct. 15, 2009) (filing of a false entry in an inmate's medical records, without more, does not constitute a constitutional violation); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("It is well-established that mere disagreement over the proper treatment does not create a constitutional claim."); *Wright v. Genovese*, 694 F. Supp. 2d 137, 155 (N.D.N.Y. 2010) ("An inmate does not have the right to treatment of his choice. The fact that the plaintiff might have preferred an alternative treatment ... does not rise to the level of a constitutional violation." (citation omitted)).

**\*32** In light of the foregoing, the Second Medical Indifference Claim, Seventh Medical Indifference Claim, and plaintiff's Eighth Amendment medical indifference claims against defendants Rosario, Nurse Jane Doe #1, and Nurse Jane Doe #2 are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 9. Failure-to-Protect Claims

Prison officials may separately be held liable under Section 1983 for failing to protect an inmate from conditions posing a substantial risk of serious harm. *See Farmer*, 511 U.S. at 836. In order to establish a "failure to protect," the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Farmer*, 511 U.S. at 836. Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

"One way to make out such a claim is to allege that 'a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant official being sued had been exposed to information concerning the risk and thus must have known about it.' " *Coronado v. Goord*, No. 99-CV-1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (quoting *Farmer*, 511 U.S. at 842-43); *see also Hayes*, 84 F.3d at 620-21 (prisoner's repeated expressions of fear following an inmate attack and requests for transfer as a safety measure raised a question of fact). "Courts have [also] found that a prisoner validly states an Eighth Amendment claim based on a failure to protect when he alleges that he informed corrections officers about a specific fear of assault and is then assaulted." *Davis v. Torres*, No. 10-CV-2236, 2012 WL 3070092, at *5 (S.D.N.Y. May 2, 2012), *report and recommendation adopted by* 2012 WL 3070083 (S.D.N.Y. July 27, 2012); *see also Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008) (denying summary judgment where plaintiff presented evidence that he informed sergeant of correction officers' threatening behavior and was later assaulted by those officers).

"On the other hand, an inmate's communications about 'generalized safety concerns' or 'vague concerns of future assault by unknown individuals' are insufficient to provide knowledge that the inmate is subject to a substantial risk of serious harm." *Stephens v. Venettozzi*, No. 13-CV-5779, 2016 WL 929268, at *19 (S.D.N.Y. Feb. 24, 2016) (quoting *Ross v. City of New York*, No. 12-CV-8545, 2014 WL 3844783, at *8 (S.D.N.Y. 2014), *rev'd on other grounds*, No. 14-3327 (2d Cir. July 20, 2015) (summary order)), *report and recommendation adopted sub nom. Stephens v. Venettozzi*, 2016 WL 1047388 (S.D.N.Y. Mar. 10, 2016).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's Second Failure-to-Protect Claim and Third Failure-to-Protect Claim

against defendant Stevenson survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

**\*33** With respect to the First Failure-to-Protect Claim, the complaint alleges that defendants Christopher, Hilton, Bishop, Storey, Fischer, Harris, Laliberte, Chaudry, Czerwinski, Schrader, Penree, Ferrone, Prisma, Hark, Johnson, Hamilton, and Russell failed to provide plaintiff with a shower curtain despite his requests prior to a slip and fall incident on October 5, 2024. Compl. at 92-94. Importantly, the complaint does not include any details which plausibly suggest that plaintiff specifically advised any of these officials about a risk of harm as a result of not having access to a shower curtain in advance of October 5, 2024. Furthermore, by plaintiff's own allegations, he was aware of the wet floor condition before exiting the shower, and the complaint does not allege that plaintiff was unable to exercise self-precautions on this particular day, such as covering the water with a sheet or towel, sidestepping it, or requesting assistance upon seeing it. In other words, the Court has no basis to plausibly infer either that (1) plaintiff was exposed to an objectively serious risk of harm on October 5, 2024, or (2) defendants Christopher, Hilton, Bishop, Storey, Fischer, Harris, Laliberte, Chaudry, Czerwinski, Schrader, Penree, Ferrone, Prisma, Hark, Johnson, Hamilton, or Russell knew or should have known that not providing plaintiff a shower curtain exposed him to an objectively serious risk of harm on this date. *See McCray v. Lee*, No. 16-CV-1730, 2018 WL 1620976, at \*7-9 (S.D.N.Y. Mar. 29, 2018) (concluding that a recreation area not entirely covered with ice did not present an objectively serious environment, and allegations that an official directed plaintiff into the recreation area where he slipped and fell on ice suggested, at most, negligence), *aff'd in pertinent part*, 963 F.3d 110 (2d Cir. 2020) (affirming "dismissal of so much of the [SAC] as seeks relief on the basis that the combination of the slippery conditions in the recreation yards and Kutz's order that McCray go into the yard on February 20, 2014 violated McCray's rights under the Eighth Amendment"); *Korotkova v. United States*, 990 F. Supp. 2d 324, 330 (E.D.N.Y. 2014) ("[I]n prisons—where the conditions of confinement are not voluntary or recreational ...—courts have found that 'slip-and-fall plaintiffs' do not state a cognizable claim under the Eighth Amendment."); *Fredricks v. City of New York*, No. 12-CV-3734, 2014 WL 3875181, at \*4 (S.D.N.Y. July 23, 2014) ("A prisoner's bare complaint about a slippery floor, without more, does not state an arguable claim of deliberate indifference."); *Martin*

*v. City of New York*, No. 11-CV-600, 2012 WL 1392648, at \*9 (S.D.N.Y. Apr. 20, 2012) (dismissing complaint that alleged that the plaintiff slipped and fell on a wet floor while wearing ill-fitting shoes); *Garland v. City of New York*, No. 22-CV-10947, 2023 WL 2898625, at \*3 (S.D.N.Y. Apr. 10, 2023) ("Plaintiff does not allege any facts as to the October 3, 2014, fall, or as to the May 5, 2015, shower scalding, showing that any correction official was deliberately indifferent to a risk of serious harm to Plaintiff."); *Heredia v. Doe*, 473 F. Supp. 2d 462, 463 (S.D.N.Y. 2007) (dismissing a § 1983 claim based on an allegation that the plaintiff "slipped and fell while walking to his cell" because "the pleadings fail to state facts which constitute anything more than a claim for negligence, for which there is no cause of action under ... § 1983").

With respect to the Third Failure-to-Protect Claim, the complaint alleges that defendant Stevenson verbally harassed plaintiff on October 1, 2023, suggesting in the presence of other inmates that plaintiff was incarcerated for being a sex offender, and defendants Laliberte, Tapia, Hilton, and Seguin subsequently failed to take corrective steps with respect to plaintiff's sexual harassment complaint. *See* Compl. at 193-194.

Insofar as plaintiff asserts claims against defendants Laliberte, Tapia, Hilton, and Seguin, the Court has no basis to plausibly infer from the allegations in the complaint that plaintiff faced any ongoing risk of serious harm as a result of defendant Stevenson's actions on October 1, 2023, let alone any ongoing risk that was made known to Laliberte, Tapia, Hilton, and Seguin through plaintiff's complaints. Rather, the allegations in the complaint suggest that plaintiff complained to these officials only about a past incident of harm. Thus, the alleged failure to address the wrongdoing after-the-fact does not amount to an Eighth Amendment violation. *See, e.g., Boyd v. Doe #1*, No. 9:18-CV-1333 (TJM/ATB), 2021 WL 7542409, at \*16 (N.D.N.Y. Nov. 30, 2021) (citations omitted) ("[T]he crux of [the] plaintiff's claims against [the defendants] is that they are liable for failing to sufficiently remedy the wrongs of their subordinates, despite having received notice from [the] plaintiff of the alleged misconduct. These contentions closely track the pre-*Tangreti* standard for establishing personal involvement of a supervisory official; contemplating personal involvement where an official, after being informed of the violation through report or appeal, failed to remedy the wrong. However, in the wake of *Tangreti* these allegations are insufficient to establish personal involvement of a supervisory official, and plaintiff has otherwise failed to allege facts

plausibly suggesting [the defendants'] personal involvement in the alleged conduct giving rise to [the] plaintiff's First and Eighth Amendment claims."), *report and recommendation adopted by* 2022 WL 823648 (N.D.N.Y. Mar. 18, 2022); *Germano v. Cook*, No. 21-CV-0550, 2021 WL 2810170, at *5 (D. Conn. July 6, 2021) ("But absent allegations of an ongoing violation of a prisoner's constitutional rights, such allegations that supervisors did not do enough after a constitutional violation has already occurred is not enough to show personal involvement of the supervisors in the violation of a prisoner's constitutional rights."); *Sawyer v. New York State Dept. of Corr. Servs.*, No. 11-CV-0152, 2015 WL 6644112, at *6-7 (W.D.N.Y. June 30, 2015) (dismissing failure-to-protect claim against official who received inmate's grievance expressing fear for his safety based on other inmates calling him a "rat" and a "snitch," even though plaintiff alleged he was assaulted following an investigation of the grievance by another official, noting that the amended complaint and documents attached thereto failed to "reveal that Plaintiff ever asserted a physical attack was imminent such that [the official who received plaintiff's grievance] cannot be found to have known that Plaintiff was being threatened by certain inmates with actual or imminent harm" (internal quotation mark and citation omitted)), *report and recommendation adopted in pertinent part by* 2015 WL 6641471 (W.D.N.Y. Oct. 28, 2015); *Lombardo v. Stone*, No. 99-CV-4603, 2001 WL 940559, at *7 (S.D.N.Y. Aug. 20, 2001) ("Plaintiff's claims against Lee is that she failed to investigate her subordinates and preserve evidence against them. The failure to investigate is not sufficient to sustain an Eighth Amendment claim." (collecting cases)).

**\*34** Finally, with respect to the Fourth Failure-to-Protect Claim, which is based on several named defendants participating in a labor strike that allegedly created safety risks within the facility, the complaint is devoid of allegations which plausibly suggest that any of the named defendants participated in the strike out of deliberate indifference to plaintiff's well-being. Furthermore, the Court rejects the premise of plaintiff's claim of wrongdoing insofar as it imposes a duty on corrections officials to work, regardless of their personal circumstances.

In light of the foregoing, plaintiff's First Failure-to-Protect Claim, Third Failure-to-Protect Claim against all defendants other than Stevenson, and Fourth Failure-to-Protect Claim are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 10. Conditions-of-Confinement Claims

To demonstrate that the conditions of confinement constitute cruel and unusual punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. *See Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Jolly*, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference." *Wilson*, 501 U.S. at 303-04.

Generally speaking, housing an incarcerated individual in restrictive confinement, without more, and notwithstanding the restrictions that such confinement imposes on ordinary inmate life, does not constitute cruel and unusual punishment. *See Bowens v. Smith*, No. 9:11-CV-0784, 2013 WL 103575, at *10 (N.D.N.Y. Jan. 8, 2013) ("Confinement in SHU, in itself, notwithstanding its additional restrictions on inmates, has not been held to constitute cruel and unusual punishment."), *report and recommendation adopted by* 2013 WL 103596 (N.D.N.Y. Jan. 8, 2013); *Hamilton v. Fisher*, No. 9:10-CV-1066 (MAD/RFT), 2012 WL 987374, at *8 (N.D.N.Y. Feb. 29, 2012) (" '[N]ormal' conditions of SHU confinement do not constitute an Eighth Amendment violation." (citations omitted)), *report and recommendation adopted by* 2012 WL 987122 (N.D.N.Y. Mar. 22, 2012); *Jackson v. Johnson*, 15 F. Supp. 2d 341, 363 (S.D.N.Y. 1998) ("The mere placement in keeplock for 99 days is not sufficiently egregious to constitute cruel and unusual punishment under the Eighth Amendment") (collecting cases); *Dixon v. Goord*, 224 F.Supp.2d 739, 748-49 (S.D.N.Y. 2002) (holding that "allegations of having been cut off from the prison population, a computer program, religious services, legal research, medical showers and personal property, as well as limits on food access, and other normal incidents of SHU confinement," which lasted ten months, were "not violations of the Eighth Amendment"); *Marino v. Watts*, No. 12-CV-801, 2015 WL 5603454, at *3 (N.D.N.Y. May 29, 2015), *report and recommendation adopted in part, rejected in part on other grounds*, 2015 WL 5603472 (N.D.N.Y. Sept. 23, 2015) (inmate who was placed in SHU for two and one half months, during which he did not have "window ventilation, sunshine, or fresh air" in addition to other harsh conditions, failed to establish that the conditions were sufficiently serious under the objective prong of the Eighth Amendment/Due Process

analysis); *Abdur-Raheem v. Caffery*, No. 13-CV-6315, 2015 WL 667528, at *4 (S.D.N.Y. Feb. 17, 2015) (dismissing Eighth Amendment claim based on placement in SHU for six months with resulting loss of packages, commissary, and telephone privileges, noting that such deprivations "are not sufficient to give rise to an Eighth Amendment violation").

**\*35** "However, courts are also cognizant that 'the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented,' including the fact that prolonged solitary confinement 'can and does lead to significant psychological harm.' " *Smith v. Annucci*, No. 6:18-CV-06261, 2019 WL 539935, at *6 (W.D.N.Y. Feb. 11, 2019) (quoting *Peoples v. Annucci*, 180 F. Supp. 3d 294, 299 (S.D.N.Y. 2016)). "Accordingly, courts have found Eighth Amendment violations where inmates are held in solitary confinement for extended periods of time, such that the effects are 'grossly disproportionate' to the reasons for the isolation." *Smith*, 2019 WL 539935, at *6 (citing, *inter alia*, *Peoples v. Fischer*, 898 F. Supp. 2d at 621); *see also Williams v. Korines*, No. 16-CV-1157 (FJS/TWD), 2017 WL 11458011, at *5 (N.D.N.Y. Jan. 5, 2017) ("[SHU] confinement is not 'abnormal' unless it is 'totally without penological justification,' 'grossly disproportionate,' or 'involve[s] the unnecessary and wanton infliction of pain.' " (quoting *Smith v. Coughlin*, 748 F.2d 783, 787 (2d Cir. 1984))).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's First Conditions-of-Confinement Claim, Second Conditions-of-Confinement Claim, Fourth Conditions-of-Confinement Claim, Fifth Conditions-of-Confinement Claim, and Sixth Conditions-of-Confinement Claim survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

With respect to the Third Conditions-of-Confinement Claim, the complaint alleges that defendants J. Christopher and Fischer denied plaintiff access to out-of-cell programming at various times throughout his incarceration. While the Court has allowed plaintiff to proceed with an Eighth Amendment claim based on the overall nature of his restrictive confinement in the Step-Down Program, plaintiff does not have an independent constitutional right to participate in out-of-cell programming that would trigger a separate Eighth Amendment claim. *See Lutz v. Cuomo*, No. 9:19-CV-0262 (BKS/CFH), 2019 WL 13369576, at *9 (N.D.N.Y. Apr. 12, 2019) ("[I]nmates have no constitutional right to participation in prison programs." (citing *Murray v. Hulihan*, No. 9:08-CV-912 (NAM/ATB), 2010 WL 1235615, at *7 (N.D.N.Y. Mar. 17, 2010)), *adopted by* 2010 WL 1260140 (N.D.N.Y. Mar. 31, 2010), *aff'd*, 436 F. App'x 22 (2d Cir. 2011)); *Walker v. Bellnier*, No. 9:17-CV-1008 (GTS/CFH), 2017 WL 5135702, at *9 (N.D.N.Y. Nov. 3, 2017) ("[I]nmates do not have a constitutional right to participate in prison programs." (collecting cases)); *Harrison v. Fischer*, No. 08-CV-1327 (NAM/DRH), 2010 WL 2653629, at *8 (N.D.N.Y. June 7, 2010) (reasoning that discharge from prison programming is also not a constitutional violation).

With respect to the Seventh Conditions-of-Confinement Claim, which is based on allegations that defendant Martuscello suspended certain out-of-cell privileges during the labor strike, the Court has no basis to plausibly infer from the allegations in the complaint that this occurred based on defendant Martuscello's deliberate indifference to plaintiff's well-being, as opposed to for legitimate penological reasons, such as prisoner and employee safety. *Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (holding that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests").

In light of the foregoing, plaintiff's Third Conditions-of-Confinement Claim and Seventh Conditions-of-Confinement Claim are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 11. Disciplinary Due Process Claims

**\*36** To successfully state a claim under Section 1983 for denial of due process arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Ortiz v. McBride*, 380 F.3d 649, 654 (2d Cir. 2004); *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

In *Sandin v. Conner*, 515 U.S. 472 (1995), the United States Supreme Court determined that to establish a liberty interest, a plaintiff must sufficiently demonstrate that (1) the State

actually created a protected liberty interest in being free from segregation; and that (2) the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84; *Tellier,* 280 F.3d at 80; *Hynes,* 143 F.3d at 658. To determine whether an inmate has suffered an "atypical and significant hardship," the conditions imposed upon the inmate must be compared with those imposed upon the rest of the general population of the facility as well as those in administrative and protective confinement. *See Welch v. Bartlett,* 196 F.3d 389, 393 (2d Cir. 1999); *see also Vega v. Lantz,* 596 F.3d 77, 83 (2d Cir. 2010) ("To be actionable, the liberty interest must subject the prisoner to 'atypical and significant hardship ... in relation to the ordinary incidents of prison life.' ") (quoting *Sandin,* 515 U.S. at 484). When assessing the severity of the hardship imposed, a court should take into account both the duration and the conditions of the confinement, where appropriate. *See Arce v. Walker,* 139 F.3d 329, 336 (2d Cir. 1998). While certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin* (*see Colon,* 215 F.3d at 232 n.5), the Second Circuit generally takes the position that disciplinary confinement, without unusual conditions, for a period of up to 101 days will generally not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz,* 380 F.3d at 654; *Colon,* 215 F.3d at 231. As a general matter, "[a] period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." *Bunting v. Nagy,* 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citing *Sealey,* 197 F.3d at 589); *see also Palmer,* 364 F.3d at 64-65 ("Where the plaintiff was confined for an intermediate duration -- between 101 and 305 days -- 'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required.") (citing *Colon,* 215 F.3d at 232).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir. 2004) (citing, inter alia, *Wolff v. McDonnell,* 418 U.S. 539, 563-67 (1974)). The hearing officer's findings must be supported by "some" "reliable

evidence." *Id.* (citing, inter alia, *Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

**\*37** At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's First Disciplinary Due Process Claim, Third Disciplinary Due Process Claim against defendants Laliberte and Rodriguez, and Fourth Disciplinary Due Process Claim survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

With respect to the Second Disciplinary Due Process Claim, the complaint alleges that defendant Mayo issued plaintiff a misbehavior report in connection with his role in an altercation with inmate Bradley in April 2023, and defendant Storey thereafter found plaintiff guilty of the charges in the misbehavior report and sentenced him to six months of SHU confinement, which defendant Rodriguez affirmed. Compl. at 183-185. The complaint does not allege that plaintiff was innocent of the charges in the misbehavior report. Nor does the complaint include any details explaining how, if at all, plaintiff may have been denied the process to which he was entitled in connection with his disciplinary hearing. In other words, plaintiff has failed to adequately allege that he suffered a deprivation of his due process rights in connection with this disciplinary hearing.

Accordingly, plaintiff's Second Disciplinary Due Process Claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

With respect to the Third Disciplinary Due Process Claim, the complaint alleges that plaintiff was issued a misbehavior report in connection with a cup throwing incident on December 8, 2024, and defendant Lewis was assigned as plaintiff's assistant for his disciplinary hearing. Compl. at 127-128. The complaint further alleges that plaintiff asked defendant Lewis to gather certain evidence for his hearing on December 31, 2024, but later that day, plaintiff received defendant Laliberte's disciplinary disposition, which "falsely" indicated that plaintiff was "removed from the hearing for bad behavior" and found plaintiff guilty of the charges in the misbehavior report. Compl. at 128-129. While the Court will allow plaintiff to proceed with his due process claims against defendants Laliberte and Rodriguez, the Court has no basis to plausibly infer from the allegations in the complaint that

defendant Lewis was personally involved in the alleged due process deprivation. Indeed, by plaintiff's own allegations, by the time he spoke with defendant Lewis and requested assistance, defendant Laliberte had already reached a decision on the disciplinary charges.

Accordingly, insofar as plaintiff's Third Disciplinary Due Process Claim is asserted against ORC Lewis, that claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

With respect to the Fifth Disciplinary Due Process Claim, the complaint alleges that plaintiff was issued a misbehavior report by defendant Moss based on a milk throwing incident on May 4, 2025, and defendant Ciancio thereafter found plaintiff guilty of the charges and imposed an "excessively harsh sentence" that included loss of package, phone, tablet, commissary, and property privileges for 120 days and six months loss of good time credits. Compl. at 236-239.

**\*38** Plaintiff does not allege that he was innocent of the charges in the misbehavior report. Nor does plaintiff explain how he believes he was denied the process to which he was entitled during his disciplinary hearing. Rather, he alleges more generically that defendant Ciancio should not have served as the hearing officer based on a bias against plaintiff, and that the imposed sentence was "excessively harsh." However, the fact that this official previously served as a hearing officer and issued a ruling that was reversed in a state court proceeding does not, without more, plausibly suggest that plaintiff was deprived of the process to which he was entitled.

Furthermore, a loss of privileges for 120 days, without any accompanying restrictive confinement, does not trigger a liberty interest. *See, e.g., Burrell v. Durkin*, No. 9:22-CV-0102 (BKS/ML), 2022 WL 22955445, at \*11 (N.D.N.Y. Apr. 20, 2022) ("Defendant LeClaire, however, sanctioned plaintiff only to 10 days of SHU confinement and 90 days loss of commissary, packages, and phone privileges.... None of these sanctions constitute an atypical or significant hardship under the Due Process Clause."); *Taylor v. Glover*, No. 21-CV-06452, 2024 WL 5090172, at \*8 (S.D.N.Y. Dec. 11, 2024) ("[C]ourts in the Second Circuit have consistently held the loss of commissary, package, and visitation privileges does not implicate liberty interests."); *McLellan v. Chapdelaine*, No. 16-CV-02032, 2017 WL 388804, at \*4 (D. Conn. Jan. 27, 2017) (holding that loss of commissary for sixty days did not constitute significant or atypical hardship); *Woodward v. Lytle*, No. 9:16-CV-1174 (NAM/DEP), 2016 WL 11906586, at \*6 (N.D.N.Y. Oct. 19, 2016) ("[P]laintiff has not alleged facts which plausibly suggest that he enjoyed a protected liberty interest in being free from the sanction related to the conditions of his confinement – ninety (90) days loss of privileges."); *Alexander v. Fischer*, No. 9:14-CV-0548 (GLS/ATB), 2015 WL 10568892, at \*4 (N.D.N.Y. Dec. 21, 2015) ("The loss of visitation and related privileges, the only other deprivations identified by plaintiff, do not rise to the level of an 'atypical and significant hardship' so as to create a liberty interest protected by procedural due process."), adopted by 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016); *Smart v. Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) ("[T]he loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest under New York law.").[9]

[9]
> Because the sanction allegedly included a loss of good time credits, the disciplinary sentence subjected plaintiff to "mixed sanctions" affecting both the duration (recommended good time loss) and conditions of his confinement (loss of privileges), and plaintiff has not alleged that the disciplinary determination was reversed in an Article 78 proceeding. Thus, even if the loss of privileges could be deemed sufficient to trigger a liberty interest, plaintiff's claim would still be barred by the favorable termination rule articulated in *Heck v. Humphrey*, 512 U.S. 477 (1994) unless he "abandon[ed], not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding[s] he is attacking in [this] § 1983 suit." *Peralta v. Vasquez*, 467 F.3d 98, 103 (2d Cir. 2006) (holding that "a prisoner subject to such mixed sanctions can proceed separately, under § 1983, with a challenge to the sanctions affecting his conditions of confinement without satisfying the favorable termination rule, *but ... he can only do so if he is willing to forgo once and for all any challenge to any sanctions that affect the duration of his confinement*" (emphasis in original)).

**\*39** Accordingly, plaintiff's Fifth Disciplinary Due Process Claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

Finally, with respect to the Sixth Disciplinary Due Process Claim, the Court finds that the complaint alleges sufficient facts for this claim to survive sua sponte review and require a response. However, the disciplinary sentence imposed by defendant Stanley implicates the validity of plaintiff's disciplinary conviction and sentence because plaintiff was subjected to "mixed sanctions" affecting both the duration (recommended good time loss) and conditions of his confinement (SHU). *See* Compl. at 233-236. Moreover, plaintiff alleges that his Article 78 proceeding was pending as of the filing of the complaint. *Id*. at 236.

Since plaintiff has not demonstrated that his disciplinary disposition has been invalidated, *Heck* bars this due process claim unless plaintiff "abandon[s], not just now, but also in any future proceeding, any claims he may have with respect to the duration of his confinement that arise out of the proceeding[s] he is attacking in [this] § 1983 suit." *Peralta, 467 F.3d at 104*. Accordingly, the Court directs plaintiff to advise the Court in writing, within thirty (30) days of the filing date of this Decision and Order, whether he waives for all times all claims relating to the disciplinary sanctions imposed by defendant Stanley affecting the duration of his confinement in order to proceed with his claims challenging the sanctions affecting the conditions of his confinement. The Court specifically advises plaintiff that his failure to file this statement (the "*Peralta* Waiver") within the required time will be interpreted as his refusal to waive these claims, and such failure will result in the dismissal without prejudice of the Sixth Disciplinary Due Process Claim.

### 12. Due Process Claim Based on OBS Cell Placement

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's due process claim against defendants Ferrone, Henry, Walker, McGraw, Shue, Patek, Gabel, and Corrections Lieutenant John Doe based on placing plaintiff in an OBS cell in December 2024 without a hearing survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 13. Due Process Claim Based on "Negative Informationals"

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's due process claims against defendant Hughes and the PMT members based on the imposition of "negative informationals" and "false refusals" that resulted in plaintiff being denied privileges without a hearing survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 14. Medical Privacy Claims

The Second Circuit has recognized a constitutional right to privacy, which protects "the individual interest in avoiding disclosure of personal matters." *Matson v. Bd. of Educ. of City Sch. Dist. of N.Y., 631 F.3d 57, 63 (2d Cir. 2011)* (citation omitted). Specifically, the Due Process Clause of the Fourteenth Amendment protects a "right to privacy [that] can be characterized as a right to 'confidentiality,' " which "includes the right to protection regarding information about the state of one's health." *Doe v. City of N.Y., 15 F.3d 264, 267 (2d Cir. 1994)*. "[P]risoners retain a right to privacy for medical information unless (1) that disclosure was reasonably related to legitimate penological interests or (2) the information ... was not the type of sensitive medical information contemplated by the courts for constitutional protection." *Simon v. N.Y.C. Dep't of Corr.*, No. 12-CV-8624, 2013 WL 4792840, at *2 (S.D.N.Y. Aug. 29, 2013) (citing *Powell v. Schriver, 175 F.3d 107, 111-13 (2d Cir. 1999)*).

**\*40**  At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's medical privacy claims against defendant Mohammed, Ferguson, and Schrader survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

### 15. Destruction of Property Claims

The Supreme Court has held that even the unauthorized intentional destruction of a prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson, 468 U.S. at 531* (citing *Parratt v. Taylor, 451 U.S. 527, 541 (1981)*);

see also *Rivera-Powell v. New York City Board of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) ("When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post deprivation remedy."). As noted, "New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action." *Jackson*, 256 F.3d at 96; *Davis*, 311 Fed. App'x at 400 ("The existence of this adequate post-deprivation state remedy would thus preclude [plaintiff's] due process claim under § 1983 [for lost personal property]."). Moreover, the complaint is devoid of allegations which plausibly suggest that adequate post-deprivation remedies to pursue expenses associated with plaintiff's lost or destroyed property were or are unavailable to him.

Accordingly, plaintiff's Fourteenth Amendment due process claim based on the loss or destruction of personal property is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 16. Denial of Adequate Grievance Channels

It is well-settled that an incarcerated individual has no constitutional right of access to an internal grievance process. *Rhodes v. Hoy*, No. 9:05-CV-0836 (FJS/DEP), 2007 WL 1343649, at *6 (N.D.N.Y. May 5, 2007) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."); *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see to it that grievances are properly processed does not create a claim under Section 1983). Thus, an alleged failure to afford an incarcerated individual meaningful access to the internal grievance procedure, or meaningfully consider a grievance, does not give rise to a cognizable constitutional claim. *See Perrilla v. Fischer*, No. 13-CV-0398, 2013 WL 5798557, at *7 (W.D.N.Y. Oct. 28, 2013) ("[A]llegations against [the Superintendent] and the IGRC Supervisor are subject to dismissal because it is well-established that the review, denial or affirmance of a denial of a grievance is insufficient to establish personal involvement."); *Johnson v. McKay*, No. 9:14-CV-0803 (BKS/TWD), 2015 WL 1735102,

at *6 (N.D.N.Y. Apr. 16, 2015) ("[E]ven assuming that defendants denied plaintiff evidence for or access to inmate grievance procedures at Upstate Correctional Facility, such facts simply do not implicate the First Amendment or give rise to a constitutional claim.").

**\*41** Furthermore, inmates do not have a due process right to an investigation requested through a grievance. *See DeShaney v. Winnebago Soc. Servs.*, 489 U.S. 189, 196 (1989) (The Due Process Clause "generally confers no affirmative right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."); *Pine v. Seally*, No. 9:09-CV-1198 (DNH/ATB), 2011 WL 856426, at *9 (N.D.N.Y. Feb. 4, 2011) ("To the extent that plaintiffs attempt to assert a separate constitutional claim of 'failure to investigate,' the law is ... clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials.") (citing *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (collecting cases)); *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 341-42 (S.D.N.Y. 2003) (Inmates do not have a due process right to a thorough investigation of grievances).

Accordingly, insofar as the complaint may be construed to assert Fourteenth Amendment due process claims related to plaintiff's lack of meaningful access to grievance channels and/or the alleged failure to process and consider plaintiff's grievances, such claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 17. HIPAA Claims

To the extent that plaintiff claims that his HIPAA rights were violated, "there is no private right of action under HIPAA, express or implied." *Meadows v. United Servs., Inc.*, 963 F.3d 240, 242 (2d Cir. 2020) (per curiam). "Instead, HIPAA provides for penalties to be imposed by the Secretary of the Department of Health and Human Services." *Id.* at 244.

Accordingly, plaintiff's HIPAA claims are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### 18. Violation of the HALT Act

Insofar as plaintiff has asserted one or more claims under the HALT Act, there are at least three problems with allowing plaintiff to litigate his claims under this statute in this case. First, New York Correction Law § 24 provides a jurisdictional limitation regarding state law claims asserted against any officer or employee of the New York State Department of Corrections and Community Supervision ("DOCCS"), and thus, "the Court is obligated to address the issue on initial review." *See Flynn v. Ward*, No. 9:15-CV-1028 (GLS/CFH), 2015 WL 8056060, at *6 (N.D.N.Y. Dec. 4, 2015). "Claims for damages arising out of a DOCCS employee's act performed within the scope of his employment may be maintained in the New York Court of Claims as a claim against the State of New York." *Heyliger v. Gebler*, 496 F. Supp. 2d 250, 252 (W.D.N.Y. 2007). Courts look at the following factors to determine whether a defendant's action is within the scope of employment:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in the actual practice; whether the act is one commonly done by any employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could have reasonably anticipated.

*Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997) (quotations and citations omitted).

The test to determine whether the defendants' actions fall within the scope of their employment is "whether the act was done while the servant was doing his master's work no matter how irregularly, or with what disregard of the instructions." *Cruz v. New York*, 24 F. Supp. 3d 299, 309 (W.D.N.Y. 2014) (citing *Cepeda v. Coughlin*, 128 A.D.2d 995, 996 (3d Dep't 1987)). "In certain circumstances, conduct that is 'prompted by purely personal reasons unrelated to the employers' interest,' or 'an intentional course of conduct contrary to institutional rules, training and common sense,' may be found outside the scope of employment." *Flynn*, 2015 WL 8056060, at *6 (quoting *Johnson v. N.Y. State Dep't of Corr. Servs. and Cmty. Supervision*, No. 11-CV-0079, 2013 W L 5347468, at *3 (W.D.N.Y. Sept. 23, 2013)).

**\*42** Here, the complaint lacks allegations which plausibly suggest that any of the named defendants who were responsible for plaintiff's restrictive confinement acted for purely personal reasons unrelated to the employers' interest.

Second, even assuming that New York Correction Law § 24 does not present a jurisdictional bar to plaintiff's claim under the HALT Act, the federal statute governing the exercise of supplemental jurisdiction over state law claims allows this Court to exercise supplemental jurisdiction over claims that are "so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, even where such a relationship exists between federal and state claims, 28 U.S.C. § 1367(c) provides that the district court "may decline to exercise supplemental jurisdiction" for any of the following reasons: "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction."

The Court has little trouble concluding that plaintiff's claims under the HALT Act raise novel issues of state law. For example, it is not entirely clear whether the law contemplates a private right of action. *Compare Suarez v. Annucci*, No. 20-CV-7133, 2021 WL 6065765, at *13 (S.D.N.Y. Dec. 21, 2021) (holding that, for claims involving a prisoner with serious mental illness who had been confined in segregated housing, "Section 137(6) does include a private right of action consistent with the legislative purposes and scheme"), *with Correa v. Lynch*, No. 20-CV-2875, 2021 WL 2036697, at *8 (S.D.N.Y. May 20, 2021) (holding that there is no private right of action allowing a prisoner to sue for a violation of N.Y. Corr. Law § 137(5), which prohibits "degrading treatment" or most corporal punishment). Furthermore, even if the Court were to assume that the HALT Act contemplates a private right of action, it is unclear how damages should be calculated, or whether additional damages may be awarded by a federal court that cannot be awarded to plaintiff in an Article 78 proceeding. These uncertainties present "other compelling reasons" for this Court to decline to exercise supplemental jurisdiction over plaintiff's state law claim. *See* 28 U.S.C. § 1367(c)(4).

Third, plaintiff acknowledges in his pleading that he filed an action in the New York Court of Claims, which is "intertwined with [and] related to this matter[.]" *See* Compl. at 23. The status of that proceeding is unknown. However, "[o]nce a party chooses to litigate his claims by way of an Article 78 proceeding, he assumes the risk of collateral estoppel being applied in a subsequent proceeding such as a § 1983 action." *Fortunatus v. Clinton Cnty., N.Y.*, 937 F. Supp. 2d 320, 332 (N.D.N.Y. 2013) (citing *Giakoumelos v. Coughlin*, 88 F.3d 56 (2d Cir. 1996) (applying collateral estoppel to a previous Article 78 judgment where the plaintiff failed to show that there were procedural deficiencies or a lack of an opportunity to litigate)). Thus, while there does not appear to be any prejudice to this Court declining to exercise supplemental jurisdiction over plaintiff's state law claim, there are undoubtedly concerns with doing the opposite.

**\*43** In light of the foregoing, the Court declines to exercise supplemental jurisdiction over plaintiff's claims under the HALT Act.

## IV. FIRST MOTION FOR INJUNCTIVE RELIEF

Preliminary injunctive relief " ' is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.' " *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted)). However, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted)). A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts.*, 598 F.3d at 35 n.4) (internal quotation marks omitted); *see also Tom Doherty*

*Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (a plaintiff seeking a mandatory injunction must make a "clear" or "substantial" showing of a likelihood of success on the merits of his claim).

The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Perri v. Bloomberg*, No. 06-CV-0403, 2008 WL 2944642, at \* 2 (E.D.N.Y. Jul. 31, 2008). The district court has wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 511 (2d Cir. 2005). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994)) (other citations omitted).

" 'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.' " *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group Ltd.*, 437 Fed. App'x 57, 58 (2d Cir. 2011) (summary order) (quoting *Faiveley Transport Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)). Generally, an alleged violation of a constitutional right creates a presumption of irreparable harm. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). However, speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983); *see also Garcia v. Arevalo*, No. 93-CV-8147, 1994 WL 383238, at \*2 (S.D.N.Y. June 27, 1994) ("It is well settled that an allegation of the mere possibility of irreparable harm is insufficient to justify the drastic remedy of preliminary injunction.... A party who seeks the extraordinary remedy of a preliminary injunction must show the alleged irreparable harm to be imminent, not remote or speculative, and the alleged injury to constitute one that is incapable of being fully remedied by monetary damages." (citations omitted)).

**\*44** Plaintiff's motion seeks affirmative injunctive relief directing officials to "provide a medically appropriate course of orthopedic follow-ups" for plaintiff's right knee, schedule "follow-up treatment with the endocrinologist" for plaintiff's thyroid and adrenal gland abnormalities, reschedule an MRI for plaintiff's lower back, and transfer plaintiff to "an appropriate correctional facility Special Population [and] or

2025 WL 3265447

protective custody." *See* First Motion for Injunctive Relief at 1-2.

Insofar as plaintiff seeks a transfer to another facility, in general, it is DOCCS, and not this Court, that determines where plaintiff will be housed during his period of incarceration. *See Meachum v. Fano*, 427 U.S. 215, 229 (1976) (stating that "[t]he federal courts do not sit to supervise state prisons, the administration of which is [of] acute interest to the States") (citations omitted); *Olim v. Wakinekona*, 461 U.S. 238, 248-49 (1983) (stating that inmates have no right to be confined in a particular state or particular prison within a given state); *Montayne v. Haymes*, 427 U.S. 236, 243 (1976) (holding that New York state prisoners have no right to incarceration at a particular prison facility). It is well-established that DOCCS has "broad leeway in deciding where to house the inmates under its protective care." *McFadden v. Solfaro*, Nos. 95-CV-1148, 95-CV-3790, 1998 WL 199923, at *10 (S.D.N.Y. Apr. 23, 1998).

With that said, upon review of the file in this matter, the Court finds that a response to plaintiff's First Preliminary Injunction Motion must be filed by the surviving defendants. The Court directs these defendants, or their counsel, to respond to plaintiff's motion (Dkt. No. 2) within thirty (30) days of the date of service of the summons and complaint upon any defendant. After a defendant has filed a response to the motion, the Clerk shall return this file to the Court for further review.

## V. FURTHER FILINGS

As noted, this action was initially comprised of a 360-page handwritten complaint and 264 pages of exhibits. Since the complaint was filed, the Court has received over 1000 pages of documents from plaintiff. *See* Dkt. Nos. 7, 8, 9, 10, 12, 13, 14, 15, 16, 17, 18.

By Text Order entered on October 16, 2025, the Honorable Miroslav Lovric advised plaintiff that this Court "does not accept submissions on a rolling basis[,]" and that "any further submissions prior to a ruling on the sufficiency of the complaint ... [would] be stricken from the docket." Dkt. No. 19. Despite this Text Order, plaintiff has continued to file documents with the Court. *See* Dkt. Nos. 20, 21.

District courts have the "inherent authority to manage their dockets" to promote "the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) (citations omitted). "Absent extraordinary circumstances, such as a

demonstrated history of frivolous and vexatious litigation, ... or a failure to comply with sanctions imposed for such conduct, ... a court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure." *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 649 (2d Cir. 1987). However, an action cannot proceed unless and until service is completed. Although it is the Court's obligation to assist with service when a pro se prisoner is proceeding in forma pauperis, *see* Fed. R. Civ. P. 4(c)(3) (Marshals Service must be appointed to serve process when plaintiff is authorized to proceed in forma pauperis); 28 U.S.C. § 1915(d) ("[T]he officers of the court shall issue and serve all process and perform all duties in [in forma pauperis] cases."); *see also Wright v. Lewis*, 76 F.3d 57, 59 (2d Cir. 1996) ("By granting Wright leave to pursue his § 1983 claim in forma pauperis, Magistrate Smith shifted the responsibility for serving the complaint from Wright to the court."); *Kavazanjian v. Rice*, No. 03-CV-1923, 2005 WL 1377946, at *2 (E.D.N.Y. June 6, 2005) (noting that "[f]or plaintiffs proceeding in forma pauperis ..., the U.S. Marshal's Office—not the plaintiff—is primarily responsible for effecting service."), the Court cannot do so unless and until the pro se prisoner has provided the required documents. *See Carpio v. Luther*, No. 06-CV-0857, 2009 WL 605300, at *1 (W.D.N.Y. Mar. 9, 2009) (acknowledging the Court's "obligation to assist a pro se incarcerated litigant ... to cause the summons and complaint to be served" but noting further that "the plaintiff nonetheless retains the obligation to provide the necessary information" for this to occur). [10]

[10]    Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, in the absence of a showing of good cause, "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."

**\*45**  Moreover, Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute it, or to comply with the procedural rules or orders of the court. Fed. R. Civ. P. 41(b); *see also Link v. Wabash R.R. Co.*, 370 U.S. 626 (1962). This power to dismiss may be exercised when necessary to achieve orderly and expeditious disposition of cases. *See Freeman v. Lundrigan*, No. 95-CV-1190 (RSP/RWS), 1996 WL 481534, at *1 (N.D.N.Y. Aug. 22, 1996).

In light of the foregoing, and plaintiff's burdensome practices to date, which has resulted in this Court spending considerable time on this matter, plaintiff is advised that he must provide the Court with all necessary copies of his complaint in order for this case to proceed. Plaintiff is further advised that the Court will not (1) consider any further submissions from him until after receipt of the copies necessary for service, or (2) accept any further pleading submissions from him until after the completion of service, at which point any further amendment must identify any remaining "Doe" officials in this case, and be limited to the events discussed in the original complaint.

**VI. CONCLUSION**

**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's IFP Application (Dkt. No. 3) is **GRANTED**. [11] The Clerk shall provide the superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form (Dkt. No. 4), and notify the official that this action has been filed and that plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

[11]    Plaintiff should note that although his IFP Application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that the Clerk shall provide a copy of plaintiff's authorization form (Dkt. No. 4) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the Clerk shall update the docket to identify "Maintenance Man Slim" as "Dutcher"; and it is further

**ORDERED** that the following Section 1983 claims **SURVIVE** sua sponte review and require a response: (1) each of plaintiff's retaliation claims; (2) plaintiff's mail tampering claims; (3) plaintiff's free exercise claims; (4) plaintiff's Fourth Amendment privacy claims; (5) each of plaintiff's excessive force and failure-to-intervene claims; (6) plaintiff's First Medical Indifference Claim except insofar as that claim is asserted against defendant Rosario; (7) plaintiff's Third Medical Indifference Claim; (8) plaintiff's Fourth Medical Indifference Claim; (9) plaintiff's Fifth Medical Indifference Claim except insofar as that claim is asserted against Nurse Jane Doe #1 and Nurse Jane Doe #2; (10) plaintiff's Sixth Medical Indifference Claim; (11)

plaintiff's Eighth Medical Indifference Claim; (12) plaintiff's Ninth Medical Indifference Claim; (13) plaintiff's Tenth Medical Indifference Claim; (14) plaintiff's Eleventh Medical Indifference Claim; (15) plaintiff's Second Failure-to-Protect Claim; (16) plaintiff's Third Failure-to-Protect Claim insofar as it is asserted against defendant Stevenson; (17) plaintiff's First Conditions-of-Confinement Claim; (18) plaintiff's Second Conditions-of-Confinement Claim; (19) plaintiff's Fourth Conditions-of-Confinement Claim; (20) plaintiff's Fifth Conditions-of-Confinement Claim; (21) plaintiff's Sixth Conditions-of-Confinement Claim; (22) plaintiff's First Disciplinary Due Process Claim; (23) plaintiff's Third Disciplinary Due Process Claim except insofar as it is asserted against ORC Lewis; (24) plaintiff's Fourth Disciplinary Due Process Claim; (25) plaintiff's Fourteenth Amendment due process claims against defendants Ferrone, Henry, Walker, McGraw, Shue, Patek, Gabel, and Corrections Lieutenant John Doe based on placing plaintiff in an OBS cell in December 2024 without a hearing; (26) plaintiff's Fourteenth Amendment due process claims against the PMT members and defendant Hughes based on the imposition of "negative informationals" and "false refusals" that resulted in the denial of privileges without a hearing; (27) plaintiff's Fourteenth Amendment medical privacy claims against defendants Mohammed, Ferguson, and Schrader; and it is further

**\*46** **ORDERED** that plaintiff advise the Court in writing, **within thirty (30) days of the filing date of this Decision and Order**, whether he waives for all times all claims in this action relating to the Sixth Disciplinary Due Process Claim, i.e., the disciplinary sanctions imposed by defendant Stanley on or around June 2, 2025, affecting the duration of his confinement (i.e., the loss of good time) in order to proceed with his claims challenging the sanctions affecting the conditions of his confinement. [12] The Court specifically advises plaintiff that his failure to file this "*Peralta* Waiver" within the required time will be interpreted as his refusal to waive these claims, and such failure will result in the dismissal without prejudice of the Fourteenth Amendment due process claims against defendants Christopher and Stanley; and it is further

[12]    In the alternative, plaintiff may demonstrate that the disciplinary sentence was reversed or invalidated.

**ORDERED** that the Court declines to exercise supplemental jurisdiction over plaintiff's claims under N.Y. Correction Law § 137(6), which are **DISMISSED without prejudice**

pursuant to Fed. R. Civ. P. 12(b)(1) and 28 U.S.C. § 1367(c); and it is further

**ORDERED** that plaintiff's remaining Section 1983 claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; [13] and it is further

[13]   Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint, subject to the limitations set forth above. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised. Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. Plaintiff's deadline to amend his pleading as a matter of course is set forth in Rule 15(a) of the Federal Rules of Civil Procedure.

**ORDERED** that plaintiff's Second Motion for Injunctive Relief (Dkt. No. 11) is **DENIED** as duplicative of the First Motion for Injunctive Relief; and it is further

**ORDERED** that a response to plaintiff's first motion for preliminary injunctive relief (Dkt. No. 2) be filed by the remaining defendants, or their counsel, within thirty (30) days of the date of service of the summons and complaint on any defendant; and it is further

**ORDERED** that upon receipt from plaintiff of 119 copies of his complaint (without exhibits), the Clerk shall issue summonses and forward them, along with these copies, to the United States Marshal for service upon defendants Chandler, Mazzone, Manson, Hamilton, Penree, Surgey, Clapper, Schrader, Chaudry, Czerwinski, Schrader, Dana, Candy Hayes, Banks, Brown, Walhby, Ajukik, Hosma, Mohammed, Abdelwahab, Noble, Max, Deck, Ardo, Venettozzi, Conrad, Passage, Hilton, McKoy, Mayo, Klien, Hall, Yaddow, Tapia, Ross, Patek, Gabel, Shue, Lamoch, Aiken, Kallay, Jennifer Christopher, Christopher Hayes, Hoffman, LaCoppola, Nurse Jane Doe, Russell, Paladino, Fischer, Harris, Storey, Fish, Kallay, Dorchester, Perham, Schiavi, Tourtelot, Costello, Dundden, Johnson, Carpenter, Bishop, Murphy, Mosher, Laliberte, Ferrone, Prisma, Walker, Reddner, Slate, Hark,

Smalls, Henry, McGraw, Sullivan, Martuscello, Annucci, Rodriguez, Matlock, Stevens, Gardner, Dehli, Martin, Nicholas, Peters, Ferris, Ward, Corrections Officer Lewis, Lavinski, Kowalski, Fuse, Bailey, Cole, Klossner, C. Zangari, D. Zangari, Galusha, Fear, Ortiz, Bartlett, Townsend, Moss, Seguin, Luther, Annarino, Stevenson, Johnson, Hamlin, Worden, Rogers, Short, Fann, Mr. Dutcher, Burns, Barbosa, Ciancio, Everson, Stanley, and Hughes (collectively, the "Non-Doe Surviving Defendants"). [14]   The Clerk shall forward a copy of the summons and complaint by electronic mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

[14]   Summonses will not issue for Corrections Officers John Doe #1-5, Corrections Lieutenant John Doe, John Doe Short Guy, John Doe Tall Guy, and National Guard Officer John Doe because the U.S. Marshal cannot effect service on an individual who has not been identified by name.

 **\*47   ORDERED** that the Clerk **TERMINATE** all officials other than the aforementioned defendants for which the Clerk has been directed to issue summonses; and it is further

**ORDERED** that plaintiff take reasonable steps to ascertain the identity of the remaining "Doe" defendants, and when identified, seek to amend the complaint to add the individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a); and it is further

**ORDERED** that a response to the complaint be filed by the Non-Doe Surviving Defendants, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action**; and it is further

2025 WL 3265447

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED**.

**All Citations**

Slip Copy, 2025 WL 3265447

---

**End of Document**                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings**

There are no Filings for this citation.

**History**

There are no History results for this citation.

WESTLAW     © 2026 Thomson Reuters. No claim to original U.S. Government Works.

Case 5:26-cv-00152-BKS-MJK   Document 11   Filed 02/04/26   Page 53 of 90

Powell v. Ocwen Loan Servicing, LLC, Not Reported in Fed. Rptr. (2024)

2024 WL 763406

2024 WL 763406
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Gary POWELL, Gail Powell, Plaintiffs-Appellants,

v.

OCWEN LOAN SERVICING, LLC, as Servicer
for Deutsche Bank National Trust Company, PHH
Mortgage, DBA Newrez, Hinshaw & Culbertson,
LLP, Does, 1-50, [1] Defendants-Appellees.

[1]   The Clerk of Court is respectfully directed to
amend the official caption as set forth above.

23-421
|
February 26, 2024

Appeal from a judgment of the United States District Court
for the District of Connecticut (Kari A. Dooley, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED IN PART** and
**VACATED** and **REMANDED IN PART**.

**Attorneys and Law Firms**

FOR PLAINTIFFS-APPELLANTS: Gary Powell, Gail
Powell, pro se, Wallingford, CT.

FOR DEFENDANTS-APPELLEES: Marissa I. Delinks,
Aaron A. Fredericks, Hinshaw & Culbertson LLP, Boston,
MA.

PRESENT: DEBRA ANN LIVINGSTON, Chief Judge,
GERARD E. LYNCH, BETH ROBINSON, Circuit Judges.

## SUMMARY ORDER

 *1  Because we write primarily for the parties, who are
familiar with the history of this case, we recite only what is
necessary to explain our decision. In 2018, a Connecticut state
court entered a judgment of foreclosure on the Wallingford
home of plaintiffs Gary and Gail Powell. In the years since,
the Powells have brought a variety of state and federal
challenges seeking to stave off the sale of their home—at least

in part successfully, as the sale does not appear to have taken
place yet.

In 2020, during the pendency of a prior federal lawsuit filed
after the initial state judgment of foreclosure, the Powells
claim they entered into a settlement agreement with their
loan servicer, which was intended to end the state and federal
litigation. Although the copy of the agreement provided by
the Powells is heavily redacted, the agreement appears to be
aimed at giving the Powells an opportunity to pay off their
outstanding debt on more favorable terms.

The Powells filed this lawsuit in December 2021, alleging that
the defendants—primarily, servicer PHH Mortgage, DBA
Newrez ("PHH Mortgage") [2] and its law firm, Hinshaw
& Culbertson LLP ("Hinshaw")—failed to perform under
the settlement agreement. The Powells bring various state
law claims, with their main count raising a breach-of-
contract claim, and they seek enforcement of the agreement,
declaratory relief, and awards of attorney's fees and damages.

[2]   We do not address the claims against defendant
Ocwen Loan Servicing ("Ocwen") because PHH
Mortgage is Ocwen's successor by merger.

The defendants moved to dismiss the complaint, primarily on
the ground that the action was barred by the *Rooker-Feldman*
doctrine. The district court agreed, first dismissing the claims
against Hinshaw because it is not a party to the settlement
agreement (and concluding that it was otherwise protected by
litigation privilege) and then the remainder of the complaint
for lack of jurisdiction under the *Rooker-Feldman* doctrine.
*See* *Powell v. Ocwen Loan Servicing, LLC*, No. 3:21-
cv-01605 (KAD), 2023 WL 2538127 (D. Conn. Mar. 16,
2023).

This appeal followed. We conduct *de novo* review of an order
dismissing a complaint under Fed. R. Civ. P. 12(b)(1) for
lack of subject matter jurisdiction and 12(b)(6) for failure
to state a claim. *Jaghory v. N.Y. Sate Dep't of Educ.*, 131
F.3d 326, 329 (2d Cir. 1997). Because the Powells have been
*pro se* throughout this federal litigation, we construe their
submissions liberally and interpret them to raise the strongest
arguments they suggest. *Hunter v. McMahon*, 75 F.4th 62, 67
(2d Cir. 2023).

Given that the Powells do not challenge the district court's
dismissal of Hinshaw from this case, we affirm that portion
of the district court's judgment and deem the Powells' claims

2024 WL 763406

against Hinshaw abandoned. *See Debique v. Garland*, 58 F.4th 676, 684 (2d Cir. 2023) ("We consider abandoned any claims not adequately presented in an appellant's brief, and an appellant's failure to make legal or factual arguments constitutes abandonment." (internal quotation marks and citation omitted)).

**\*2** Because the Powells focus their appeal only on the district court's dismissal based on the *Rooker-Feldman* doctrine, we proceed to consider that issue as to the remaining defendants. "[U]nder what has come to be known as the *Rooker-Feldman* doctrine, lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments" because 28 U.S.C. § 1257(a) vests federal appellate jurisdiction over state judgments exclusively in the United States Supreme Court. *Lance v. Dennis*, 546 U.S. 459, 463 (2006) (per curiam). In this Circuit, an action is barred under *Rooker-Feldman* only if "(1) the federal-court plaintiff lost in state court; (2) the plaintiff complains of injuries caused by a state court judgment; (3) the plaintiff invites review and rejection of that judgment; and (4) the state judgment was rendered before the district court proceedings commenced." *Hunter*, 75 F.4th at 68 (internal quotation marks and citation omitted).

We conclude that *Rooker-Feldman* does not prevent the exercise of federal jurisdiction in this case. The Powells do not seek direct review and rejection of the foreclosure judgment. *See Vossbrinck v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2014). Instead, they allege nonperformance under a settlement agreement in which the defendants, having obtained a judgment, did not seek to immediately collect on it, and instead offered the Powells terms for retaining ownership of their home.

In effect, the Powells challenged the way in which the defendants chose to enforce (or not enforce) the foreclosure judgment they obtained in state court. *Cf. Bell v. New Jersey*, 461 U.S. 773, 779 (1983) (explaining that a judgment is generally not self-executing, and a party who secures a money judgment "may have to undertake further proceedings to collect the damages awarded"). The harm here flows from allegedly wrongful conduct in breaching a settlement agreement, not the foreclosure judgment itself. *See Sung Cho v. City of New York*, 910 F.3d 639, 647 (2d Cir. 2018) ("[T]he complaint attacks the conduct itself, and the claim does not function as a *de facto* appeal.") As we have explained, state-court losers may challenge a party's conduct in litigation that resulted in a foreclosure judgment if it does not require the

federal court to "consider[ ] independently ... the merits of that foreclosure judgment." *Hansen v. Miller*, 52 F.4th 96, 100 (2d Cir. 2022). The same is true of conduct in litigation that follows from a state court foreclosure judgement.

Our decision is narrow. We do not decide whether the Powells have a valid or plausible breach claim, or even whether the defendants are bound by the alleged settlement agreement. We express no opinion as to whether the Powells' breach of contract claims or claims for relief are subject to issue preclusion on the basis of state court rulings. We conclude only that jurisdiction to enforce this alleged settlement agreement, whether by awarding damages or compelling performance by PHH, is not barred by *Rooker-Feldman* simply because the settlement agreement was ancillary to a state court judgment.

Although *Rooker-Feldman* is not a bar to jurisdiction in this case, the federal courts may lack jurisdiction due to incomplete diversity. This Court has the "independent obligation to consider the presence or absence of subject matter jurisdiction *sua sponte*." *Joseph v. Leavitt*, 465 F.3d 87, 89 (2d Cir. 2006). "[T]he party seeking to invoke jurisdiction under 28 U.S.C. § 1332 bears the burden of demonstrating that the grounds for diversity exist and that diversity is complete." *Herrick Co. v. SCS Commc'ns, Inc.*, 251 F.3d 315, 322–23 (2d Cir. 2001) (internal quotation marks and citation omitted).

The Powells did not satisfy this obligation. First, their complaint failed to plead that the amount in controversy "exceeds the sum or value of $75,000." 28 U.S.C. § 1332(a). And, more crucially, the Powells did not set out a complete and accurate accounting of the defendants' citizenship. They identified Hinshaw as a Massachusetts citizen, but a law partnership like Hinshaw's "has the citizenship of each of its partners" for the purposes of establishing diversity. *Herrick*, 251 F.3d at 322. Although we affirm Hinshaw's dismissal, the Powells have also not properly alleged the citizenship of PHH Mortgage, a corporation. For the purposes of diversity jurisdiction, a corporation is a citizen of both its state of incorporation and its principal place of business. *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 60 (2d Cir. 2016). Here, the Powells have only alleged PHH Mortgage's principal place of business. Accordingly, if the defendant is a citizen of Connecticut, the required complete diversity would be lacking because the Powells allege that they are citizens of Connecticut. Because the factual record does not definitively establish or defeat diversity jurisdiction, we leave this question for the district court to decide.

**Powell v. Ocwen Loan Servicing, LLC, Not Reported in Fed. Rptr. (2024)**

2024 WL 763406

**\*3** We do not reach the remaining arguments in light of our disposition above. Accordingly, we **AFFIRM IN PART** and **VACATE** and **REMAND IN PART** for further proceedings consistent with this order.

**All Citations**

Not Reported in Fed. Rptr., 2024 WL 763406

---

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

## Filings (10)

| Title | PDF | Court | Date | Type |
|-------|-----|-------|------|------|
| **1. Brief of Defendants-Appellees**<br>Gary POWELL; Gail Powell, Plaintiffs-Appellants, v. OCWEN LOAN SERVICING, LLC, as Servicer for Deutsche Bank National Trust Company, PHH Mortgage d/b/a NewRez, and Hinshaw & Culbertson LLP, Defendants-Appellees.<br>2023 WL 5747934 | — | C.A.2 | Aug. 31, 2023 | Brief |
| **2. Brief of Defendants-Appellees**<br>Gary POWELL; Gail Powell, Plaintiffs-Appellants, v. OCWEN LOAN SERVICING, LLC, as Servicer for Deutsche Bank National Trust Company, PHH Mortgage d/b/a NewRez, and Hinshaw & Culbertson LLP, Defendants-Appellees.<br>2023 WL 5955229 | — | C.A.2 | Aug. 31, 2023 | Brief |
| **3. Complaint and Jury Demand**<br>Gary POWELL, Gail Powell, Plaintiff, v. OCWEN LOAN SERVICING, LLC as Servicer for Deutsche Bank National Trust Company; Phh Mortgage dba Newrez; Hinshaw & Culbertson, LLP; Does 1-50., Defendants.<br>2021 WL 5792706 | — | D.Conn. | Dec. 03, 2021 | Pleading |
| **4. Plaintiffs Motion for Reconsideration on Tro**<br>Gary POWELL, Gail Powell, Plaintiff, v. OCWEN LOAN SERVICING, LLC as Servicer for Deutsche Bank National Trust Company; PHH Mortgage dba Newrez; Hinshaw & Culbertson, LLP; Does 1-50, Defendants.<br>2022 WL 19073382 | — | D.Conn. | Sep. 19, 2022 | Motion |
| **5. Plaintiffs Surreply Opposition to Defendants Motion to Dismiss**<br>Gary POWELL, Gail Powell, Plaintiff, v. OCWEN LOAN SERVICING, LLC as Servicer for Deutsche Bank National Trust Company; PHH Mortgage dba Newrez; Hinshaw & Culbertson, LLP; Does 1-50., Defendants.<br>2022 WL 19073384 | — | D.Conn. | Aug. 17, 2022 | Motion |
| **6. Defendants' Reply Memorandum in Support of Motion to Dismiss**<br>Gary POWELL and Gail Powell, Plaintiffs, v. OCWEN LOAN SERVICING, LLC as Servicer for Deutsche Bank National Trust Company, PHH Mortgage d/b/a Newrez, and Hinshaw & Culbertson LLP, Defendants.<br>2022 WL 19073381 | — | D.Conn. | Aug. 02, 2022 | Motion |
| **7. Plaintiffs Opposition to Defendants Motion to Dismiss**<br>Gary POWELL, Gail Powell, Plaintiff, v. OCWEN LOAN SERVICING, LLC as Servicer for Deutsche Bank National Trust Company; PHH Mortgage dba Newrez; Hinshaw & Culbertson, LLP; Does 1-50., Defendants.<br>2022 WL 19073383 | — | D.Conn. | July 20, 2022 | Motion |

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **8.  Defendants Memorandum of Law in Support of their Motion to Dismiss**<br>Gary POWELL and Gail Powell, Plaintiffs, v. OCWEN LOAN SERVICING, LLC as Servicer for Deutsche Bank National Trust Company, PHH Mortgage d/b/a Newrez, and Hinshaw & Culbertson LLP, Defendants.<br>2022 WL 19073376 | — | D.Conn. | June 30, 2022 | Motion |
| **9.  Docket 23-421**<br>Powell v. Ocwen Loan Servicing, LLC | — | C.A.2 | Mar. 23, 2023 | Docket |
| **10.  Docket 3:21-CV-01605**<br>Powell et al v. Ocwen Loan Servicing, LLC et al | — | D.Conn. | Dec. 03, 2021 | Docket |

**History (4)**

**Direct History (3)**

🚩  1.  Powell v. Ocwen Loan Servicing, LLC
2023 WL 2538127 , D.Conn. , Mar. 16, 2023

*Affirmed in Part, Vacated in Part, Remanded by*

2.  Powell v. Ocwen Loan Servicing, LLC ☞
2024 WL 763406 , 2nd Cir.(Conn.) , Feb. 26, 2024

*On Remand to*

3.  Powell v. Ocwen Loan Servicing, LLC
2024 WL 5239340 , D.Conn. , Dec. 27, 2024

**Related References (1)**
4.  Powell v. Ocwen Loan Servicing, LLC
2022 WL 4095784 , D.Conn. , Sep. 07, 2022

Pina v. United States, Not Reported in Fed. Supp. (2021)

2021 WL 2019003

Case 5:26-cv-00152-BKS-MJK    Document 11    Filed 02/04/26    Page 59 of 90

2021 WL 2019003
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Frederick D. PINA, Plaintiff,
v.
The UNITED STATES of America, Defendant.

20-CV-1371 (PAE) (BCM)
|
Signed 04/20/2021

**Attorneys and Law Firms**

Frederick D. Pina, Staten Island, NY, Pro Se.

Joshua Evan Kahane, U.S. Attorney Office SDNY, New York, NY, for Defendant.

**REPORT AND RECOMMENDATION
TO THE HON. PAUL A. ENGELMAYER**

BARBARA MOSES, United States Magistrate Judge

**\*1** Plaintiff Frederick D. Pina, proceeding *pro se* on behalf of himself and his company, Japanese Juices, LLC (Japanese Juices) filed this action on February 14, 2020, pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346, *et seq.*, seeking damages arising out of a May 31, 2018 collision between a Japanese Juices vehicle, driven by Pina, and a United States Postal Service (USPS) truck. Pina alleges that the USPS truck crashed into the rear of his vehicle – a 2017 Cadillac sedan – which injured him, damaged the car, and caused Japanese Juices to lose a "highly lucrative new beverage contract" with Delta Airlines, Inc. (Delta) valued at $146 million. Compl. (Dkt. No. 2) ¶¶ 1-2, 8-10. On March 5, 2020, the Court (McMahon, C.J.) dismissed Japanese Juices as a plaintiff, without prejudice, because a limited liability company can only appear in federal court through a licensed attorney. (Dkt. No. 3.) [1]

[1] The only plaintiff listed in the caption of the Complaint is Japanese Juices. However, Chief Judge McMahon liberally construed the document to assert a claim on behalf of Pina as well as Japanese Juices, and gave Pina an opportunity to submit an application to proceed in *forma pauperis* in his own name as plaintiff, which he did on

March 12, 2020. (Dkt. No. 4.) That application was granted on July 7, 2020. (Dkt. No. 5.)

Now before me for report and recommendation (Dkt. No. 18) is defendant's motion (Dkt. No. 14), made pursuant to Fed. R. Civ. P. 12(b)(1), to dismiss all claims other than those seeking damages for personal injuries to plaintiff Pina and/or automobile repair costs incurred as a result of the accident. Defendant argues that because plaintiff's administrative FTCA claim, submitted to the USPS in June 2018, sought only personal injury damages (in the amount of $400,000) and property damage with respect to the vehicle (in the amount of $50,000), plaintiff has failed to exhaust his administrative remedies with regard to the alleged lost business opportunity, and with regard to any damages beyond the $450,000 sought in his administrative claim.

In his opposition memorandum (Pl. Opp. Mem.) (Dkt. No. 25), plaintiff does not dispute that his administrative claim sought relief limited to injuries to his person and damage to the vehicle, but blames his prior counsel, Thomas W. Hochberg, for representing him poorly during the administrative process, and further contends that the USPS examiner/adjuster who denied his claim, Kimberly Herbst, "mislead [sic] Plaintiff" into discharging his counsel, only to "immediately reject" his claim thereafter. Pl. Opp. Mem. at 1. Plaintiff also argues that he and his company "are one and of the same," *id.* at 3-4, but does not explain how that would excuse him or it from presenting the lost profits claim to the USPS.

For the reasons discussed below, I respectfully recommend that defendant's motion be granted and that plaintiff's claims be dismissed except as to the damages that he sought before the agency for his personal injuries and property damage.

**I. BACKGROUND**

**A. The Complaint**

**\*2** Plaintiff alleges that he is the founder and CEO of Japanese Juices, a start-up beverage company aimed at the commercial airline industry, which at the time of the accident was "in a year's long highly confidential" and "highly sensitive" negotiation with Delta concerning a "new beverage contract" tentatively valued (plaintiff does not say by whom) at $146 million. Compl. ¶¶ 2, 8-10, 26. On May 31, 2018, plaintiff was operating his company-owned Cadillac in Manhattan when a USPS truck "violently struck and side-swiped the front left side of [his] vehicle," causing

Case 5:26-cv-00152-BKS-MJK   Document 11   Filed 02/04/26   Page 60 of 90

Pina v. United States, Not Reported in Fed. Supp. (2021)

2021 WL 2019003

damage to the vehicle and unspecified injures to plaintiff himself, forcing him to "abandon all business operations" so that he could tend to his injuries "and other family-related matters." *Id.* ¶¶ 8-9. Plaintiff's injuries required "a battery of [ ] physical therapy sessions[,] which were medically required and directed by his prior counsel." *Id.* ¶ 10. He also suffered emotional damages. *Id.* As a result, plaintiff and his company lost the prospective contact with Delta. *Id.* Having missed "this rare opportunity," Japanese Juices suspended its operations. *Id.* [2]

[2]     Plaintiff attaches three email exchanges between himself and various Delta personnel, all dated between November 7, 2018 (six months after the accident) and July 28, 2019 (fourteen months after the accident). Compl. Ex. B. In each email exchange, plaintiff expresses an interest in a possible business partnership with Delta, only to be told that Delta is not interested "at this time" but would "keep you in mind." *Id.*

According to plaintiff, the New York Police Department's accident report "place[d] all legal liability" on the USPS driver. Compl. at ECF page 3; *see also id.* Ex. A (NYPD accident report). [3] Nonetheless, after initially offering him a $5,222.37 settlement (which he rejected), the USPS, acting through Herbst, denied his claim. *Id.* at ECF pages 6-7 (August 27, 2019 letter from Herbst to plaintiff). On this basis, plaintiff contends that the United States is responsible for all of his losses, including $146 million for the lost opportunity with Delta, attorney's fees, $200,000 in "lost company income," $7000 for car repair costs, including storage fees, and $6000 for "reimbursement of a loss commercial insurance policy." Compl. at ECF pages 4-5. [4]

[3]     The accident report itself does not appear to contain that conclusion. It does contain a diagram, based on the statements made at the scene by both drivers, indicating that the USPS driver attempted to make a right turn from the left lane, and in the process cut off Pina's vehicle. Compl. Ex. A, at 2. The USPS driver told the NYPD that he "did not see" plaintiff's car. *Id.* at 1. The accident report also states that there were "no injuries reported." *Id.*

[4]     Pina's Prayer for Relief does not expressly request personal injury damages, but it does seek "such

other relief as the Court deems just and proper." Compl. at ECF pages 4-5.

**B. The Motion Papers**

Defendant filed its motion to dismiss on September 11, 2020, supported by the Declaration of Kimberly Herbst, who attests that on June 11, 2018, plaintiff – through his then-attorney Hochberg – filed an administrative claim on Standard Form 95 (SF-95) with the USPS, in his own name, seeking $400,000 for neck pain and a pinched nerve in his back, and $50,000 for damage to the Cadillac. Herbst Decl. (Dkt. No. 16) ¶ 3 & Ex. 1. No other damages were described or sought. By letter dated August 20, 2019, Hochberg withdrew as counsel for plaintiff, *id.* Ex. 2, and stated that Herbst "may speak with Mr. Pina directly." *Id.* Ex. 2. By letter dated August 27, 2019, addressed directly to Pina and sent by certified mail, the USPS denied his claims, noting that he had previously refused its settlement offer of $5,222.37. *Id.* Ex. 3.

Plaintiff filed his opposition memorandum on October 30, 2020, attaching a print-out from the Internal Revenue Service website regarding the tax treatment of sole proprietorships, Pl. Opp. Mem. Ex. A, and a series of (unauthenticated) emails among himself, Hochberg and Herbst. *Id.* Ex. B. In an email dated August 22, 2019, addressed to Hochberg and copied to Herbst, plaintiff stated, among other things, that his experience with Hochberg had been "frustrating," and directed his attorney to "send me a copy of your withdrawal letter to Ms. Herbst." *Id.* at ECF page 13.

**\*3** Defendant filed a reply memorandum on November 6, 2020. (Dkt. No. 26.) On November 11, 2020, without leave of Court, plaintiff filed a sur-reply memorandum arguing that he could not have failed to exhaust his administrative remedies because there was a pending "criminal investigation by the Government of New York" against Hochberg. Pl. Reply Mem. (Dkt. No. 28) at ECF pages 2, 6. [5] Plaintiff goes on to argue that he was deprived of his constitutional right to the effective assistance of counsel. *Id.* at ECF page 4.

[5]     Plaintiff appears to be referring to a complaint that he filed against Hochberg with the Attorney Grievance Committee of the New York Supreme Court, First Appellate Division. In correspondence to this Court dated September 25, 2020, plaintiff attached a copy of a letter dated June 23, 2020, from the Grievance Committee, advising him that it had received his request for reconsideration of its determination to dismiss his complaint against

Case 5:26-cv-00152-BKS-MJK    Document 11    Filed 02/04/26    Page 61 of 90

Pina v. United States, Not Reported in Fed. Supp. (2021)

2021 WL 2019003

Hochberg, and that he would be notified "when the Committee reaches a decision." (Dkt. No. 22 at ECF page 4.)

## II. ANALYSIS

### A. Subject Matter Jurisdiction

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). If a federal court determines that subject matter jurisdiction does not exist, it "must dismiss the complaint[.]" *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (internal citation omitted). *See also* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."). If the court determines that it lacks subject matter jurisdiction over some, but not all, claims, it may dismiss those claims over which it lacks jurisdiction, while allowing the remaining claims to proceed. *See Suvak v. U.S.*, 2013 WL 2217171, at *3-4 (S.D.N.Y. May 21, 2013), *adhered to on reconsideration*, 2013 WL 2460192 (S.D.N.Y. June 7, 2013).

### B. Standard on Motion to Dismiss Pursuant to Rule 12(b)(1)

In considering a motion to dismiss for lack of subject matter jurisdiction, a federal trial court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *See, e.g.*, *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012); *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). However, the court may also "refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113; *see also APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) (quoting *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999)) ("[W]here jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."); *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986) ("when, as here, subject matter jurisdiction is challenged under Rule 12(b)(1), evidentiary matter may be presented by affidavit or otherwise"). The plaintiff has the burden of proof and "must prove the existence of subject matter jurisdiction by a preponderance of the evidence." *Moser v. Pollin*, 294 F.3d 335, 339 (2d Cir. 2002); *accord Makarova*, 201 F.3d at 113; *Architectural Body Rsch. Found. v. Reversible Destiny Found.*, 335 F. Supp. 3d 621, 633 (S.D.N.Y. 2018).

### C. The Federal Tort Claims Act

The FTCA is the "exclusive" remedy against the United States for "injury or loss of property, or personal injury or death arising or resulting from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment." 28 U.S.C. § 2679(b)(1). No FTCA suit may be filed "unless the claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail." 28 U.S.C. § 2675(a). Moreover, an FTCA plaintiff may not seek "any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b); *see also Lopez v. U.S.*, 312 F. Supp. 3d 390, 404 n.17 (S.D.N.Y. 2018) (limiting plaintiff's federal court claim, which originally sought damages of $2.2 million, to $1 million, which is the amount she claimed in her administrative demand). "The purpose of the exhaustion requirement is to allow the government to 'investigate, evaluate and consider settlement of a claim,' in order to 'ease court congestion and avoid unnecessary litigation, while making it possible for the Government to expedite the fair settlement of tort claims asserted against the United States.' " *Furman v. U.S. Postal Serv.*, 349 F. Supp. 2d 553, 557 (E.D.N.Y. 2004) (quoting *State Farm Ins. Co., v. United States,* 2004 WL 1638175, *2 (E.D.N.Y. July 23, 2004)).

**\*4** Because the FTCA constitutes "a limited waiver by the United States of its sovereign immunity," its "limitations foreclose suit unless the tort claimant has previously presented to the appropriate administrative agency a claim that meets the specific statutory requirements as to its form, content, and timing." *Millares Guiraldes de Tineo v. U.S.*, 137 F.3d 715, 719 (2d Cir. 1998).[6] The administrative exhaustion requirement "is jurisdictional and cannot be waived." *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005); *see also Mayes v. United States*, 790 F. App'x 338, 339 (2d Cir. 2020) (summary order) ("The district court lacks jurisdiction over FTCA claims if the plaintiff failed to exhaust."); *Thompson v. United States*, 795 F. App'x 15, 20 (2d Cir. 2019) ("A district court lacks subject matter jurisdiction if the plaintiff failed to exhaust his FTCA claims."), *cert. denied,* 140 S. Ct. 2675, (2020).

2021 WL 2019003

6

With regard to timing, 28 U.S.C. § 2401(b) requires that the administrative claim be presented, in writing, "within two years after such claim accrues" (which in an auto accident case is ordinarily the date of the accident), and that the plaintiff commence suit "within six months after the date of mailing ... of notice of final denial of the claim by the agency to which it was presented." *Hardie v. United States*, 2020 WL 7485015, at *3 (E.D.N.Y. Nov. 17, 2020) (quoting 28 U.S.C. § 2401(b)).

Where, as here, an FTCA complaint is challenged, in whole or in part, on administrative exhaustion grounds, "[t]he burden is on plaintiff to demonstrate subject matter jurisdiction in compliance with the FTCA's requirements." *Hardie*, 2020 WL 7485015, at *3; *see also Tamares v. United States*, 2009 WL 691002, at *2 (S.D.N.Y. Mar. 17, 2009) ("The burden is on plaintiff to plead and prove compliance with the FTCA's statutory requirements in order for a district court to have subject matter jurisdiction over the claim."). Those statutory requirements are "strictly construed." *Furman*, 349 F. Supp. 2d at 557 (quoting *Romulus v. United States*, 983 F. Supp. 336, 338 (E.D.N.Y.1997), *aff'd*, 160 F.3d 131 (2d Cir.1998)). "In the absence of such compliance ... a district court has no subject matter jurisdiction over the claim." *Hardie*, 2020 WL 7485015, at *3 (dismissing FTCA case arising out of collision with USPS vehicle for lack of subject matter jurisdiction due to failure to exhaust administrative remedies); *see also Furman*, 349 F. Supp. 2d at 559 (same); *Tamares*, 2009 WL 691002, at *4 (same).

**D. Plaintiff Failed to Exhaust His Administrative Remedies as to the Lost Business Opportunity Claim**

In this case, it is clear from the face of plaintiff's SF-95 that he did not present – and thus did not administratively exhaust – any claim for lost business opportunity damages, whether on his own behalf or on behalf of Japanese Juices. Although the claim form noted that Japanese Juices was the owner of the Cadillac, Pina clearly identified himself as the claimant. Moreover, although he specifically requested $400,000 in damages for bodily injury (describing "neck pain" and a "pinched nerve" in the "center back") and another $50,000 for property damage (describing damage to the "left side of [the] Cadillac"), he did not so much as hint that he or his company suffered any broader business harm. Herbst Decl. Ex. 1 at 1. Plaintiff's claim for $146 million in lost business opportunity damages, even if otherwise adequately pleaded, is therefore foreclosed in this Court. *See Mayes*, 790 F. App'x at 339

(affirming district court's denial of leave to amend to add an FTCA claim for failure to obtain informed consent because plaintiff's "initial administrative claim asserted only medical malpractice and did not include an informed consent claim," which "did not satisfy the FTCA's exhaustion requirement"); *Rodriguez v. U.S.*, 2003 WL 21961121, at *2-4 (S.D.N.Y. Aug. 14, 2003) (dismissing loss-of-consortium claims by Rodriguez's spouse for lack of subject matter jurisdiction where spouse failed to submit any administrative claim to the USPS, and dismissing Rodriguez's personal injury claims for failure to include a "sum certain" in his underlying administrative submissions, and as untimely); *Guthrie v. U.S. Fed. Bureau of Prisons*, 2010 WL 2836155, at *4 (S.D.N.Y. July 7, 2010) (dismissing all of plaintiff's FTCA claims other than those arising from his alleged permanent loss of hair while incarcerated at Fort Dix, because his SF 95 "did not list any injuries besides his hair loss").

**\*5** Plaintiff does not deny that he failed to present his lost business opportunity claim to the USPS. Rather, he argues that his failure to exhaust should be excused because his attorney was ineffective and that the government should be estopped from making the argument because the USPS, acting through Herbst, engaged in "malicious" and "deceptive" conduct by "mislead[ing] plaintiff into relinquishing [his] counsel as a condition of negotiation ... only to immediately reject [his] claim upon learning of the termination of [his] counsel." Pl. Opp. Mem. at 1, 3. Plaintiff presents no evidence in support of either theory. [7] Even more fundamentally, the "federal courts have 'no authority to create equitable exceptions to jurisdictional requirements.' " *Davis v. U.S.*, 2013 WL 5225931, at *5 (S.D.N.Y. Sept. 1, 2013) (quoting *Bowles v. Russell*, 551 U.S. 205, 214 (2007)).

7

Pina's August 22, 2019 email to Hochberg, attached to his opposition brief, suggests, if anything, that plaintiff was eager to discharge his attorney. *See* Pl. Opp. Mem. Ex. B, at ECF page 13 ("to say that my experience with you has been frustrating ... is more than an understatement"; "you've been testing my patience for quite some [time] now"; "I don't interfere with your life; please don't interfere with mine."). Moreover, Herbst's letter rejecting Pina's claim was dated August 27, 2019 – fifteen months after he filed his FS-95 and more than nine months after Delta told him, on November 8, 2018, "we are not going to pursue a partnership due to other priorities for our team." Compl. Ex. B, at ECF page 13. In her letter, Herbst noted, among other

Pina v. United States, Not Reported in Fed. Supp. (2021)
2021 WL 2019003

Case 5:26-cv-00152-BKS-MJK    Document 11    Filed 02/04/26    Page 63 of 90

things, that the government had previously offered a $5,222.37 settlement, which plaintiff rejected. *Id.* at ECF pages 6-7.

The *Davis* plaintiffs (who, like plaintiff Pina, claimed injuries arising from an automobile accident with a USPS vehicle) jumped the gun, filing federal lawsuits before they received a final decision from the USPS on their administrative claims. Faced with a Rule 12(b)(1) motion to dismiss, they argued that their failure to exhaust their administrative remedies should be excused, or that the government should be estopped from raising the issue, because they received "confusing" letters from the USPS which "created the distinct impression that the defendants were directing the claimants to start their lawsuits and had conferred upon the claimants the eligibility to commence the lawsuits." *Id.* at *5. The court squarely rejected that argument, explaining that "[t]he Government cannot be estopped from raising Plaintiffs' failure to exhaust as a defense in this FTCA case" because, "[i]n the FTCA context, a plaintiff's failure to exhaust administrative remedies prior to filing suit deprives the Court of subject-matter jurisdiction altogether," thus divesting it of any authority to create an equitable exception. *Id.* "Accordingly, a party may not invoke equitable estoppel to create subject-matter jurisdiction over an action." *Id.*; *see also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court."); *Burns v. United States*, 764 F.2d 722, 724 (9th Cir. 1985) ("The government may not be equitably barred from asserting jurisdictional requirements."); *Doe v. F.D.I.C.*, 2012 WL 612461, at *4 n.8 (S.D.N.Y. Feb. 27, 2012) ("[S]ubject matter jurisdiction cannot be created by estoppel or by the actions of the parties.").

Similarly, there is no equitable exception to the exhaustion requirement based on ineffectiveness of counsel. The constitutional right to the effective assistance of counsel applies to criminal defendants, not tort plaintiffs. *See, e.g., Espaillat v. Cont'l Express, Inc.*, 33 F. App'x 567, 568-69 (2d Cir. 2002) (summary order) ("Ineffective assistance of counsel is not a proper ground for relief in a civil matter."). Even where the bar to suit is non-jurisdictional, such a statute of limitations, a claim of attorney malpractice generally does not excuse noncompliance. "[A]ttorney neglect is, unfortunately, too common of an occurrence to toll the statute of limitations." *James v. New York City Police Dep't*, 2019 WL 3451152, at *3 (E.D.N.Y. Mar. 4, 2019) (collecting cases and rejecting plaintiff's claim that misconduct by his attorney should excuse his late filing of a civil rights claim); *see also Tsatsani v. Walmart,*

*Inc.*, 2020 WL 6688939, at *15 (S.D.N.Y. Oct. 26, 2020) (recommending dismissal of Title VII action as time-barred, notwithstanding plaintiff's claim that her former attorney failed to inform her about the statute of limitations), *report and recommendation adopted,* 2020 WL 6701019 (S.D.N.Y. Nov. 13, 2020) Engelmayer, J.). *A fortiori,* such a claim cannot confer subject matter jurisdiction on this Court as to an unexhausted FTCA claim. In any event, as noted above, plaintiff presents no facts – much less admissible evidence – supporting his conclusory claim of attorney misconduct.

**\*6** Finally, plaintiff's claim that he and Japanese Juices are "one and ... the same," Pl. Opp. Mem. at 4, misses the mark, because *neither* plaintiff *nor* his company presented a lost business opportunity claim to the USPS. Thus, even if Pina (the sole plaintiff here, and the only claimant before the USPS) had standing to pursue such a claim on behalf of Japanese Juices, it would be subject to dismissal, pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction.

### III. CONCLUSION

For the foregoing reasons, I recommend, respectfully, that defendant's motion be GRANTED and that plaintiff's claims be DISMISSED, without prejudice, to the extent they seek damages beyond those that plaintiff sought before the agency for his personal injuries and property damage. The Clerk of Court is respectfully directed to mail a copy of this Report and Recommendation to the plaintiff.

### NOTICE OF PROCEDURE FOR FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from this date to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b). *See also* Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, addressed to the Hon. Paul A. Engelmayer. No courtesy copies are required. Any request for an extension of time to file objections must be directed to Judge Engelmayer. **Failure to file timely objections will result in a waiver of such objections and will preclude appellate review**. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x, 486, 487 (2d Cir. 2018); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

Pina v. United States, Not Reported in Fed. Supp. (2021)

2021 WL 2019003

Case 5:26-cv-00152-BKS-MJK    Document 11    Filed 02/04/26    Page 64 of 90

**All Citations**

Not Reported in Fed. Supp., 2021 WL 2019003

---

**End of Document**                                                  © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 2:20-CV-01371**<br>Pina v. The United States of America | — | S.D.N.Y. | Feb. 14, 2020 | Docket |

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**History (15)**

**Direct History (9)**

1.  Pina v. United States 🔗
    2021 WL 2019003 , S.D.N.Y. , Apr. 20, 2021

    *Report and Recommendation Adopted by*

2.  Pina v. United States
    2021 WL 1947739 , S.D.N.Y. , May 12, 2021

    *Adhered to by*

3.  Pina v. United States
    2021 WL 2418747 , S.D.N.Y. , June 14, 2021

    *AND Motion to Vacate Denied by*

4.  Pina v. United States
    2022 WL 17959469 , S.D.N.Y. , Dec. 27, 2022

    *AND Reconsideration Denied by*

5.  Pina v. United States
    2025 WL 1019718 , S.D.N.Y. , Apr. 04, 2025

6.  Pina v. United States 🔗
    2021 WL 2019003 , S.D.N.Y. , Apr. 20, 2021

    *Extension of Time Granted by*

7.  Pina v. United States
    2021 WL 2012938 , S.D.N.Y. , May 20, 2021

8.  Pina v. United States
    2022 WL 18046792 , S.D.N.Y. , Dec. 07, 2022

    *Report and Recommendation Adopted by*

9.  Pina v. United States
2022 WL 17959469 , S.D.N.Y. , Dec. 27, 2022

**Related References (6)**

10.  Japanese Juices LLC v. United States
2020 WL 8679708 , S.D.N.Y. , Mar. 05, 2020

11.  Pina v. United States
2021 WL 6841648 , S.D.N.Y. , Dec. 01, 2021

*Report and Recommendation Adopted by*

12.  Pina v. United States
2022 WL 782996 , S.D.N.Y. , Mar. 15, 2022

13.  Pina v. United States
2023 WL 2529763 , S.D.N.Y. , Mar. 15, 2023

⚑ 14.  Pina v. United States
2025 WL 2958751 , S.D.N.Y. , Oct. 17, 2025

*Appeal Filed by*

15.  Pina v. The United States of America
, 2nd Cir. , Oct. 21, 2025

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1977972
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jason S. PLANCK, Plaintiff,

v.

SCHENECTADY COUNTY, et al., Defendants.

No. 1:12–CV–0336(GTS/DRH).
|
June 1, 2012.

**Attorneys and Law Firms**

Jason S. Planck, of Counsel, Schenectady, NY, pro se.

Goldberg Segalla LLP, Jonathan M. Bernstein, Esq., William J. Greagan, Esq., of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently pending before the Court, in this *pro se* civil rights action filed by Jason S. Planck ("Plaintiff") against Schenectady County and fifteen of its legislators ("Defendants"), are the following four motions: (1) Plaintiff's motion for reconsideration of the Court's Decision and Order of February 29, 2012, denying his motion for a temporary restraining order (Dkt. No. 10); (2) Plaintiff's motion for a report from the Court regarding the status of his motion for reconsideration (Dkt. No. 30); (3) Plaintiff's motion for a preliminary injunction (Dkt. No. 4); and (4) Defendants' cross-motion to dismiss Plaintiffs' Complaint (Dkt. No. 17). For the reasons set forth below, Plaintiffs' three motions are denied; and Defendants' cross-motion is granted.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**

Generally, when construed with the utmost of special liberality, Plaintiff's Complaint asserts three civil rights claims against Defendants-one claim asserting a violation of Rehabilitation Act of 1973, and two claims asserting violations of the Americans with Disabilities Act-arising from Schenectady County's ("the County") approval of a project labor agreement (to construct a new nursing home) that permits the hiring of only unionized construction workers, thus discriminating against qualified nonunionized construction workers with disabilities. (*See generally* Dkt. No. 1.) Because this Decision and Order is intended primarily for the review of the parties, and because Defendants (in their memorandum of law) accurately describe the claims and factual allegations asserted in Plaintiff's Complaint, the Court will not describe those claims and factual allegations in detail in this Decision and Order. Rather, the Court will refer the reader to pages 1 through 3 of Defendants' memorandum of law and paragraphs 2 through 4, and 7 through 44, of Plaintiff's Complaint. (Dkt. No. 17, Attach. 11, at 6–8 [attaching pages "1" through "3" of Defs.' Memo. of Law]; Dkt. No. 1, at ¶¶ 2–4, 7–44.)

**B. Briefing on the Parties' Motions**

Because the parties have demonstrated in their memoranda of law an adequate understanding of the legal arguments asserted in each other's motions, the Court need not, and does not, describe in detail those arguments in this Decision and Order. Rather, the Court will simply make two points.

First, generally, in their cross-motion to dismiss, Defendants assert the following three arguments: (1) Plaintiff's Complaint should be dismissed under Fed.R.Civ.P. 12(b)(1), because (a) the Court lacks subject-matter jurisdiction over Plaintiff's challenge to the County's project labor agreement (which must be presented by Plaintiff in an Article 78 proceeding in state court), and (b) Plaintiff, who is not a qualified construction worker but merely a taxpayer, lacks standing to challenge the County's approval of the project labor agreement; (2) in the alternative, Plaintiff's Complaint should be dismissed for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6), because Plaintiff has failed to allege facts plausibly suggesting the elements of a claim under either Rehabilitation Act of 1973 or the Americans with Disabilities Act (particularly the element requiring that he be a *qualified* individual with a disability); and (3) in the alternative, Plaintiff's claims against the legislative Defendants should be dismissed for failure to state a claim upon which relief can be granted under Fed.R.Civ.P. 12(b)(6), because, based on Plaintiff's own factual allegations, those claims are either duplicative of Plaintiff's claims against the County or barred as a matter of law by the doctrine of legislative immunity. (Dkt. No. 17, Attach. 11, at 8–22 [attaching pages "3" through "17" of Defs.' Memo. of Law].)

Planck v. Schenectady County, Not Reported in F.Supp.2d (2012)

2012 WL 1977972

**\*2** Second, in this District, when a party files a dispositive motion (such as a motion for a preliminary injunction), [1] that party is not entitled to file a surreply. N.D.N.Y. L.R. 7.1(b)(1). Furthermore, when a party files a nondispositive motion (such as a motion for reconsideration), that party is not even entitled to file a reply, without prior leave of the Court. N.D.N.Y. L.R. 7.1(b)(2). Finally, when a party files a cross-motion (such as a cross-motion to dismiss), that party is not entitled to file a reply on its cross-motion without prior leave of the Court. N.D.N.Y. L.R. 7.1(c). Even if it were permitted to file a reply, that reply may address only the party's own cross-motion, and not the opponent's original motion; otherwise, the "reply" would, in part, constitute a surreply. [2] Here, the parties have violated each of these rules, in addition to violating several filing deadlines. (Dkt. Nos. 23, 25, 31, 32; *see also* Text Notices filed March 9, 2012, and Apr. 2, 2012.) [3] As a result, the submissions contained in Docket Numbers 23, 25, 31 and 32 will not be considered by the Court. The Court would add only that, even if it were to consider the submissions, that consideration would not change the outcome of this Decision and Order.

[1]  See *Odom v. Senkowski,* 96–CV–0554, 1997 WL 458450, at *1 (N . D.N.Y. Aug. 7, 1997) (Pooler, D.J.) ("Because Odom's request for a preliminary injunction is a dispositive motion, the magistrate judge's recommendations require de novo review.").

[2]  See *Carlwood Dev. Inc. v. U.S.,* 10–CV–1773, 2011 WL 69374, at *1 (D.Nev. Jan. 10, 2011) (denying petitioner's motion to strike government's improper "cross-motion"—which did not "address[ ] any matters even remotely indicative of a motion for summary judgment" but rather merely responded to the matters raised by the petitioners in their opening brief-because "rather than striking any portion of the ['cross-motion'] itself, the Court will merely construe [it] as only a response to the [petitioner's] opening brief, and not a cross-motion," and strike the government's unauthorized reply on its improper cross-motion as "nothing more than a disingenuous attempt to get the last word").

[3]  The Court notes that, on February 28, 2012, Plaintiff receive a courtesy copy of the Local Rules

of Practice for this Court. (*See* Docket Entry dated Feb. 28, 2012; Dkt. No. 9.)

## II. ANALYSIS

### A. Motion for Reconsideration

Generally, there are only three grounds upon which a district court may justifiably reconsider its previous ruling: (1) an intervening change in controlling law, (2) new evidence, or (3) a demonstrated need to correct a clear error of law or to prevent manifest injustice. *U.S. v. Sanchez,* 35 F.3d 673, 677 (2d Cir.1994), *cert. denied,* 514, U.S. 1038 (1995).

Here, after carefully considering the matter, Plaintiff's motion for reconsideration is denied for each of the numerous reasons offered by Defendants in their memorandum of law: Plaintiff has not satisfied the above-described standard. (Dkt. No. 17, Attach. 11, at 15–18 [attaching pages "10" through "13" of Defs.' Memo. of Law].)

The Court would add two alternative grounds for the denial of Plaintiff's motion. First, Plaintiff's motion is unsupported by a memorandum of law that is separate and apart from an affidavit, in violation of Local Rule 7.1. The Court notes that an affidavit may not contain legal argument. N.D.N.Y. L.R. 7.1(a)(2). Second, Plaintiff's motion is moot in that it seeks an order restraining Defendants from acting between a discrete time period (i.e., the time of the Court's decision on Plaintiff's motion a temporary restraining order and the time of the Court's decision on Plaintiff's motion for a preliminary injunction), which has, as of the date of this Decision and Order, already expired.

Finally, the Court notes that Plaintiff's motion for reconsideration also requested oral argument, and/or an expedited decision, on Plaintiff's motion for reconsideration. That request is denied as unsupported by a showing of cause and/or moot.

### B. Motion for a Status Report from the Court
**\*3** After carefully considering the matter, Plaintiff's motion for a status report from the Court is denied as unsupported by a showing of cause and/or moot.

### C. Motion for a Preliminary Injunction
Generally, the issuance of a preliminary injunction pursuant to Fed.R.Civ.P. 65 depends on the movant's demonstration of (1) irreparable harm and (2) either a likelihood of success on

Planck v. Schenectady County, Not Reported in F.Supp.2d (2012)

2012 WL 1977972

the merits, or a sufficiently serious question as to the merits of the case to make it a fair ground for litigation and a balance of hardships tipping decidedly in its favor. *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.,* 60 F.3d 27, 33 (2d Cir.1995).

Here, after carefully considering the matter, Plaintiff's motion for a preliminary injunction is denied for each of the numerous reasons offered by Defendants in their memorandum of law: Plaintiff has not satisfied the above-described standard: on the current record, Plaintiff has not established either irreparable harm or a likelihood of success on the merits. (Dkt. No. 17, Attach. 11, at 18–22 [attaching pages "13" through "17" of Defs.' Memo. of Law] .) Of particular concern to the Court is this latter deficiency (i.e., Plaintiff's failure to show a likelihood of success on the merits), which is exacerbated by the various substantive pleading defects in his Complaint. The Court would add only that, even setting aside these pleading defects, following the Court's denial of Plaintiff's motion for a temporary restraining order, Plaintiff did not supplement the record with the sufficient evidence to warrant a contrary finding. (*Compare* Dkt. No. 1 *and* Dkt. No. 4 *with* Dkt. No. 10 *and* Dkt. No. 22.)

**D. Defendants' Cross–Motion to Dismiss**

**1. Legal Standard Governing Dismissal for Lack of Subject–Matter Jurisdiction Pursuant to Fed.R.Civ.P. 12(b)(1)**

"It is a fundamental precept that federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger,* 437 U.S. 365, 374 (1978). Generally, a claim may be properly dismissed for lack of subject-matter jurisdiction where a district court lacks constitutional or statutory power to adjudicate it. *Makarova v. U.S.,* 201 F.3d 110, 113 (2d Cir.2000). A district court may look to evidence outside of the pleadings when resolving a motion to dismiss for lack of subject-matter jurisdiction. *Makarova,* 201 F.3d at 113. The plaintiff bears the burden of proving subject-matter jurisdiction by a preponderance of the evidence. *Makarova,* 201 F.3d at 113 (citing *Malik v. Meissner,* 82 F.3d 560, 562 [2d Cir.1996] ). When a court evaluates a motion to dismiss for lack of subject-matter jurisdiction, all ambiguities must be resolved and inferences drawn in favor of the plaintiff. *Aurecchione v. Schoolman Transp. Sys., Inc.,* 426 F.3d 635, 638 (2d Cir.2005) (citing *Makarova,* 201 F.3d at 113).

The Court notes that challenges to a litigant's standing are properly raised on a motion for lack of subject-matter jurisdiction. *See Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.,* 436 F.3d 82, 88–89 & n. 6 (2d Cir.2006) ("Although we have noted that standing challenges have sometimes been brought under Rule 12(b)(6), as well as Rule 12(b)(1), ... the proper procedural route is a motion under Rule 12(b)(1)."); *A.C. v. Mattingly,* 05–CV–2986, 2007 WL 894268, at *3 (S.D.N.Y. March 20, 2007) ("The argument of lack of standing is properly raised under Rule 12(b)(1).").

**2. Legal Standard Governing Dismissal for Failure to State a Claim Upon Which Relief Can Be Granted, Pursuant to Fed.R.Civ.P. 12(b)(6)**

**\*4** It has long been understood that a dismissal for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6), may be based on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga County,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review) [citations omitted].

With regard to the first ground, Fed.R.Civ.P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n. 17 [citations omitted]. The main purpose of this rule is to "facilitate a proper decision on the merits." *Id.* at 212, n. 18 [citations omitted]. [4]

[4]     *See also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ( "Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F .2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement. *Id.*

at 212, n. 20 [citations omitted]. However, even this liberal notice pleading standard "has its limits." *Id.* at 212, n. 21 [citations omitted]. As a result, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet this liberal notice pleading standard. *Id.* at 213, n. 22 [citations omitted]; *see also Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949–52 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation [s]." *Id* . at 1965 [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [citations omitted]. [5]

[5]    *See also Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2d Cir.2007) ( "[The Supreme Court] is not requiring a universal standard of heightened fact pleading, but is instead requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ).

 **5** As have other Circuits, the Second Circuit has recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, including claims brought by *pro se* litigants (although the plausibility of those claims is to be assessed generously, in light of the special solicitude normally afforded *pro se* litigants). [6] It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se*

pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) [citation omitted; emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. [7]

[6]    *See, e.g., Jacobs v. Mostow,* 271 F. App'x 85, 87 (2d Cir. March 27, 2008) (in *pro se* action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Rule 32.1[c][1] of the Local Rules of the Second Circuit); *Boykin v. KeyCorp.,* 521 F.3d 202, 215– 16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently presented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

[7]    For example, in *Erickson,* the Supreme Court held that, because the plaintiff-prisoner had alleged that, during the relevant time period, he suffered from hepatitis C, he had alleged facts plausibly suggesting that he possessed a sufficiently serious medical need for purposes of an Eighth Amendment claim of inadequate medical care. *Erickson,* 127 S.Ct. at 2199–2200. Expressed differently, the Court held that such a plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatitis C medication (a requirement that had been imposed by the district court). This point of law is hardly a novel one, which is presumably why the *Erickson* decision was relatively brief. Prior to the Supreme Court's decision, numerous decisions, from district courts within the Second Circuit alone, had found that suffering from hepatitis

C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e.g., Rose v. Alvees,* 01–CV–0648, 2004 WL 2026481, at \*6 (W.D.N.Y. Sept. 9, 2004); *Verley v. Goord,* 02–CV–1182, 2004 WL 526740, at \*10 n. 11 (S.D.N.Y. Jan. 23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01–CV–6571, 2002 WL 338375, at \*6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99–CV–3208, 2000 WL 760751, at \*9 (S.D.N.Y. June 13, 2000). The important thing is that, in *Erickson,* even the *pro se* plaintiff was required to allege some sort of fact.

In reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor. This standard is applied with even greater force where the plaintiff alleges civil rights violations and/or where the complaint is submitted *pro se.* However, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), [8] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [9] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [10] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].

[8]     *Sealed Plaintif v. Sealed Defendant # 1,* No. 06–1590, 2008 WL 3294864, at \*5 (2d Cir. Aug. 12, 2008); *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983).

[9]     *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (3d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691] [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

[10]     *See McNeil v. U.S.,* 508 U.S. 106, 113 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law" [citation omitted]; *accord, Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

Finally, a few words are appropriate regarding what documents are considered when a dismissal for failure to state a claim is contemplated. Generally, when contemplating a dismissal pursuant to Fed.R.Civ.P. 12(b)(6) or Fed.R.Civ.P. 12(c), the following matters outside the four corners of the complaint may be considered without triggering the standard governing a motion for summary judgment: (1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference in the complaint (and provided by the parties), (3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case. [11] Moreover, in the Second Circuit, a *pro se* plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of his complaint-to the extent those papers are consistent with the allegations in the complaint. [12]

[11]     *See* Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *L–7 Designs, Inc. v. Old Navy, LLC,* No. 10–573, 2011 WL 2135734, at \*1 (2d Cir. June 1, 2011) (explaining that conversion from a motion to dismiss for failure to state a claim to a motion for summary

judgment is not necessary under *Fed.R.Civ.P.* 12[d] if the "matters outside the pleadings" in consist of [1] documents attached to the complaint or answer, [2] documents incorporated by reference in the complaint (and provided by the parties), [3] documents that, although not incorporated by reference, are "integral" to the complaint, or [4] any matter of which the court can take judicial notice for the factual background of the case); *DiFolco v. MSNBC Cable L.L.C.,* 622 F.3d 104, 111 (2d Cir.2010) (explaining that a district court considering a dismissal pursuant to Fed. R. Civ. 12(b)(6) "may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint.... Where a document is not incorporated by reference, the court may neverless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document 'integral' to the complaint.... However, even if a document is 'integral' to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document. It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document.") [internal quotation marks and citations omitted]; *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir.2009) ("The complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.") (internal quotation marks and citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 72 (2d Cir.1995) (per curiam) ("[W]hen a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take the document into consideration in deciding [a] defendant's motion to dismiss, without converting the proceeding to one for summary judgment.") (internal quotation marks and citation omitted).

12   See *Drake v. Delta Air Lines, Inc.,* 147 F.3d 169, 170 n. 1 (2d Cir.1998) (per curiam) ("[W]e deem Drake's complaint to include the facts contained in his memorandum of law filed in response to Delta's 1996 motion to dismiss."); *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) ( "In his affidavit submitted in opposition to

defendants' motion to dismiss, Gill asserts that Mooney's actions amounted to deliberate and willful indifference. Liberally construed under *pro se* pleading standards, Gill's allegations against Mooney involve more than ordinary lack of due care for the prisoner's interests or safety, ... and therefore state a colorable claim under the Eighth and Fourteenth Amendments.") (internal quotation marks and citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.) ("[I]n cases where *a pro se* plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside of the complaint to the extent they "are consistent with the allegations in the complaint.") (collecting district court cases), *vacated on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004) (Hurd, J.).

### 3. Analysis

**\*6**   After carefully considering the matter, and applying the above-described legal standard, Plaintiff's motion for a preliminary injunction is denied for each of the three alternative reasons offered by Defendants in their memorandum of law. *See, supra,* Part I.B. of this Decision and Order (summarizing those reasons).

The Court would add only two points. First, although Plaintiff attaches 97 pages of exhibits in his opposition to Defendants' motion to dismiss for failure to state a claim, and a 23–page memorandum of law, the Court either (1) does not construe the allegations in those documents as consistent with the allegations in Plaintiff's Complaint or (2) finds the allegations in those documents to be insufficient to rescue the pleading defects contained in Plaintiff's claims. Second, although Plaintiff appears to now largely hinge his claims on *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581 (1999), and/or *Fed.R.Civ.P.* 23, the Court finds that reliance to be misplaced. (Dkt. No. 22, Attach. 1, at 4–8 .)

### 4. Whether Dismissal Should Be With or Without Prejudice

Generally, when a district court dismisses a *pro se* action *sua sponte,* the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999). However, an opportunity to amend is not required where the plaintiff has already been afforded the opportunity to amend. [13]

**13**    *Shuler v. Brown,* 07–CV–0937, 2009 WL 790973, at *5 & n. 25 (N.D.N.Y. March 23, 2009) (McAvoy, J., adopting Report–Recommendation by Lowe, M.J.) ("Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint."), *accord, Smith v. Fischer,* 07–CV–1264, 2009 WL 632890, at *5 & n. 20 (N.D.N.Y. March 9, 2009) (Hurd, J., adopting Report–Recommendation by Lowe, M.J.); *Abascal v. Hilton,* 04–CV–1401, 2008 WL 268366, at *8 (N.D.N.Y. Jan. 130 2008) (Kahn, J., adopting, on de novo review, Report–Recommendation by Lowe, M.J.); *see also Yang v. New York City Trans. Auth.,* 01–CV–3933, 2002 WL 31399119, at *2 (E.D.N.Y. Oct. 24, 2002) (denying leave to amend where plaintiff had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once); *cf. Foman v. Davis,* 371 U.S. 178, 182 (1962) (denial of leave to amend not abuse of discretion movant has repeatedly failed to cure deficiencies in pleading).

Moreover, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. As the Second Circuit has explained, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted). [14] This rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355 at * 1.

**14**    *Accord, Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also Foman v. Davis,* 371 U.S. 178, 182 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where

a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ( "[W]here ... there is no merit in the proposed amendments, leave to amend should be denied").

Here, the Court finds that the pleading deficiency in Plaintiff's claims are substantive and not merely formal. As an initial matter, lack of subject-matter jurisdiction is generally viewed as a substantive defect. [15] Even if the Court did possess subject-matter jurisdiction over Plaintiff's claims, the pleading defects in those detailed claims still appear substantive. For example, it does not appear to the Court that granting Plaintiff leave to amend his claims would likely be productive. Setting aside the fact that he has failed to correct those defects despite having had months in which to do so, the fact remains that he appears to insist on asserting nonactionable claims, rendering any amendment futile. (*See generally* Dkt. No. 22, Attach. 1.) As a result, the Court declines to afford Plaintiff an opportunity to amend his Complaint prior to dismissal.

**15**    *See U.S. ex rel. Phipps v. Comprehensive Comty. Dev. Corp.,* 152 F.Supp.2d 443, 455 (S.D.N.Y.2001) ("[I]t is not appropriate to grant Phipps's request [for leave to amend the Complaint] because the Court has determined that it does not have subject matter jurisdiction over this action."); *Chan v. Reno,* 916 F.Supp. 1289, 1302 (S.D.N.Y.1996) ("An amendment is considered futile if the amended pleading fails to state a claim or would be subject to a successful motion to dismiss on some other basis. As will be discussed herein, [the proposed amended complaint] ... presents a non-justiciable claim and fails to present this Court with subject matter jurisdiction. Therefore, because [the proposed amended complaint] would be subject to a successful motion to dismiss ..., amendment would be futile.").

However, because Defendants argued persuasively that Plaintiff should have presented his challenge to the County's project labor agreement in an Article 78 proceeding in state court, the Court dismisses Plaintiff's claims against the County without prejudice to refiling in state court within thirty (30) days of this Decision and Order. [16]

16    The Court notes that, in addition, it expresses no
      opinion as to the merits of any claim, arising in the
      future, that Plaintiff may or may not bring pursuant
      to *Olmstead v. L.C. ex rel. Zimring,* 527 U.S. 581
      (1999).

**\*7  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion for reconsideration of the Court's Decision and Order of February 29, 2012, denying his motion for a temporary restraining order (Dkt. No. 10) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's motion for a report from the Court regarding the status of his motion for reconsideration (Dkt. No. 30) is ***DENIED;*** and it is further

**ORDERED** that Plaintiff's motion for a preliminary injunction (Dkt. No. 4) is ***DENIED;*** and it is further

**ORDERED** that Defendants' cross-motion to dismiss Plaintiffs' Complaint (Dkt. No. 17) is ***GRANTED;*** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is ***DISMISSED*** **with prejudice EXCEPT** for his claims against Schenectady County, which are ***DISMISSED*** **without prejudice** to refiling in state court within **THIRTY (30) DAYS** of this Decision and Order.

*The Court hereby certifies, for purposes of* 28 U.S.C. § 1915(a) (3), *that any appeal taken from this Decision and Order would not be taken in good faith.*

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1977972

---

End of Document                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.

**Filings (1)**

| Title | PDF | Court | Date | Type |
|---|---|---|---|---|
| **1.  Docket 1:12cv00336**<br>PLANCK v. SCHENECTADY COUNTY ET AL | — | N.D.N.Y. | Feb. 27, 2012 | Docket |

**History (1)**


**Direct History (1)**

1.  Planck v. Schenectady County
    2012 WL 1977972 , N.D.N.Y. , June 01, 2012 , appeal dismissed (2nd Circ. 12-2594) ( Aug 07, 2012 )



**User Name:** Chaim Jaffe
**Date and Time:** Wednesday, February 4, 2026 11:38 AM EST
**Job Number:** 274773623

## Document (1)

1. _Tavares v. New York City Health & Hosps. Corp., 2015 U.S. Dist. LEXIS 3815_
   **Client/Matter:** -None-
   **Search Terms:**
   **Search Type:**

✚ Positive
As of: February 4, 2026 4:38 PM Z

## *Tavares v. New York City Health & Hosps. Corp.*

United States District Court for the Southern District of New York

January 13, 2015, Decided; January 13, 2015, Filed

13-cv-3148 (PKC)(MHD)

**Reporter**

2015 U.S. Dist. LEXIS 3815 *

PEDRO TAVARES, Plaintiff, -against- NEW YORK CITY HEALTH AND HOSPITALS CORP., LYNDA D. CURTIS, MICHAEL DEUTSCH, BARTOSZ GROBELNY, LAWRENCE MIETELES, NELSON MUTHRA, MARYANN GENOVESE, and MARK SCOTT, Defendants.

**Subsequent History:** Summary judgment granted by *Tavares v. N.Y.C. Belleview Hosp., 2015 U.S. Dist. LEXIS 160350 (S.D.N.Y., Nov. 30, 2015)*

**Counsel:** [*1] Pedro Tavares, Plaintiff, Pro se, Woodbourne, NY.

For N.Y.C. Belleview Hospital, Senior V.P. Lynda D. Curtis, Mark Scott, Deputy-Warden-Commander, Michael Deutsch, B.H. Dr., Bartosz Grobelny, B.H. Doctor, Defendants: Omar Hani Tuffaha, LEAD ATTORNEY, New York City Law Department, New York, NY.

For Lawrence Mieteles, Otolaryngology, Nelson Muthra, Medical Provider, Maryann Genovese, Medical Director, Defendants: Jeb Harben, LEAD ATTORNEY, Office of the Attorney General, New York State, New York, NY.

**Judges:** P. Kevin Castel, United States District Judge.

**Opinion by:** P. Kevin Castel

# Opinion

## MEMORANDUMAND ORDER

CASTEL, U.S.D.J.

Plaintiff Pedro Tavares, proceeding pro se, brings this action against the New York City Health and Hospitals Corporation ("HHC"),[1] Lynda D. Curtis, Michael Deutsch, Bartosz Grobelny, and Mark Scott (collectively with HHC, the "City Defendants"); and Lawrence Mieteles, Nelson Muthra and Maryann Genovese, all three employees of the New York State Department of Corrections and Community Supervision ("DOCCS") (collectively, the "DOCCS Defendants"). He asserts causes of action under *42 U.S.C. § 1983* and state law, alleging that he was provided inadequate medical care which caused him to develop a hearing impairment, and [*2] that the defendants falsified medical records in order to cover up the real cause of his impairment.

The City Defendants and the DOCCS Defendants have moved separately to dismiss the complaint pursuant to *Rule 12(b)(6), Fed. R. Civ. P.* For the following reasons, the City Defendants' motion is denied with respect to defendant Deutsch, but granted with respect to the other City Defendants. The DOCCS Defendants' motions are granted in their entirety.

_____

[1] HHC is sued herein as "N.Y.C. Belleview [sic] Hospital." Bellevue Hospital is a facility owned and operated by HHC, however, and is not an independently suable entity. See *Nogbou v. Mayrose, No. 07 Civ. 3763, 2009 U.S. Dist. LEXIS 96118, 2009 WL 3334805, at *7 (Oct. 15, 2009)*, aff'd, *400 F. App'x 617 (2d Cir. 2010)*. By statute, HHC has the capacity to be sued. N.Y. Unconsol. Laws § 7385(1).

BACKGROUND

The following facts are taken from Tavares's amended complaint (Dkt. No. 36) unless otherwise noted, and are accepted as true for the purposes of this motion.[2] On March 10, 2011, Tavares, who was then incarcerated at the George R. Vierno Center ("GRVC"), a facility operated by the New York City Department of Corrections ("DOC"), was discharged from Bellevue Hospital after receiving surgery for carpal tunnel syndrome on his left hand. (Am. Compl. ¶¶ 5, 6.) He was discharged mere hours after the surgery,[3] and the doctor [*3] who did so, defendant Michael Deutsch, failed to direct corrections officers to refrain from handcuffing him. (Id. ¶ 6.) He also failed to protect the wound with "some type of gasket" to prevent infection. (Opp'n to City Defs.' Mot. 10; see also id. at 2 (stating that "the surgery was [sic] been left open").) As a result, his hand became infected "all

_____

[2] In opposition to the DOCCS Defendants' motion to dismiss, Tavares has submitted an affidavit (Dkt. No. 68, "Pl.'s Aff.") to which are attached as exhibits medical records documenting the care he received from Bellevue Hospital and from DOCCS. The DOCCS medical records were also attached to Tavares's original complaint (Dkt. No. 2). Tavares also previously submitted [*4] the Bellevue records as attachments to a "notice of motion" filed in response to an early motion to dismiss by the City Defendants that was subsequently withdrawn (Dkt. No. 58).

Although generally a court may not look outside the pleadings when reviewing a _Rule 12(b)(6)_ motion to dismiss, new factual allegations in a pro se plaintiff's opposition papers may be read as supplementing the allegations in the complaint, at least when they are consistent with them. See, e.g., _Vail v. City of N.Y.,  F. Supp. 3d , 2014 U.S. Dist. LEXIS 166925, No. 12-cv-5125(KMK), 2014 WL 6772264, at *12 (S.D.N.Y. Dec. 2, 2014)_; _Chukwueze v. NYCERS, 891 F. Supp. 2d 443, 448 (S.D.N.Y. 2012)_; _Donahue v. U.S. Dep't of Justice, 751 F. Supp. 45, 49 (S.D.N.Y. 1990)_. Accordingly, the Court will consider these medical records as though they were exhibits to the amended complaint. It will also consider new allegations consistent with the complaint that are contained in Tavares's opposition papers.

[3] The Bellevue medical records indicate instead that Tavares was discharged the morning following his surgery. (See Pl.'s Aff. Ex. 1.) Tavares claims that this is inaccurate, and that he was in fact discharged on the day of his surgery between 4 and 7 p.m. (Dkt. No. 58, at 3.) The time discrepancy is not material to the resolution of these motions.

the way up to elbow [sic], or further up to the arm" (Am. Compl. ¶ 6), and Tavares was readmitted to Bellevue on March 17. (Id. ¶ 7.) He stayed there until March 22, and was administered a course of antibiotics, which was necessary to avoid the amputation of his hand. (Id.) Tavares alleges that the doctor who administered the antibiotics, defendant Bartosz Grobelny, did not take any precautionary measures and failed to take into account Tavares's age and other medical conditions. (Id.)

During his stay at Bellevue, Tavares began to notice that he was losing his hearing. (Id. ¶ 8.) He informed the hospital staff, which ordered [*5] a hearing test. (Id.) He was discharged without being told his test results. (Id.) Tavares was then transferred out of DOC custody, to DOCCS's Downstate Correctional Facility. (Id. ¶ 9.) On July 7, he underwent an audiology test, which determined that he suffered from High Tone Hearing Impairment in both ears. (Id. ¶¶ 9, 10; Pl.'s Aff. Ex. 4 (Dkt. No. 68).). On July 15, Tavares saw defendant Dr. Lawrence Mieteles, an otolaryngology specialist, who noted that Tavares's hearing loss might be linked to noise exposure, since Tavares used to work in construction. (Am. Compl. ¶ 10; Pl.'s Aff. Ex. 5.). Tavares claims, however, that he never told Mieteles about his work in construction, and furthermore that he never worked with noisy machinery. (Am. Compl. ¶ 10.) He alleges that his hearing loss was in fact caused by "the excessive amount of antibiotic [sic] ordered by Defendant Dr. Bartosz Grobelny" (id. ¶ 9), and that Mieteles was attempting to "cover-up" the City Defendants' negligence in giving him these antibiotics. (Id. ¶ 10.) He further alleges that the other DOCCS Defendants, Dr. Nelson Muthra and Dr. Maryann Genovese, were "co-conspirator[s]" with Mieteles (Id. ¶ 11), because his medical records [*6] contain a written statement by Muthra that noise exposure caused Tavares's hearing loss (Pl.'s Aff. ¶ 8; Pl.'s Aff. Ex. 6), and Genovese "endorsed" that statement. (Pl.'s Aff. ¶ 9.)

Tavares filed this action on May 3, 2013 (Dkt. No.

2015 U.S. Dist. LEXIS 3815, *6

2), and filed the amended complaint on January 10, 2014. The City Defendants moved to dismiss on May 29. (Dkt. No. 55.) Mieteles and Muthra moved to dismiss on June 26 (Dkt. No. 60), and Genovese moved separately on September 10. (Dkt. No. 74.) As of December 3, all three motions were fully briefed.

LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)* (quoting *Bell Atlantic v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)).* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." Id. In assessing the complaint, the district court must draw all reasonable inferences in favor of the non-movant. *In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).* Legal conclusions and "[t]hreadbare recitals of the elements of a cause [*7] of action," however, are not entitled to any presumption of truth. *Iqbal, 556 U.S. at 678.*

Courts have a duty to construe a complaint filed by a pro se plaintiff liberally, conducting their examination with "special solicitude [and] interpreting the complaint to raise the strongest claims that it suggests." *Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011).*

DISCUSSION

I. *Section 1983* Claims

A. Claims against the City Defendants

1. Failure to Exhaust Administrative Remedies

The Prison Litigation Reform Act of 1995 ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under *[section 1983]*, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *42. U.S.C. § 1997e(a).* This exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002).* Furthermore, "[s]ection 1997e(a) requires 'proper exhaustion'—that is, 'using all steps that the agency holds out, and doing so properly.'" *Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011)* (quoting *Woodford v. Ngo, 548 U.S. 81, 90, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006)).*

In *Hemphill v. New York, 380 F.3d 680 (2d Cir. 2004),* however, the Second Circuit held that failure to exhaust administrative remedies may sometimes be excused.[4] This is the case: (1) if the administrative remedies [*8] were not in fact available to the prisoner; (2) if the defendants are estopped from raising non-exhaustion as an affirmative defense, because they failed to raise or preserve it, or because of their own actions inhibiting the inmate's exhaustion of remedies; or (3) if other "special circumstances" have been plausibly alleged that justify the prisoner's failure to exhaust. *Id. at 686.* One such "special circumstance" is when an inmate is transferred a short time after the grievable incident occurs to a correctional facility governed by a different governmental jurisdiction and a different grievance procedure. *Hartry v. Cnty. of Suffolk, 755 F. Supp. 2d 422, 433-34 (E.D.N.Y. 2010)* (collecting cases).

---

[4] The Second Circuit has since noted that Hemphill is in tension with Woodford's later holding that the PLRA requires "proper exhaustion." See *Amador, 655 F.3d at 102.* In the absence of any clear indication that Hemphill has been overruled, however, this Court will continue to treat it as good law. *McClinton v. Connolly, No. 13-CV-2375(KMW)(DCF), 2014 U.S. Dist. LEXIS 143450, 2014 WL 5020593, at *2 n.4 (S.D.N.Y. Oct. 8, 2014); Smith v. City of N.Y., No. 12 Civ. 3303(CM), 2013 U.S. Dist. LEXIS 144122, 2013 WL 5434144, at *9 (S.D.N.Y. Sept. 26, 2013).*

DOC provides a multi-step Inmate Grievance Resolution Program ("IGRP"), and the failure to make use of the IGRP constitutes failure to exhaust under the PLRA.[5] See, e.g., _Seabrook v. City of N.Y., No. 13-CV-6620(JPO), 2014 U.S. Dist. LEXIS 174207, 2014 WL 7176052, at *3 (S.D.N.Y. Dec. 16, 2014)_. Claims of deliberate indifference to medical needs, such as those Tavares brings here, [*9] are covered by the IGRP. See, e.g., _Harris v. Bowden, No. 03 Civ. 1617(LAP), 2006 U.S. Dist. LEXIS 12450, 2006 WL 738110, at *3 (S.D.N.Y. Mar. 23, 2006)_. Tavares concedes that he never filed a grievance in connection with the violations he alleges against the City Defendants. (Am. Compl. ¶ 20). He argues, however, that his failure to exhaust should be excused, because he was transferred out of DOC custody shortly after his claims against the City Defendants arose, and because he was misinformed about the scope of the IGRP.

First, Tavares alleges that he was transferred to a DOCCS facility on March 27, 2011, a mere five (according to the complaint) or six (according to the medical records submitted by Tavares) days after his second discharge from Bellevue, and argues that this should excuse his failure to exhaust. The City Defendants, however, dispute this version of events, claiming that Tavares did not leave DOC custody until June 17, 2011. [*10] They urge the Court to verify this through DOC's online inmate tracking system, and to take judicial notice of the information obtained therefrom. While a court deciding a motion to dismiss must generally accept the complaint's factual allegations as true, it is permitted to reject the truthfulness of those allegations when they are contradicted by matters of which judicial notice may be taken, such as

matters of public record. _Fowlkes v. Rodriguez, 584 F. Supp. 2d 561, 574 (E.D.N.Y. 2008)_; see also _Davison v. Ventrus Biosciences, Inc., No. 13 Civ. 3119(RMB), 2014 U.S. Dist. LEXIS 63038, 2014 WL 1805242, at *10 (S.D.N.Y. May 5, 2014)_ (rejecting allegations contradicted by public SEC filings); _Makowski v. United Bhd. of Carpenters & Joiners of Am., No. 08 Civ. 6150(PAC), 2010 U.S. Dist. LEXIS 77775, 2010 WL 3026510, at *2 n.4 (S.D.N.Y. Aug. 2, 2010)_ (rejecting allegations contradicted by the docket in another action). Courts in this district have taken judicial notice of information obtained from online inmate tracking services. See, e.g., _Tribble v. City of N.Y., No. 10 Civ. 8697(JMF), 2013 U.S. Dist. LEXIS 2954, 2013 WL 69229, at *1 n.1 (S.D.N.Y. Jan. 3, 2013)_; _Williams v. City of N.Y., No. 07 Civ. 3764(RJS), 2008 U.S. Dist. LEXIS 59932, 2008 WL 3247813, at *2 (S.D.N.Y. Aug. 7, 2008)_ (using DOCCS's tracking service).

Although the Court was unable to find Tavares on the DOC's website— presumably because he is no longer in DOC custody—a search of DOCCS's online inmate lookup service confirms that Tavares did not enter DOCCS custody until June 17, 2011.[6] In his opposition papers, Tavares does not respond to the City Defendants' argument and does not attempt to defend his original timeline, for instance by alleging that there was a gap between his time in DOC custody and his time [*11] in DOCCS custody. In light of this, the Court is constrained to reject Tavares's claim that he was transferred on March 27.[7] Although a transfer five or six days after the grievable incident might constitute a "special circumstance" excusing exhaustion, a transfer nearly three months later does not. See

_____

[5] The Court takes judicial notice of the IGRP, as courts in this district have regularly done. See _Myers v. City of N.Y., 11 Civ. 8525(PAE), 2012 U.S. Dist. LEXIS 123994, 2012 WL 3776707, at *4 n.6 (S.D.N.Y. Aug. 29, 2012)_ (collecting cases). The version of the IGRP that was in effect in 2011 is available at the DOC's website. See N.Y. City Dep't of Correction, Directive 3375R-A (effective from Mar. 13, 2008 to Sept. 10, 2012), available at _http://www.nyc.gov/html/doc/downloads/pdf/3375R-A.pdf_.

_____

[6] The service is available at _http://nysdoccslookup.doccs.ny.gov_.

[7] The City Defendants' account is bolstered by Tavares's own pre-motion letter to the Court, dated Feb. 11, 2014, in which he explains that during the three-month period before June 17, he made many trips to Bellevue and Elmhurst Hospitals (both facilities operated by HHC), was resentenced in court, and attended physical therapy. (Dkt. No. 39, at 2.) He claims that these comings and goings can be corroborated by DOC, rather than DOCCS, records.

*Burns v. Moore, No. 99-CV-0966(LMM)(THK), 2002 U.S. Dist. LEXIS 1036, 2002 WL 91607 (S.D.N.Y. Jan. 24, 2002)* (holding that the plaintiff's transfer two months after his claim arose did not excuse his failure to exhaust; *Miles v. Cnty. of Broome, No. 3:04-CV-1147, 2006 U.S. Dist. LEXIS 15482, 2006 WL 561247 (N.D.N.Y. Mar. 6, 2006)* (holding that exhaustion was not excused where the plaintiff was transferred sixteen, seventeen or eighteen days after the subject of his "primary gripes" occurred).

Tavares next claims, in his memorandum in opposition to the City Defendants' **[*12]** motion, that the grievance coordinator at GRVC and the law library officer at the Bellevue Hospital Ward both told him that they did not accept grievances on medical issues. The City Defendants characterize this as an estoppel argument, under Hemphill's second prong, and argue that it is applicable only against a defendant whose own actions inhibited the plaintiff from exhausting. See *Hemphill, 380 F.3d at 689* (suggesting that, "depending on the facts pertaining to each defendant, it is possible that some individual defendants may be estopped, while others may not be"). Because neither the grievance coordinator nor the law library officer is a defendant in this action, the defendants argue that estoppel does not apply.

But even if estoppel does not apply, the allegation that officials misinformed the plaintiff about the grievance procedure "may be relevant to an analysis of excuse on grounds other than estoppel." *Smith v. City of N.Y., No. 12 Civ. 3303(CM), 2013 U.S. Dist. LEXIS 144122, 2013 WL 5434144, at *11 (S.D.N.Y. Sept. 26, 2013)*. Specifically, "[a]n administrative remedy is not available, and therefore need not be exhausted, if prison officials erroneously inform an inmate that the remedy does not exist or inaccurately describe the steps he needs to take to pursue it." *2013 U.S. Dist. LEXIS 144122, [WL] at *16* (quoting *Medina v. Nassau Cnty. Sheriff Dep't, No. 11 Civ. 228 (JFB)(GRB), 2013 U.S. Dist. LEXIS 129114, 2013 WL 4832803, at *6 (E.D.N.Y. Sept. 10, 2013))*; **[*13]** see also

*Burgess v. Garvin, No. 01 Civ. 10994(GEL), 2004 U.S. Dist. LEXIS 4122, 2004 WL 527053, at *3 (S.D.N.Y. Mar. 16, 2004)* ("remedies are not available when prisoners are not informed of their existence"). In Smith, one plaintiff "was told that the grievance process was not available to him for this particular prison condition." *Smith, 2013 U.S. Dist. LEXIS 144122, 2013 WL 5434144, at *14*. The court concluded that remedies could not be deemed to be "available" to that plaintiff, and also that this might constitute a "special circumstance" excusing exhaustion. *2013 U.S. Dist. LEXIS 144122, [WL] at *17*. Just as in Smith, Tavares was allegedly told that the IGRP would not address his grievances because they pertained to medical issues. If proven, this would excuse Tavares's failure to exhaust remedies under the IGRP, under either the first or the third Hemphill prong. While Tavares provides little relevant factual detail, he does identify the officials who allegedly misinformed him; taking into account Tavares's pro se status, this is sufficient at the motion to dismiss stage. Accordingly, the Court concludes that Tavares's failure to exhaust remedies under the IGRP is excused, although the City Defendants will be at liberty to raise the issue at the summary judgment stage.

### 2. Failure to State a Claim

A plaintiff suing under *section 1983* must show that the defendants **[*14]** "deprived him of a right secured by the Constitution or laws of the United States." *Palmieri v. Lynch, 392 F.3d 73, 78 (2d Cir. 2004)*. In *Estelle v. Gamble, 429 U.S. 97, 104-05, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976)*, the Supreme Court recognized that deliberate indifference to a prisoner's serious medical needs violates the *Eighth Amendment's* prohibition against cruel and unusual punishment. This is the type of violation that underlies Tavares's *section 1983* claims against the City Defendants. To prevail on these claims, Tavares must prove an objective element and a subjective element. The objective element relates to the alleged deprivation suffered: Tavares must show that he "was actually deprived of adequate

medical care," and that "the inadequacy in medical care [was] sufficiently serious." *Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006)*. The subjective element relates to the City Defendants' state of mind: Tavares must show that they "acted with deliberate indifference to inmate health," i.e., that they "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm [would] result." *Id. at 280*. This standard is demanding—"the equivalent of criminal recklessness." *Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)*.

With the exception of Deutsch, Tavares's *section 1983* claims against the City Defendants fail because he has not adequately pleaded the subjective element against them. As an initial matter, Tavares does not allege that **[*15]** the City Defendants ignored his carpal tunnel syndrome or inordinately delayed treating it, nor does he allege that they lacked diligence in attending to his subsequent infection. Indeed, both the carpal tunnel syndrome and the infection were successfully treated. Tavares's medical records show that he returned to Bellevue for a follow-up visit on June 8, 2011. (Pl.'s Aff. Ex. 3.) In a letter to the Court dated February 11, 2014, Tavares also claims that between March and June 2011, he went "back and forht [sic] to Belleview [sic] Hospital and to Elmshurst [sic] Hospital," and also attended physical therapy three times per week. (Dkt. No. 39, at 2.) Rather than evincing deliberate indifference, this shows that Tavares received a sustained level of medical attention. See *Washington v. City of N.Y., No. 10 Civ. 389(LTS)(JLC), 2011 U.S. Dist. LEXIS 15257, 2011 WL 566801, at *2 (S.D.N.Y. Feb. 15, 2011)* (finding no deliberate indifference where the plaintiff was treated several times by doctors and was given painkillers); *Colon v. City of N.Y., No. 08 Civ. 3142(HB), 2009 U.S. Dist. LEXIS 43746, 2009 WL 1424169, at *8 (S.D.N.Y. May 21, 2009)* (finding no deliberate indifference where the plaintiff received significant medical attention for several months following his injury); *Brown v. Selwin, 250 F. Supp. 2d 299, 308 (S.D.N.Y. 1999)*

(finding no deliberate indifference where the plaintiff was treated on numerous occasions).

Tavares alleges that Grobelny **[*16]** was deliberately indifferent to known medical risks when he made choices about a particular treatment—the course of antibiotics—for him. He claims that, when Grobelny administered the antibiotics, he failed to take into account Tavares's age and to order tests that would have detected Tavares's diabetes, high blood pressure and chronic back problems. He alleges that these factors all made it more likely that the antibiotics would cause hearing loss. But it is well settled that "the question whether . . . additional diagnostic techniques . . . [are] indicated is a classic example of a matter for medical judgment," and that the decision not to order certain diagnostic tests "does not represent cruel and unusual punishment." *Estelle, 429 U.S. at 107*. Grobelny's decision not to order tests is understandable because he was faced with an emergency situation: an infection which, if left untreated, could lead to the amputation of Tavares's hand. When faced with an emergency, members of prison staff do not violate the *Eighth Amendment* unless they act "maliciously and sadistically for the very purpose of causing harm." *Wilson v. Seiter, 501 U.S. 294, 302, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991)* (quoting *Whitley v. Albers, 475 U.S. 312, 320-21, 106 S. Ct. 1078, 89 L. Ed. 2d 251 (1986))*; see also *Salahuddin, 467 F.3d at 280* (noting that the deliberate indifference standard applies to "medical-treatment cases not arising **[*17]** from emergency situations"). Nothing in Tavares's allegations raises the inference that Grobelny acted with anything approaching criminal recklessness, let alone malice and sadism, when he administered the antibiotics.

Tavares has not adequately and plausibly alleged that any of the City Defendants were deliberately indifferent in connection with the handcuffing episode. The transportation officers who handcuffed Tavares without regard to his recent wrist surgery are not defendants in this action. Moreover, "the doctrine of respondeat superior

cannot be used to establish liability under *Section 1983*." *Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999)*. Because Curtis, a Vice President at HHC, and Warden Scott were not personally involved in the decision to handcuff Tavares, the officers' alleged deliberate indifference cannot be attributed to them. Finally, Tavares does not allege that Deutsch was aware of the risk that the officers would handcuff him: in fact, he claims that it "is not a protocol" to handcuff a prisoner who has a wounded hand. (Opp'n to City Defs.' Mot. 11.) Because deliberate indifference in this context requires showing that the defendant was actually aware of the risk he allegedly disregarded, see *Salahuddin, 467 F.3d at 280*, Tavares has not plausibly [*18] alleged that Deutsch was deliberately indifferent when he failed to direct the officers not to handcuff Tavares.

Construing his submissions liberally, however, Tavares has successfully alleged the subjective element with respect to Deutsch's actions upon discharging him after his surgery. Tavares claims that Deutsch disregarded the fact that Tavares suffered from type-2 diabetes and was thus at higher risk of infection, and that Deutsch discharged him early and failed to take necessary precautions to protect the wound, because Tavares was needed in court for resentencing. (Opp'n to City Defs.' Mot. 9-10.) Tavares alleges that the failure to protect the wound was no mere oversight, because Deutsch represented to him "that there was no problem to leave the surgery that way." (Id. at 2.) Tavares thus alleges that Deutsch knew of Tavares's heightened susceptibility to infection, and consciously disregarded it by prioritizing the scheduled resentencing over Tavares's medical needs. The allegation that a physician chose to give less efficacious treatment for reasons not deriving from medical judgment can support a deliberate indifference claim. See *Chance v. Armstrong, 143 F.3d 698, 703-04 (2d Cir. 1998)* (holding that the plaintiff had alleged deliberate [*19] indifference where the defendant chose a type of treatment based on monetary incentives); *Stevens v. Goord, 535 F. Supp. 2d 373, 388 (S.D.N.Y. 2008)*

("judgments that have no sound medical basis . . . and appear designed simply to justify an easier course of treatment . . . may provide the basis of a[n Eight Amendment] claim").

Tavares has also plausibly alleged that he received inadequate care, based on Deutsch's failure to protect his wound. The extent of the inadequacy is not clear from Tavares's submissions. In the amended complaint, Tavares simply states that the wound was left "unbandage[d]." (Am. Compl. ¶ 16.) He elaborates in his opposition papers, stating that "the surgery was [sic] been left open" (Opp'n to City Defs.' Mot. 2), faulting Deutsch for "not protecting the hand with some type of gasket in order for the open wound not to get infected" (id. at 10), and referring to "a newly open wound." (Id. at 10.) Nevertheless, and although a reference to sutures in the Bellevue medical records conflicts with the suggestion that Tavares was discharged before his surgical wound was even closed (see Pl.'s Aff. Ex. 2), Tavares has at the very least alleged that Deutsch failed to dress or bandage the wound, or to put Tavares's wrist in a splint. At this stage in this litigation, the [*20] Court cannot conclude as a matter of law that this constituted adequate medical care. See *Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003)* (stating that "the failure to provide treatment for an otherwise insignificant wound may violate the *Eighth Amendment* if the wound develops signs of infection, creating a substantial risk of injury in the absence of appropriate medical treatment"). Accordingly, Tavares has successfully alleged a deliberate indifference claim against Deutsch based on the failure to protect his wound. He has not alleged, however, that it is unreasonable to discharge a patient who underwent carpal tunnel surgery, even one with type-2 diabetes, a few hours after the operation. Thus, the portion of his claim premised on the time of his discharge from Bellevue is dismissed.

Tavares's claim against HHC, a municipal organization, fails because he has not satisfied the requirements of *Monell v. Department of Socal*

*Services, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)*. In that case, the Supreme Court held that a municipal organization may be held liable under *section 1983* only if the plaintiff's injury is the result of municipal policy, custom, or practice. *Id. at 694*. It may not be held liable solely "by application of the doctrine of respondeat superior." *Pembaur v. City of Cincinnati, 475 U.S. 469, 478, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)*. Generally, "a single incident alleged in a complaint, especially if it involved **[\*21]** only actors below the policy making level, does not suffice to show a municipal policy." *DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998)*. Tavares has not alleged any facts suggesting that Deutsch's failure to protect his wound was anything other than an isolated incident. He does not allege that HHC has a policy, or even an informal understanding, requiring doctors to prioritize patients' court appearances over their medical needs. Nor does he allege that HHC management had actual or constructive notice that doctors frequently did this, and failed to act to remedy the problem. See *Connick v. Thompson, __ U.S. __, 131 S. Ct. 1350, 1360, 179 L. Ed. 2d 417 (2011)*. With respect to the transportation officers (who the Court assumes arguendo violated Tavares's rights and were HHC employees), Tavares alleges that they were acting in violation of protocol, as noted earlier. Accordingly, the claim against HHC must be dismissed.

To summarize, Tavares has not successfully alleged the subjective element of his deliberate indifference claim against any of the individual City Defendants besides Deutsch, and accordingly, his *section 1983* claims against them must be dismissed. His claim against HHC is dismissed for failure to show a municipal policy, custom, or practice. His claim against Deutsch survives, however, but only insofar as **[\*22]** it is premised on Deutsch's failure to bandage or otherwise protect Tavares's wound following the carpal tunnel surgery.

B. Claims against the DOCCS Defendants

Tavares alleges that the DOCCS Defendants conspired to cover up the City Defendants'

wrongdoing in causing him to develop hearing loss, by fabricating a false reason for that hearing loss. Tavares does not allege that he was at any point after he was transferred to a DOCCS-run facility.[8] His claims against the DOCCS Defendants are thus best understood as *section 1983* "cover-up" and conspiracy claims. The DOCCS Defendants argue that these claims should be dismissed because Tavares failed to exhaust the administrative remedies provided by the DOCCS's grievance resolution program, but the Court need not address that argument, because Tavares has not adequately stated the claims.

In a *section 1983* claim alleging a cover-up by government agents, the constitutional right at issue is the *First Amendment* right of access to courts: the theory is that the cover-up has made it impossible for the plaintiff to litigate an underlying claim, because material evidence was destroyed, for instance, or because the statute of limitations expired before the plaintiff discovered the cover-up. See *Christopher v. Harbury, 536 U.S. 403, 413-14, 122 S. Ct. 2179, 153 L. Ed. 2d 413 & n.11 (2002)* (describing these claims as "backward-looking access claims"). The Second Circuit has emphasized, however, that "[t]he viability of [such] claims is far from clear," pointing out that the Harbury decision was careful not to endorse their validity. *Sousa v. Marquez, 702 F.3d 124, 128 (2d Cir. 2012)*.

_____

[8] In his submission in opposition to the DOCCS Defendants' motion, Tavares claims that the DOCCS Defendants delayed issuing him hearing aids, and that this delay constituted cruel and unusual punishment violating the *Eighth Amendment*, as well as a violation of the Americans with Disabilities Act ("ADA"). (Opp'n to DOCCS Defs.' Mot. 15-16; see also Pl.'s **[\*23]** Aff. ¶¶ 17-19.) A plaintiff, however, "may not amend his complaint to add new claims by raising them for the first time in his motion papers." *Ifill v. N.Y. State Court Officers Ass'n, 655 F. Supp. 2d 382, 393 (S.D.N.Y. 2009)* (citing *Wright v. Ernst & Young LLP, 152 F.3d 169, 178 (2d Cir.1998))*. Accordingly, the Court will not consider these claims, but notes that in any event, the ADA claim fails, because "[i]ndividuals cannot be named as defendants in ADA suits in either their official or representative capacities." *Carrasquillo v. City of N.Y., 324 F. Supp. 2d 428, 441 (S.D.N.Y. 2004)*.

Nevertheless, even assuming backward-looking access claims are actionable, Tavares's fails. "[S]uch claims are available only if a judicial remedy was 'completely foreclosed'" by the alleged cover-up. *Id.* (quoting **[*24]** *Broudy v. Mather, 460 F.3d 106, 120, 373 U.S. App. D.C. 170 (D.C. Cir. 2006))*. Tavares has not alleged that the DOCCS Defendants' actions prevented him from litigating his underlying *Eighth Amendment* and state-law medical malpractice claims against the City Defendants—indeed, he is bringing those very claims in this action. Moreover, although the City Defendants argue that Tavares's malpractice claim is time-barred (City Defs.' Br. 21-22), Tavares does not allege that the allegedly false statements made by the DOCCS Defendants caused him to delay bringing the claim. In fact, he does not allege that he ever believed the DOCCS Defendants' contention that his hearing loss was caused by noise exposure. Finally, to the extent Tavares claims that the allegedly falsified medical records make it more difficult for him to prove his malpractice case *now*, the claim still fails, because

> a plaintiff who has knowledge of the facts giving rise to his claim and an opportunity to rebut opposing evidence does have adequate access to a judicial remedy. If a governmental official is lying, for instance, the plaintiff can attempt to demonstrate the falsity of the official's statements through discovery and argument before the court. The point of the backward-looking right of access recognized by **[*25]** other circuits is to ensure that plaintiffs have that opportunity—not to convert every instance of deception by a governmental witness into a separate federal lawsuit.

*Sousa, 702 F.3d 124, 128-129* (emphasis in original). Here, none of the DOCCS Defendants' actions foreclosed Tavares's opportunity to argue that the medical records did not accurately state the cause of his hearing loss. Thus, his "cover-up" claim under *section 1983* must be dismissed.[9]

The conspiracy claim fares no better. A *section 1983* conspiracy claim must allege "(1) an agreement between two or more state actors . . . ; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson, 200 F.3d 65, 72 (2d Cir. 1999)*. "[C]omplaints containing only conclusory, vague, **[*26]** or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed." *Ciambriello v. Cnty. of Nassau, 292 F.3d 307, 325 (2d Cir. 2002)* (quoting *Dwares v. City of N.Y., 985 F.2d 94, 100 (2d Cir. 1993))*. Specifically, a complaint "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003)* (discussing conspiracies under *42 U.S.C. § 1985*).

Tavares's allegations do not meet this standard. The amended complaint simply reads: "Defendants Dr. Nelson Muthra, and MD Maryann Genovese went even further in trying to cover-up the Defendants at Belleview Hospital by stating that Plaintiff hearing loss was indeed due to working in construction with heavy equipments without any facts to support their statement, making Dr. Muthra and MD Genevese co-conspirator by trying to support or endorced Defendant Dr. Lawrence Meiteles medical report" (sic). (Am. Compl. ¶ 11.) Tavares thus jumps directly from the DOCCS Defendants' separate statements to the conclusion that they were

---

9 In his submission in opposition to the DOCCS Defendants' motion,

Tavares attempts to rebut these arguments by claiming that the DOCCS Defendants violated *18 U.S.C. § 1035(a)(2)*, which forbids making "materially false, fictitious, or fraudulent statements . . . in connection with the delivery of . . . health care . . . services." *Section 1035*, however, is a criminal statute, for which there is no private right of action. *Hankins v. Super. Ct., No. 1:12-cv-01740-LJO-SKO, 2014 U.S. Dist. LEXIS 18636, 2014 WL 584311, at *3-4 (E.D. Cal. Feb. 12, 2014)*; *McCray v. U.S. Postal Serv., No. 10-30171-MAP, 2011 U.S. Dist. LEXIS 153516, 2011 WL 7429503, at *4 (D. Mass. Nov. 15, 2011)*, adopted, *2012 U.S. Dist. LEXIS 23486, 2012 WL 612509 (D. Mass. Feb. 24, 2012)*; *Slovinec v. Ill. Dep't of Human Servs., No. 02 C 4124, 2005 U.S. Dist. LEXIS 44523, 2005 WL 442555, at *7 n.7 (N.D. Ill. Feb. 22, 2005)*.

conspiring together. "Merely to assert that a conspiracy occurred, however, does not suffice. Rather, [Tavares] must allege specific facts that, if taken as true, make it plausible that [*27] the DOCCS Defendants] had some agreement or understanding . . . to commit the alleged constitutional violations." *Bermudez v. City of N.Y., No. 11 Civ. 750(LAP), 2013 U.S. Dist. LEXIS 20371, 2013 WL 593791, at *8 (S.D.N.Y. Feb. 14, 2013)* (dismissing a conspiracy claim where the plaintiff alleged that the defendants "conferred and agreed not to pursue" certain evidence, "agreed not to disclose" certain information, and "actively conspired to suppress the actual events"). This the complaint does not do, and while Tavares's affidavit submitted in opposition to the DOCCS Defendants' motion gives slightly more details about Muthra's statement and Genovese's endorsement, it, too, fails to put forward any facts supporting the inference that the DOCCS Defendants acted in concert. Accordingly, Tavares's conspiracy claim must be dismissed as well.

## II. State-Law Claims

The complaint can plausibly be read as alleging medical malpractice against the City Defendants. That claim, however, is time-barred, and must be dismissed. Actions for personal injuries against HHC must be brought no more than one year and ninety days after the cause of action accrues. N.Y. Unconsol. Laws § 7401(2). The same time limitation applies to claims against employees of New York City agencies and of HHC. *N.Y. Gen. Mun. Law § 50-k(6)*; N.Y. Unconsol. Laws § 7401(6) ( [*28] defining HHC to be an "agency" for the purposes of *N.Y. Gen. Mun. Law § 50-k*). In New York, a medical malpractice claim accrues on the date when the alleged negligent act occurred. *N.Y. C.P.L.R. 214-a.* Tavares's claim thus accrued, at the latest, on March 22, 2011, when he was discharged from Bellevue following his course of antibiotics. Because this action was filed on May 3, 2013, more than two years later, it is untimely.

Tavares resists this conclusion, arguing that he attempted to file a medical malpractice action in state court on May 22, 2012, which, unbeknownst to him, was never docketed. [the Court is unaware of any rule under which this circumstance would toll the statute of limitations. In New York, courts may not toll statutes of limitations in the interest of justice, except under explicit statutory authority. *N.Y. C.P.L.R. 201*; *Ali v. Moss, 35 A.D.3d 640, 641, 827 N.Y.S.2d 260 (2d Dep't 2006)* ("the courts, in general, have no inherent power to extend a period of limitations in the interest of justice"). New York law provides that when an action is timely commenced and is then terminated "because of some error pertaining neither to the claimant's willingness to prosecute in a timely fashion nor to the merits of the underlying claim," *George v. Mt. Sinai Hospital, 47 N.Y.2d 170, 178-79, 390 N.E.2d 1156, 417 N.Y.S.2d 231 (1979)*, the plaintiff may commence a new action within [*29] six months after the termination, even if the new action would otherwise be untimely. *N.Y. C.P.L.R. 205(a).* In Tavares's case, however, it appears that his state-court action was never actually commenced. Tavares also appears to argue that the City Defendants should be estopped from asserting a statute of limitations defense, because the state court and the New York City Comptroller's Office failed to process his paperwork for commencing his state-court lawsuit while giving him the impression that the lawsuit had been properly commenced. Equitable estoppel is only applicable, however, "where it is the defendant's affirmative wrongdoing . . . which produced the long delay between the accrual of the cause of action and the institution of the legal proceeding." *Putter v. N. Shore Univ. Hosp., 7 N.Y.3d 548, 552, 858 N.E.2d 1140, 825 N.Y.S.2d 435 (2006)* (quoting *Zumpano v. Quinn, 6 N.Y.3d 666, 673, 849 N.E.2d 926, 816 N.Y.S.2d 703 (2006)*) (emphasis added); see generally *Working v. Amity Estates, Inc., 2 N.Y.2d 43, 53, 137 N.E.2d 321, 155 N.Y.S.2d 633 (1956)* ("To constitute estoppel, the person sought to be estopped must do some act or make some admission with an intention of influencing the conduct of another." (quoting

*N.Y. Rubber Co. v. Rothery, 107 N.Y. 310, 316, 14 N.E. 269, 12 N.Y. St. 53 (1887))* (ellipsis and quotation marks omitted)). Because none of the defendants are alleged to have played any role in Tavares's failure to commence his state-court action, estoppel cannot apply against them.

Finally, whatever state-law claims Tavares **[*30]** may have against the DOCCS Defendants must be dismissed, because they may not be brought in federal court. State-law claims for damages against DOCCS employees within the scope of their employment must be brought in the New York Court of Claims as claims against New York State. *N.Y. Corr. Law § 24(2)*; *Baker v. Coughlin, 77 F.3d 12, 14-16 (2d Cir. 1996)*. Tavares does not dispute that this rule applies to the DOCCS Defendants.

CONCLUSION

For the foregoing reasons, the DOCCS Defendants' motions to dismiss the complaint are GRANTED, and the City Defendants' motion to dismiss is GRANTED with respect to all of the City Defendants except for Deutsch. The motion is DENIED with respect to Tavares's claim against Deutsch based on Deutsch's alleged failure to protect his surgical wound.

Counsel for the defendants shall provide the plaintiff with copies of all unreported decisions cited herein.

SO ORDERED.

Dated: New York, New York

January 13, 2015

/s/ P. Kevin Castel

P. Kevin Castel

United States District Judge